**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph Rudolph Wood, III,<br><br>        Plaintiff,<br><br>vs.<br><br>Charles L. Ryan, et al.,<br><br>        Defendants. | No. CV-14-1447-PHX-NVW (JFM)<br><br>**ORDER** |

Before the Court is the Motion for Preliminary Injunction or Temporary Restraining Order filed by Plaintiff Joseph Rudolph Wood III. (Doc. 11.) Wood seeks an injunction requiring Defendants to disclose certain information about the drugs, drug protocol, and personnel that will be involved in his execution, which is set for July 23, 2014. (*Id.*) Briefing on the motion was completed on July 8, 2014. (Docs. 15, 16.) The Court heard oral argument on July 9, 2014.

This order states the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(2). For the reasons that follow, Wood's motion will be denied.

**BACKGROUND**

The Court has considered the pleadings and exhibits. Based on these documents, the Court finds that the following facts are undisputed.

On April 22, 2014, the State moved for a warrant of execution. That same day, Jeffrey A. Zick, Chief Counsel of the Capital Litigation Section of the Office of the Arizona Attorney General, sent a letter to Wood's counsel informing them that the Arizona Department of Corrections intends to use a two-drug protocol consisting of midazolam and hydromorphone to execute Wood. (Doc. 119, Ex. A.) Zick also stated that if "ADC is able to procure pentobarbital, ADC will provide notice of its intent to use that drug." (*Id.*)

A warrant of execution was issued on May 28, 2014.

The current execution protocol, found in Department Order 710, and effective March 26, 2014, calls for the use of 50 mg of midazolam and 50 mg of hydromorphone. It also provides for one-drug protocols using pentobarbital or sodium pentothal. (*See* Doc. 11, Ex. I.)

Between April 30 and June 6, 2014, the parties exchanged a series of letters. On April 30, Wood's counsel sent Defendant Ryan a letter requesting information about the provenance of the midazolam and hydromorphone and asking for an explanation of the Department of Corrections' continuing search for pentobarbital. (*Id.*, Ex. B.) Counsel also sought information about the Drug Enforcement Administration qualifications of

the personnel who would participate in Plaintiff's execution asked Ryan to explain how the Department of Corrections determined the midazolam and hydromorphone dosages in its protocol and asked why the amounts of midazolam and hydromorphone differ from the amounts required in the State of Ohio's lethal-injection protocol. (*Id.*)

On May 6, Ryan replied to the April 30 letter. (*Id.*, Ex. F.) He declined to provide further information about the drugs, based on the Department of Corrections' interpretation of Arizona's executioner-confidentiality statute, A.R.S. § 13-757(C). (*Id.*) However, he avowed that the drugs are "domestically obtained" and "FDA approved." (*Id.*) Ryan further noted that the Department of Corrections continued to look for pentobarbital and would inform Plaintiff's counsel if it obtained the drug. (*Id.*) Ryan declined to provide specific information about the Drug Enforcement Administration qualifications of the execution personnel, but stated that "the qualifications of the IV team as set forth in Department Order 710.02-1.2.5 have not changed since the ADC amended the protocol in September, 2012, to include assurances of the IV team's qualifications." (*Id.*) He also indicated that the development of the Department of Corrections' two-drug protocol was based on affidavits and testimony in Case No. 2:11-CV-1016, in the Southern District of Ohio. (*Id.*)

On May 9, Woods counsel sent a follow-up letter seeking clarification and requesting specific Ohio documents referenced in Ryan's letter. (*Id.*, Ex. C.) Counsel again asked for the qualifications of the medical professionals who would participate in

Wood's execution, as well as evidence demonstrating that the Department of Corrections had verified those qualifications. (*Id.*)

On May 15, Wood's counsel sent another letter, again asking for the Drug Enforcement Administration and medical qualifications, along with information about the development of the Department of Corrections' two-drug protocol. (*Id.*, Ex. D.) Counsel also requested documents pertaining to correspondence with various state departments of corrections and federal agencies. (*Id.*)

On June 6, Ryan sent Wood's counsel a response. (*Id.*, Ex. G.) Ryan provided redacted copies of purchase orders, invoices, and order confirmations for the midazolam and hydromorphone. (*Id.*) The documents display the drug names and expiration dates—September and October 2015. (*Id.*) Information about the manufacturers and suppliers of the midazolam and hydromorphone was redacted. (*Id.*) Ryan also avowed that the Inspector General had verified the qualifications of the medical professionals on the IV team; in the event that a central femoral line was used, it would be placed by a person currently licensed or certified to do so. (*Id.*) Defendant Ryan declined to provide copies of the Ohio documents, asserting that because the Federal Public Defender's Office was involved in the Ohio litigation, Wood's counsel would have access to the documents. (*Id.*)

On June 26, Wood and plaintiffs Graham S. Henry, David Gulbrandson, Todd Smith, Charles M. Hedlund, and Eldon Schurz filed a civil rights complaint alleging

three claims: a violation of their First Amendment right of access to the courts (Claim One), a violation of their First Amendment right of access to governmental proceedings (Claim Two), and a Supremacy Clause violation based on the Department of Corrections' alleged failure to follow the Food, Drug, and Cosmetics Act in adopting its lethal-injection protocol. (Claim 3). (Doc. 1.)

On June 28, 2014, Wood received final notice from the Department of Corrections stating that his execution would be carried out using the midazolam and hydromorphone two-drug protocol. (Doc. 16, Ex. M.)

On July 1, 2014, Wood filed his motion for a preliminary injunction. (Doc. 11.)

**DISCUSSION**

Wood seeks the following information: the source(s), manufacturer(s), National Drug Codes (NDCs), and lot numbers of the drugs Defendants intend to use in his execution; non-personally-identifying information detailing the medical, professional, and controlled-substances qualifications and certifications of the personnel Defendants intend to use in his execution; and information and documents detailing the manner in which Defendants developed their lethal-injection drug protocol. (Doc. 11 at 1.) The motion is based solely on Claim Two, alleging that Defendants' refusal to provide the information violates Plaintiff's right of access to governmental proceedings. (*See id.* at 9; Doc. 16 at 2 & n.2.)

I.  **APPLICABLE LAW**

    A.  **Standard for Injunctive Relief**

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). An injunction may be granted only where the movant shows that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Beardslee v. Woodford*, 395 F.3d 1064, 1067 (9th Cir. 2005). Alternatively, under the Ninth Circuit's "serious questions" version of the sliding-scale test, a preliminary injunction is appropriate when a plaintiff demonstrates that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citation omitted). This approach requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset a weaker showing of another.

In the context of a capital case, the Supreme Court has emphasized that these principles apply when a condemned prisoner asks a federal court to enjoin his impending execution. "Filing an action that can proceed under § 1983 does not entitle

the complainant to an order staying an execution as a matter of course." *Hill v. McDonough,* 547 U.S. 573, 583–84 (2006). Rather, "a stay of execution is an equitable remedy" and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.* at 584; *see Beardslee*, 395 F.3d at 1068.

**B.**     **First Amendment Right of Access to Governmental Proceedings**

"Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." *Houchins v. KQED*, 438 U.S. 1, 15 (1978) (plurality opinion). The Supreme Court "has never intimated a First Amendment guarantee of a right of access to all sources of information within government control." *Id.* at 9; *see McBurney v. Young*, 133 S. Ct. 1709, 1718 (2013) ("This Court has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA laws.").

There is, however, a First Amendment right of public access to governmental proceedings. In *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 873–74 (9th Cir. 2002), the Ninth Circuit explained that "[i]t is well-settled that the First Amendment guarantees the public—and the press—a qualified right of access to governmental proceedings." *See Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 8–14 (1986) *("Press- Enterprise II")*; *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603–11 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980).

The right of access is premised on "the common understanding that 'a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.'" *Globe Newspaper,* 457 U.S. at 604 (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

Whether the public has a First Amendment right of access to particular governmental proceedings is informed by two "complimentary considerations": (1) "whether the place and process have historically been open to the press and general public" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8–9.

In *California First Amendment Coalition*, the Ninth Circuit noted that under its precedent the right of access extends to a "broad range of criminal proceedings" and "documents filed therein." 299 F.3d at 874 (citation omitted). Based on these principles, the court concluded that the press and the public have a First Amendment right to view execution proceedings from the moment the condemned enters the execution chamber to the time he is pronounced dead. *Id.* at 885–86. The court reasoned as follows:

> Independent public scrutiny—made possible by the public and media witnesses to an execution—plays a significant role in the proper functioning of capital punishment. An informed public debate is critical in determining whether execution by lethal injection comports with "the evolving standards of decency which mark the progress of a maturing society." To determine whether lethal injection executions are fairly and humanely administered, or whether they ever can be, citizens must have reliable information about the "initial procedures," which are invasive, possibly painful and may give rise to serious complications. This information is best gathered first-hand or from the media, which serves as

> the public's surrogate. Further, "public access . . . fosters an appearance of fairness, thereby heightening public respect for the judicial process." Finally, public observation of executions fosters the same sense of catharsis that public observation of criminal trials fosters. . . . Accordingly, the same functional concerns that drove the Court to recognize the public's right of access to criminal trial proceedings compel us to hold that the public has a First Amendment right to view the condemned as he enters the execution chamber, is forcibly restrained and fitted with the apparatus of death.

*Id.* at 876 (citations omitted).

## II. ANALYSIS

Wood contends that he is likely to succeed on the merits of Claim Two, alleging a violation of his right of access to governmental proceedings under the First Amendment. The Court disagrees.

Plaintiff relies principally on *Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668 (D.Ariz. Oct. 7, 2013), and *California First Amendment Coalition*. (Doc. 11 at 10–12.) *California First Amendment Coalition* did not address a right of access to documentary information about lethal injection drugs, the development of lethal injection protocols, or the qualification of the execution team. In *Schad*, however, the court relied on *California First Amendment Coalition* to grant relief on the plaintiff's claim of First Amendment right of access to government proceedings. The court required Defendants to disclose the manufacturer, NDCs, lot numbers, and expiration dates of the lethal injection drugs. The court found that the plaintiff had a right to the drug information because historically executions have been open events and

public access to the drug information plays a significant positive role in the functioning of capital punishment. The court stated that "the public must have reliable information about the lethal injection drugs themselves in order to judge the propriety of the particular means used to carry out an execution." *Id.*, at *5.

For the reasons discussed next, the Court reaches a different result in this case.

Since the ruling in *Schad*, two courts have addressed similar claims of First Amendment right of access to pre-execution state records and information. Both courts cited *California First Amendment Coalition* but denied the First Amendment claims. In *Owens v. Hill*, --- S.E.2d ----, 2014 WL 2025129 (Ga. 2014), the Supreme Court of Georgia rejected the inmate's claim of a First Amendment right of access to information concerning the identity of the drug manufacturer. The court cited the test formulated in *Press-Enterprise II* and applied in *California First Amendment Coalition* and concluded that "[e]ven adopting the extravagant view that the acquisition of execution drugs is a government process subject to this test, we still conclude that Hill's claims fail to satisfy either of these elements"—*i.e.*, whether access had been granted historically and whether public access would play a positive role in the functioning of the process. *Id.*, at *10.

In *Wellons v. Commissioner, Georgia Dept. of Corrections*, --- F.3d ----, 2014 WL 2748316, at *6 (11th Cir. 2014), a decision issued June 17, 2014, the Eleventh Circuit rejected an inmate's claim that the State's failure to provide information about

the drugs to be used in his execution violated his First Amendment right of access to governmental proceedings. The district court denied the inmate's motion for injunctive relief. It "agreed with Defendants that while there may be First Amendment implications involved in the openness of government operations, the cases Wellons relies upon [including *California First Amendment Coalition*] turn on the public's, rather than the individual's, need to be informed so as to foster debate." *Id.* The Court of Appeals agreed, explaining:

> We agree with the judgment of the district court. Neither the Fifth, Fourteenth, or First Amendments afford Wellons the broad right "to know where, how, and by whom the lethal injection drugs will be manufactured," as well as "the qualifications of the person or persons who will manufacture the drugs, and who will place the catheters." . . . Wellons has not established a substantial likelihood of success on the merits of his claim that the dearth of information regarding the nature of the pentobarbital that will be used in his execution and the expertise of those who will carry it out violates the First Amendment or his right to due process. This ground is also a sufficient basis to conclude that the district court did not abuse its discretion in concluding that Wellons is not entitled to injunctive relief on these claims.

*Id.*, at \*6 (quotation omitted).

Having reviewed the cases cited by both parties, particularly *California First Amendment Coalition*, the Court concludes that the First Amendment does not provide a right to access to the specific information Wood seeks. The question addressed in *California First Amendment Coalition* was "whether the public has a First Amendment right to *view* executions." 299 F.3d at 873 (emphasis added). In answering that question, the court noted that "[t]he public and press historically have been allowed to watch the

11

condemned inmate enter the execution place, be attached to the execution device and then die." *Id.* at 876. By contrast, Wood has cited no authority for the proposition that the press and general public have historically been granted access to information identifying of the manufacturer of lethal-injection drugs. To the extent that the Department of Corrections has disclosed such information to civil rights plaintiffs in the past, it has been pursuant to court order, as in *Schad*, or during discovery, as in *West v. Brewer*, No. 2:11-CV-1409-NVW.

Plaintiff also argues that information identifying the manufacturer of the lethal injection drugs is necessary to the public debate about the death penalty. The Court is not persuaded. Given the information that has already been disclosed, including the type of drug, the dosage to be used, and the expiration dates, as well as the fact that the drugs are domestically-obtained and FDA-approved, access to the additional information sought by Plaintiff would not "play[] a significant positive role in the functioning" of the death penalty. *California First Amendment Coalition*, 299 F.3d at 875 (quoting *Press-Enterprise II*, 478 U.S. at 8). The available information is sufficient for an "informed public debate." *Id.* at 876.

Finally, in contrast to the record considered by the court in *Schad*, there are not significant questions about the reliability of the information disclosed by the Arizona Department of Corrections. 2013 WL 5551668, at *2. For example, there are not

concerns that the lethal injection drugs are expired or obtained from a foreign source. *Shad*, 2013 WL 5551668, at *2.

The holding in *California First Amendment Coalition* does not extend a First Amendment right to information identifying the drug manufacturer in this case. That case specifically addressed a public right to view the execution process. That principle does not expand to encompass a First Amendment right to compel the government to disclose information about execution drugs beyond that already provided here.

The same analysis applies to the other categories of information Wood seeks. The Department of Corrections has stated that the qualifications of its execution team personnel have not changed since prior litigation, *Towery v. Brewer*, No. 2:12-CV-245-NVW, and that it developed its two-drug protocol based on declarations and testimony in the Ohio litigation. (Doc. 11, Ex. F.) Declining to provide additional information does not violate the First Amendment.

In addition, the undisclosed information does not have the practical import necessary to warrant a preliminary injunction even if there were a theoretical basis for it. At oral argument, Wood could not articulate any particular significance to the identity of the drug manufacturer beyond an abstract right to the information and its purported usefulness to public debate. (*See* Doc. 19 at 9–11.) The usefulness of the identity of the manufacturer to public debate on the death penalty is attenuated. The real effect of requiring disclosure, however, is to extend the pressure on qualified

13

suppliers not to supply the drugs, as has happened in the past. *See Landrigan v. Brewer*, 625 F.3d 1132, 1143 (9th Cir. 2010) (Kozinski, C.J., dissenting from denial of rehearing en banc). That purpose carries no weight in favor of compelled disclosure by the equitable remedy of a preliminary injunction. Indeed, the weight it carries is against disclosure. The state has a legitimate interest in getting the drugs from legal sources, which would be impeded by disclosure of the source. (*Id.*)

Next, the specific qualifications of the execution personnel is of little significance because the protocol states the levels of qualification needed and there is no challenge to the Defendants' assertion that those qualifications have been met. Also, the detail of information Wood requests might in fact become "identifying" information. That result is only a possibility on this sparse record. But the possibility alone weighs against disclosure when nothing specific weighs in favor.

Finally, the manner in which the Department of Corrections developed its protocol is less important than the protocol itself. The protocol must withstand constitutional scrutiny if challenged, however it was arrived at. Wood does not challenge the substance of the protocol on this motion. The absence of specific, articulated value of the information to Wood cuts against suspension of the state court processes to get it.

/ / /

/ / /

**CONCLUSION**

For the reasons set forth above, Plaintiff's claim of First Amendment right of access to governmental proceedings is not likely to succeed on the merits, not for the ends to which it is asserted here. *Winter*, 555 U.S. at 20. Nor are there serious questions going to the merits of the claim. *Cottrell*, 632 F.3d at 1135.

Under *Winter* or the Ninth Circuit's sliding-scale test, "if a plaintiff fails to show that he has some chance on the merits, that ends the matter." *Developmental Services Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011) (citing *Global Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1058 (9th Cir. 2007)); *see Doe v. Reed,* 586 F.3d 671, 681 n.14 (9th Cir. 2009) ("Because we conclude that Plaintiffs have failed to satisfy the first *Winter* factor—likelihood of success on the merits—we need not examine the three remaining *Winter* factors.").

Therefore, Wood has not "*by a clear showing*, carried the burden of persuasion" on his motion for a preliminary injunction. *Mazurek*, 520 U.S. at 972.

**IT IS THEREFORE ORDERED** that Plaintiff Wood's Motion for Preliminary Injunction or Temporary Restraining Order (Doc. 11) is **DENIED.**

Dated this 10th day of July, 2014.

_____
Neil V. Wake
United States District Judge