1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3    _____

4    Joseph Rudolph Wood III, et    )
     al.,                           )
5                                   ) No.  **CV 14-1447-PHX-NVW**
                        Plaintiffs, )
6    vs.                            )
                                    )      **Phoenix, Arizona**
7    Charles L. Ryan, et al.,       )      **October 29, 2014**
                                    )         **1:38 p.m.**
8                                   )
                        Defendants. )
9    _____

10

11        BEFORE:  **THE HONORABLE NEIL V. WAKE, JUDGE**

12

13                       (*Status Conference*)

14

15

16

17

18

19

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
     Sandra Day O'Connor U.S. Courthouse, Suite 312
22   401 West Washington Street, SPC 43
     Phoenix, Arizona 85003-2151
23   (602) 322-7256

24   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription

25

```
1    APPEARANCES

2    For the Plaintiffs:

3            FEDERAL PUBLIC DEFENDER'S OFFICE
             By:  Dale A. Baich, Esq.
4            By:  Robin C. Konrad, Esq.
             850 W. Adams Street
5            Suite 201
             Phoenix, AZ 85007

6
             SIDLEY AUSTIN LLP
7            By:  Mark E. Haddad, Esq.
             By:  Collin P. Wedel, Esq.
8            By:  Amanda V. Lopez, Esq.
             555 West Fifth Street
9            Suite 4000
             Los Angeles, CA 90013

10
     For the Defendants:
11
             OFFICE OF THE ATTORNEY GENERAL
12           By:  Jeffrey A. Zick, Esq.
             By:  Jeffrey L. Sparks, Esq.
13           By:  Matthew H. Binford, Esq
             By:  Lacey S. Gard, Esq.
14           1275 W. Washington
             Phoenix, AZ 85007
15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE COURTROOM DEPUTY:  This is Civil Case 2014-1447, Joseph Rudolph Wood, et al., versus Charles L. Ryan, et al. This is the time set for a status conference.

Counsel, please announce for the record.

MR. BAICH:  Dale Baich and Robin Konrad from the Federal Public Defender's Office on behalf of the prisoner plaintiffs.

MR. HADDAD:  Mark Haddad from Sidley Austin, along with colleagues Collin Wedel and Amanda Lopez, counsel for the First Amendment Coalition of Arizona and for the prisoner defendants -- prisoner plaintiffs.

MR. BINFORD:  Good afternoon, Your Honor.  Matthew Binford for the defendants.  With me at counsel table is Jeff Zick, Lacey Gard, and Jeff Sparks, also from the Attorney General's Office.

THE COURT:  All right.  Good afternoon, counsel.  I set this status conference because I want to have some input from counsel about how best to proceed in this case, both procedurally and about identifying and resolving questions that have to be resolved.  And I thought of just entering an order for some briefing, but then I thought, no, I would benefit having input from you before having you do briefing on anything.  So that's my purpose of talking today.

And let me tell you what may be the obvious things

13:38:17

13:38:33

13:38:52

13:39:18

13:39:45

```
 1    that are on my mind.  As I indicated in the order that I filed,

 2    I see a threshold issue of ripeness and case or controversy.

 3    And I want to ask for a bit of information about that from the

 4    defendants.  Have the defendants -- do you have an idea as to

 5    when you will have the next execution and how it will be done?      13:40:12

 6            So I guess, Mr. Binford, or whoever would like to

 7    respond.

 8            MR. BINFORD:  Sure, Judge.  I will give you an update

 9    on the status of the State's lethal injection protocol.

10            THE COURT:  Could you come up to the podium, please?      13:40:26

11            MR. BINFORD:  Absolutely, Judge.

12            As you may or may not have heard, the governor

13    requested a review which is currently underway.  The director

14    decided that an independent review would be best and an outside

15    consulting firm was hired to conduct that review.  The director     13:40:43

16    and his executive staff have been walled off from that review,

17    and the Department's inspector general has been providing any

18    documentation that the firm needs to conduct --

19            THE COURT:  Who is the firm that is conducting that

20    review?                                                              13:41:00

21            MR. BINFORD:  I do not have the name of the firm in

22    front of me, but I can get it for you before we're done here

23    today.

24            THE COURT:  Well, it's all right.  Go ahead.

25            MR. BINFORD:  The report is expected to come out in       13:41:07
```

1    mid-November.  That report, once it's finished, will go to the

2    governor.  The director will then review any recommendations

3    that are made in that report, and he will make decisions as to

4    what the next steps will be at that point.  It is possible that

5    the lethal injection protocol could change based on                13:41:26

6    recommendations made in that report.

7         And as you mentioned in your order, there are no

8    current warrants for execution set at this time, and the State

9    would not request any warrants for execution until after this

10   process is complete, the review is out and whether any          13:41:40

11   amendments will be made to the protocol.

12        THE COURT:  So I'm sure no one is in a position to

13   make any firm commitment about any timetable, but it's sounding

14   like there's really no prospect of any decision making from the

15   defendants until next year.  Does that sound reasonable?        13:42:12

16        MR. BINFORD:  I would say that's accurate.  There's

17   also the elections coming up, so it's not clear whether or not

18   certain executive staff members will be in their same positions

19   in the new year.  But if everything goes as planned, we should

20   have a report by mid-November they have been conducting         13:42:29

21   interviews.  They have interviewed several people.  Some people

22   have refused to provide interviews and so it's taken a little

23   longer.  But mid-November is the date right now.

24        THE COURT:  And I'm going to ask some questions that

25   you may have the same answer, which is you don't know, but I do  13:42:45

```
 1    want to be thorough.  Does the State have the drugs for the
 2    two-drug protocol on hand?
 3              MR. BINFORD:  The State does have the drugs for the
 4    midazolam/hydromorphone protocol.
 5              THE COURT:  Does the State have the drugs for any          13:43:08
 6    other protocol on hand?
 7              MR. BINFORD:  I don't know the answer to that
 8    question.
 9              THE COURT:  I would assume not because of the Wood
10    execution, as I recall, was stated that the midazolam and          13:43:19
11    hydro -- say it again.
12              MR. BINFORD:  Hydromorphone.
13              THE COURT:  -- hydromorphone would be used unless the
14    other drugs could be found, which did not happen.
15              MR. BINFORD:  And at that point in time, those were      13:43:34
16    the only two drugs that were available.
17              THE COURT:  Does the state realistically foresee any
18    prospect of obtaining any other drugs?
19              MR. BINFORD:  It's not clear at this point.
20              THE COURT:  So I'm looking at this thinking that it       13:44:07
21    seems likely, and we can't prejudge anything, but it seems
22    likely that the State is not going to be in a position to
23    proceed with any executions unless they proceed with the
24    current two-drug protocol, correct?
25              Well, you can't commit to anything.  I guess I'm more    13:44:38
```

1    thinking out loud than asking a question.

2         And with the experience with the Wood execution --

3    well, there seems to be a great deal of uncertainty, to put it

4    in great understatement.

5         MR. BINFORD:  I agree, Your Honor.  I think after the        13:45:08

6    review comes out the director will be in a better position to

7    make some decisions and use information from that review to

8    make any changes to the protocol, if necessary.

9         THE COURT:  Mr. Baich, I assume that if the State

10   elects to proceed with the current protocol again that there       13:45:28

11   will be prompt and vigorous challenge to the Eighth Amendment

12   substance of that, correct?

13        MR. BAICH:  Yes, Your Honor.

14        THE COURT:  Well, thank you very much.

15        And this comes back to the threshold question I posed,       13:45:54

16   and that is do we even have a case or controversy that warrants

17   the use of the federal judicial power.  And this would go both

18   to the plaintiffs who are the prisoners on death row and to the

19   press plaintiffs.  We can't litigate what has to be disclosed

20   until we know what has been disclosed.  And the State can't        13:46:28

21   disclose anything until they know what they are going to do.

22        Before I move on to my next subject, is there anything

23   either side wanted to add for my benefit with respect to that

24   threshold question?

25        Yes, Mr. Haddad.                                              13:46:47

1          MR. HADDAD:  Thank you very much, Your Honor.  It's

2    Mark Haddad for both the First Amendment Coalition, the press

3    plaintiff, and also for the individual plaintiffs, prisoner

4    plaintiffs.  And thank you for accommodating my schedule today.

5          I would like to directly address the threshold                    13:47:13

6    question that Your Honor has raised.  Reading over your Your

7    Honor's order and listening to Your Honor this afternoon, it

8    sounds like the core issue that is troubling the Court is given

9    that we don't know today precisely what the protocol will be

10   the next time there's a warrant for an execution, do we have      13:47:37

11   something to litigate.  And I would suggest we have something

12   to litigate that's ripe that's certainly not moot in any way

13   for two broad reasons.

14          The first is that the claims that we have raised --

15          THE COURT:  Let me interrupt you just for a minute to      13:48:01

16   say, my thought is we're talking about how to proceed and what

17   to brief, so I haven't asked for briefing.  So I want to hear

18   whatever anyone has to say.  But this -- I see this as a

19   threshold discussion.

20          MR. HADDAD:  Yes.                                          13:48:17

21          THE COURT:  Go ahead.

22          MR. HADDAD:  No, I understand.  And to just try to

23   make it crisp for the Court, our claims are, in many respects,

24   entirely independent of any changes the State may make to its

25   protocol.                                                         13:48:34

1          THE COURT:  What if the State never does another

2     execution with these two drugs?  How is it ripe then?

3          MR. HADDAD:  The protocol, the protocol very well may

4     change and say, you know, we're going to use a different drug

5     going forward.  We're going to use pentobarbital.  But we          13:48:48

6     learned from the Wood execution that the State is entirely

7     unconstrained by the written protocol and by the

8     representations that the State makes in the federal courts.

9     The State was under an injunction, a stay, issued by the Ninth

10    Circuit at the time it went to the United States Supreme Court,   13:49:13

11    the day before Mr. Wood was executed.  And it told the United

12    States Supreme Court that there was no need for that stay, that

13    it should lift that stay because the plaintiff and the public

14    knew the exact dosages and drugs that would be used in the

15    execution.  That was 24 hours before the execution in which the   13:49:34

16    State faced a decision --

17         THE COURT:  You want to litigate for the future based

18    on the past conduct when there's every reason to think that new

19    decisions are very likely to be made.

20         MR. HADDAD:  Well, but the new decisions will not          13:50:00

21    place the State under any injunction not to deviate.

22         THE COURT:  Well, how can we say without knowing until

23    they have made a decision and told you what they are going to

24    tell you and told you what they are not going to tell you?  It

25    sounds like the ultimate and hypothetical adjudication.          13:50:15

1          MR. HADDAD:  Well, for example, a prisoner plaintiff

2     today, Mr. Hedlund, Mr. Henry, any of the five, today has no

3     protection if, for example, let's say that the State says we're

4     going to use pentobarbital or some other drug that they can get

5     access to.  Well, what happens if the first administration of       13:50:38

6     that dose, per the protocol, doesn't work?  Under the Wood

7     precedent they can just change in the middle of the execution

8     without notice to anybody.  They could bring in the midazolam

9     and the hydromorphone that they had and just pick up with that.

10          We will show, if we're allowed to proceed, that they        13:51:00

11     had no basis in prior experience, prior medical history, to be

12     confident or expect that the additional dosages of these two

13     drugs that they pushed simultaneously without notice to anyone,

14     would lead to something other than a lingering death or would

15     -- excuse me, Your Honor, accidents can happen -- or would not    13:51:28

16     result in air hunger or other pain and suffering that is

17     incompatible with a properly administered execution protocol.

18          And that judgment that was made in the midst of this

19     execution is entirely ripe for litigation now, both under the

20     First Amendment and under the Eighth and Fourteenth Amendments.   13:51:57

21     And there's a second reason, and then I'd like to just briefly

22     address the briefing at a minimum that this Court would need.

23     But there's a second reason why litigation is ripe now.

24          As things stand, the State is under an obligation to

25     preserve for use in this litigation all of the communications    13:52:24

1   that occurred concerning the decision to use midazolam and

2   hydromorphone and all the communications that occurred during

3   the execution itself when it was observed that the State public

4   information officer and others were communicating, whether by

5   e-mail or text message, in real time.  And the press did not          13:52:46

6   have access to any of those communications.  It still doesn't

7   have access to them.  The counsel for the condemned prisoner

8   certainly had no access.  All of that is preserved as well as

9   all the information about the drugs used in the execution,

10  their history, their labeling, whether they were stored               13:53:09

11  properly.  All of that information is currently subject to a

12  litigation hold in this case.

13          Were this Court to dismiss this case, the State would

14  no longer have any obligation enforceable in this court to

15  preserve the evidence.  So that is a second independent reason        13:53:28

16  for the Court to allow this to go forward.  All of that is

17  buttressed by the extreme difficulty of trying to litigate

18  serious and important constitutional issues of the nature that

19  the Wood experience in particular raises under the very

20  confined timelines that waiting for a warrant to issue imposes.       13:53:53

21          THE COURT:  Well, I will come to that in a minute.  I

22  kind of want to break this discussion into parts.  And right

23  now I want to talk about whether we have a case or controversy

24  now.  But hold on.  Don't leave.

25          But Mr. Baich, are any of your clients, were their           13:54:20

1    crimes before 1992 such that they would be subject to the

2    election of the gas chamber instead of --

3            MR. BAICH:  Yes, Your Honor.

4            THE COURT:  But then nobody would choose the gas

5    chamber, would they?  They would choose --                    13:54:43

6            MR. BAICH:  The prisoners have historically decided

7    not to choose, and under the statute the default method is

8    lethal injection.

9            THE COURT:  And if the State decides that in light of

10   experience the midazolam and hydromorphone is not something   13:55:01

11   that they want to defend the use of it, or if they elect to do

12   it, and you all persuade this Court that it doesn't meet Eighth

13   Amendment standards, and the State can't get any pentobarbital,

14   there's no way to execute anyone, is there?

15           MR. HADDAD:  The State has yet, certainly not today,   13:55:30

16   taken any position that it's abandoning the use of midazolam

17   and hydromorphone.  Everything that I heard from the State

18   today is that that is the presumptive approach in place.

19           THE COURT:  I think that's what the protocol says.

20   But my question poses to you where we are if they decide to    13:55:51

21   abandon that or if they decide they can't defend it, or they

22   try to defend it and do not succeed.  Then there's no way to

23   execute anyone unless they can get some pentobarbital, right?

24           MR. HADDAD:  You know, Your Honor, quite candidly, I

25   have not canvassed all the different methods available to the  13:56:15

1    State.

2        THE COURT:  Or maybe they will have to go back to

3    scratch and come up with an entirely new protocol with some

4    totally different combination of drugs or drug that we don't

5    know about yet.  That -- I suppose that would be a possibility.    13:56:29

6        MR. HADDAD:  What I would say, Your Honor, on that is

7    that in this lawsuit, we are litigating the public's right to

8    know how the State arrives at its decisions, what its decisions

9    are, and has a right to have reasonable constraints placed on

10   the State so the representations --                                13:56:58

11       THE COURT:  But let's suppose the hypothesis I just

12   posed comes to pass.  Even Mr. Baich will have defeated the

13   death penalty in Arizona for the indefinite future, won't you?

14   There's nothing to disclose if no one gets scheduled for

15   execution.                                                         13:57:16

16       MR. HADDAD:  Well, actually, Your Honor, there is,

17   because if the Court looks, for example, at the *Globe*

18   *Newspapers versus Superior Court* decision of the United States

19   Supreme Court, it makes clear that the fact that an event has

20   passed does not moot the, certainly, the press 's interest and,  13:57:34

21   we would argue as well, the public, an individual member of the

22   public's interest, in knowing what happened at an event of

23   public importance.  So the Ninth Circuit and the Supreme Court,

24   we think, are very clear that press interest and access to

25   information in particular, but also we would argue that the       13:57:59

1    public and an individual's interest who is personally affected,

2    those rights to information do not evaporate with the passing

3    of an event.  And that's particularly true --

4         THE COURT:  Well, all of the current -- well, I guess

5    what I posed to you is the prospect of the plaintiffs achieving        13:58:16

6    complete victory against the death penalty in Arizona.  So

7    what's wrong with victory?

8         MR. HADDAD:  Your Honor, if -- I would suggest to Your

9    Honor that that outcome is more speculative than the one that

10   we are concretely facing and the one that occurred to Mr. Wood,        13:58:40

11   which is the experimentation in the process of the execution of

12   carrying out the protocol changes, as happened with Mr.

13   Beatty's execution in the drug to be used 18 hours before the

14   execution, one day before the execution as in the case of Mr.

15   Moormann.  There's a long history which Your Honor is more            13:59:04

16   familiar with probably, I'm sure, than I or most anyone in

17   Arizona is.

18        THE COURT:  I think this is my third lethal injection

19   case.

20        MR. HADDAD:  Exactly, Your Honor.  So I don't -- you           13:59:15

21   know, Your Honor is well aware of that history.  And I think

22   when you combine that history with what happened with Mr. Wood,

23   the issue of a lack of transparency, a lack of accountability

24   to the protocol is exceptionally timely, is not moot, and

25   unless -- and even if the State were to come to you today, Your       13:59:38

1  Honor, and say, you know what, Your Honor?  We have decided

2  we're never going to use midazolam.  We have written it out of

3  our protocol.  We have written hydromorphone out, written that

4  combination out.  If they are not bound by a court order, if

5  they are not enjoined from coming back to them, then they are          13:59:57

6  free to go back to them even in the midst, even the day before,

7  18 hours before the execution, during the execution as we

8  learned from Mr. Wood.  They can change back to it at any time

9  without accountability to the public, without an individual

10  condemned prisoner having the opportunity to take the discovery        14:00:22

11  and build the case for why that entire procedure of that entire

12  combination should be ruled unconstitutional.

13         We heard this afternoon that there are individuals in

14  the State who are refusing to cooperate with the external

15  investigation that the State has ordered.  Who knows where         14:00:42

16  those individuals will be when the time comes perhaps in a

17  constrained 20-day process to figure this out.

18         THE COURT:  We're going to talk about that next, the

19  time frames of resolution.

20         Go ahead.                                                   14:01:03

21         MR. HADDAD:  Well, I was just, to finish that thought,

22  so we know where they are today.  We can, if they continue to

23  refuse to cooperate in the course of discovery, on the claims

24  that the State has not moved to dismiss, we have six claims in

25  this case that the State has not moved to dismiss.  So as the        14:01:19

```
 1    case stands before Your Honor, we have stated facially valid
 2    claims that should go forward to see if facts can be developed
 3    to support them as they have been pleaded, and there's no
 4    reason not to proceed with that.  And there are good reasons
 5    not to put a stop to it, because the risk of the loss of          14:01:47
 6    evidence, whether it's text messages, whether it's labeling and
 7    history of the drugs used, whether it's interviews with key
 8    witnesses, all of that is subject to disappear.
 9          THE COURT:  All right.  I want to hear anything
10    anybody has to say before I get to my next issue, which is the    14:02:09
11    timing of future litigation.
12          Is there anything briefly you wanted to say in
13    response, Mr. Binford?
14          MR. BINFORD:  Judge, I just want to respond to a few
15    things that Mr. Haddad said and then discuss a few issues on      14:02:26
16    case or controversy.
17          First of all, the individual I mentioned that has
18    refused to comply with the investigation or participate in the
19    independent review is Mr. Baich.  Mr. Baich was a witness at
20    Mr. Wood's execution, and he was the individual I was referring   14:02:42
21    to that has not participated with the independent review
22    process.  So that --
23          THE COURT:  I assume you have been careful in your
24    requests not to get close to any attorney/client matters.
25          MR. BINFORD:  As far as I understand, there's been a        14:02:57
```

```
 1    flat out denial to provide any information.

 2              In regard to your hypothetical --

 3              THE COURT:  Is there anyone else who is refusing to --

 4    I don't want to use any emotionally ladened words here -- who

 5    is not participating?                                        14:03:20

 6              MR. BINFORD:  There's been a request for him to

 7    provide a statement and he has not provided one.

 8              THE COURT:  Is he the only person who is not

 9    cooperating with the investigation?

10              MR. BINFORD:  As far as I know.  I would have to speak  14:03:31

11    with our client.

12              THE COURT:  Mr. Zick, do you know?

13              MR. ZICK:  Just perhaps a member of the press.  Other

14    than that, no.

15              THE COURT:  Go ahead.                              14:03:50

16              MR. BINFORD:  In regards to your hypothetical

17    situation, if this Court finds that the State -- you know, the

18    use of midazolam and hydromorphone was an Eighth Amendment

19    violation and we weren't able to obtain any more drugs, the

20    only way to go forward with the execution would be to change  14:04:05

21    the state constitution.  It would be a pretty lengthy process.

22              THE COURT:  Actually, help me out on that.  And I

23    didn't do all the homework on this.  But I guess my background

24    assumption is that the Department could adopt a new protocol

25    with some other drug we don't know about now, and that that    14:04:22
```

1    would not require a change in the state constitution.  Is that
2    correct?
3              MR. BINFORD:  That's my understanding.
4              THE COURT:  But there is no such drug on the table
5    now?                                                              14:04:32
6              MR. BINFORD:  Not that I'm aware of.
7              THE COURT:  All right.
8              MR. BINFORD:  And the three current drugs in the
9    protocol right now, there's the hydromorphone and midazolam
10   combination; there's the sodium thiopental, and there's also     14:04:42
11   the pentobarbital.  Those are the three drugs in the current
12   protocol.
13             Our position is there's no case or controversy in
14   regard to Claims 4 through 9.  We believe those claims are
15   premature and speculative given the fact that no warrants have   14:04:57
16   been issued, and that there's a strong chance the protocol
17   could be changed after the independent review.
18             In *Texas versus United States*, the Supreme Court said
19   that a claim is not ripe for adjudication if it rests on
20   contingent future events that may not occur as anticipated or    14:05:12
21   indeed may not occur at all.  And I think that goes to your
22   line of thinking out loud that you have been doing here today,
23   Judge.
24             Specifically in the death penalty context, the Supreme
25   Court discussed ripeness in *Stewart v. Martinez-Villareal*, and   14:05:28

1  there it held that an inmate's competency challenge was

2  properly dismissed as unripe because his execution was not

3  imminent, and therefore his competency to be executed could not

4  be determined at that time.  The court held that the inmate's

5  claim was unquestionably ripe only after it was clear that he          14:05:45

6  would have no federal habeas relief for his conviction or death

7  sentence, and that the Arizona Supreme Court had issued a

8  warrant for his execution.

9         More specifically, the Ninth Circuit in *Poland v.*

10 *Stewart* held that an inmate's Eighth Amendment challenge to          14:05:59

11 Arizona's method of execution was not ripe because he had not

12 made a decision between lethal gas and lethal injection at that

13 point.

14        THE COURT:  But if he doesn't affirmatively express a

15 choice, the default is the lethal injection, correct?                  14:06:13

16        MR. BINFORD:  That's correct.  And that's really an

17 analogy here because there are several different drugs that

18 could be used under the current protocol, and if changes are

19 made to the protocol there may be more options.  So it would

20 really be a waste of this Court's resources to go through and          14:06:29

21 litigate an issue and make an Eighth Amendment determination on

22 midazolam and hydromorphone if those drugs aren't going to be

23 used in the future.

24        In regards to Claims 1, 2, and 3, those claims should

25 just be dismissed pursuant to Rule 12(b)(6).                           14:06:46

1          THE COURT:  Well, but I can't do that without deciding

2     whether there's a case or controversy that warrants the use of

3     the federal judicial power.  So that's the threshold question

4     I'm discussing with you all and that I'm sure we'll have to

5     have briefing on.                                           14:07:04

6          But all right.  Anything else on that?

7          MR. BINFORD:  No.  Thank you, Judge.

8          THE COURT:  All right.  Let me shift the next --

9          MR. BAICH:  Your Honor, if I may.

10         THE COURT:  I thought you were deferring to Mr.         14:07:18

11    Haddad.  You may.

12         MR. BAICH:  Just a point of clarification to Mr.

13    Binford's statement about my refusal to cooperate.  As the

14    Court is aware, the Office of the Federal Public Defender is

15    part of the judiciary, and as such, *Touhy* regulations apply to  14:07:33

16    our office.  When the letter was received, Mr. Sands sent a

17    letter to the inspector general advising the IG that *Touhy*,

18    T-O-U-H-Y, applies, then there are certain questions that

19    needed to be addressed by the inspector general.  We have not

20    heard back from the inspector general's office.  So that's     14:08:03

21    where that matter stands.

22         THE COURT:  Well, no one should take any comfort or

23    concern about what I'm about to say, but it seems that your

24    dealings, Mr. Baich, and of your office, would have all been

25    with the Department, and they would know everything that you    14:08:24

1   communicated or did.  And to the extent there may be an inquiry

2   of things not known to them, it might be a challenge to see how

3   it would matter for their inquiry.

4        But that's just a thought off the top of my head.

5        Let me shift to the next subject, which is, it is        14:08:42

6   related, and that is, this is the background of this problem

7   that happened in Wood and happened in the other cases in our

8   court, several of which I presided over, and that is the issue

9   of the manner in which the State proceeds forces crisis

10  litigation burdening all the parties and the Courts to proceed   14:09:15

11  differently, or to proceed the way things have been done,

12  risks -- if this Court intervenes, it risks -- intervenes too

13  late, risks disrupting the proceedings of the Arizona Supreme

14  Court, specifically its warrant of execution, which has a time

15  limit on it.                                                     14:09:47

16       This way of proceeding also, as a practical matter,

17  has affected the standards of adjudication and appellate

18  review.  And they are effectively diluted by proceeding through

19  a preliminary injunction procedure.  It results in any ruling

20  this court may make being reviewed on appeal for abuse of        14:10:17

21  discretion rather than with a full merits standard of review.

22  And all of this comes from the timing and the manner in which

23  these executions have been done.  And again, that does appear

24  to be closely related to the question of whether there's case

25  or controversy.                                                  14:10:44

 1           So I wanted to put this out again.  Well, I will call

 2    for briefing so everyone can have any say they want, but I

 3    welcome preliminary thoughts on how to proceed.  The

 4    difficulties, Mr. Haddad, that you complain about are, I think,

 5    caused by that.  So one way to proceed with this is to end                14:11:11

 6    existing process in which it is not until right before or about

 7    the time of seeking a warrant of execution that the disputes

 8    are firmed up, whether it's a dispute about what has been

 9    disclosed and what has not been disclosed, or substantive

10    Eighth Amendment challenges to the protocol or multiple                   14:11:46

11    protocols that may be used.

12           And if things did not proceed in that fashion then

13    there would be prompt but orderly ways to proceed so disputes

14    can be determined to both be ripe and firm and be resolved in a

15    way that reaches whatever merits need to be reached.                      14:12:15

16           Now, a couple of obvious thoughts occurs to how that

17    change in process might come about.  One way would be for, I

18    guess, the plaintiffs to seek for the Court to consider what

19    would amount to a preliminary injunction setting a more orderly

20    time frame in which the State must decide what protocol it is            14:12:51

21    actually going to use and demonstrate to the satisfaction of

22    the Court that it's a firm resolve and not just a hypothetical

23    question to be adjudicated here and then negotiated with the

24    Court of Appeals in oral argument, which has happened before,

25    and a firm decision about the substance of what will be                  14:13:15

1    disclosed and what not.  I think I have commented on this in

2    the past in this or other cases.

3          So we could proceed in a non-consensual way to address

4    that, but I think the plaintiffs would have to seek that.  And

5    if that question, the question of how to proceed in a way that          14:13:38

6    does not undercut the ability of the Court to decide the merits

7    of disputes has a separate ripeness analysis to it from the

8    substance of what is sought.

9          So if that were pursued and the Court were so

10   persuaded, the Court might enter a preliminary injunction that          14:14:07

11   sets some kind of a schedule.  The thing that is of great

12   concern is respect for the proceedings of the state courts.

13   And once the Arizona Supreme Court has issued a warrant of

14   execution with a time limit there, that's what creates the

15   crisis litigation.                                                       14:14:30

16         One way to proceed would be to enjoin the State from

17   seeking a warrant of execution until its met those ripeness

18   issues and firmness issues, firm decision, having the drugs on

19   hand that are going to be used, maybe even restraining the

20   State against changing the drugs from what has been put on the          14:14:54

21   table and presumably adjudicated to be constitutional and the

22   way it's going to be done.  That would be one way to proceed on

23   it.

24         And if -- another way to proceed, which is similar to

25   that, is just wait and see what happens for the next warrant of         14:15:18

1  execution and when it is sought and granted then we come in and

2  address the question of timing and ripeness that may then

3  result in a preliminary injunction that sets a schedule that

4  simply cannot accommodate the times for the warrant of

5  execution.  That will defeat the warrant of execution but at          14:15:41

6  least we'll know we have a controversy if the State elects to

7  proceed in that fashion and the plaintiffs persuade the Court

8  that the standards for a preliminary injunction are met.

9  Really it's a preliminary injunction to allow orderly effective

10 adjudication to protect the ability of the Court to decide the       14:16:02

11 matters before it.  It does seem that that would necessarily

12 mean enjoining the execution and defeating at least would what

13 would be the first writ of execution.

14       Maybe another way to come at this, which is -- may be

15 not all that different from the second way, is I could direct        14:16:29

16 counsel to confer about all this, and one possibility would be

17 that the State decides that it will proceed on a pace that

18 involves decision making and disclosure enough in advance of

19 seeking a writ of execution that, with diligence, the matter

20 can be litigated before the writ is sought or at least issued.       14:17:01

21       The state might find it to be in its interest to agree

22 to something like that.  And if the State did not, again, it

23 would default back to the second option, which is they don't do

24 that, they seek the writ, I am presented with a motion for

25 preliminary injunction to give an effective time frame to           14:17:27

1      litigate.

2              So I'm thinking out loud about problems and possible

3      ways to respond to them.  But having been through this now

4      three times, I'm open to the question of seeing to that we --

5      that we do not have crisis litigation again that seriously          14:18:09

6      risks impairing this Court's ability to adjudicate these

7      matters and unquestionably impairs the appellate court's

8      ability.

9              So, well, those are my thoughts, and I don't really

10     expect anyone to commit to anything.  I lay this out because       14:18:39

11     these are on my mind.  I do invite counsel if they want to

12     respond to any of that, and again, this is a preliminary -- a

13     status conference, a discussion preliminary to what would be

14     formal briefing.  And the decision making that would be made

15     first would be concerning scheduling of briefing and scheduling    14:19:06

16     of issues, nothing substantive, and scheduling within the

17     framework we are now in which is that the State has no

18     executions planned and no method settled upon.  But that would

19     not necessarily preclude the timing issues that I am concerned

20     about.                                                             14:19:35

21             So I guess the plaintiffs always get to speak first,

22     so if there's anything you want to say, Mr. Haddad, go right

23     ahead.  And you don't really have to say anything.

24             MR. HADDAD:  I will be brief, Your Honor.

25             But I think it would be of assistance to both the          14:19:47

1    second issue and the first issue for me to call the Court's

2    attention to Claim 7 of our complaint because we believe Claim

3    7 actually focuses directly on this litigation via crisis

4    issue.  And we have presented that as, in fact, a violation of

5    the due process clause and the rights of the individual                14:20:18

6    plaintiff prisoners to have their ability to be heard on these

7    issues and to challenge them in a full way vindicated.  And so

8    it's relevant, obviously, for that reason to the issues that

9    the Court just raised.  It's also relevant to the case or

10   controversy issue because our complaint tees things up.                14:20:47

11             THE COURT:  If we do proceed and the Court is

12   persuaded -- either the parties agree or the Court is persuaded

13   to some procedure and scheduling matter along those lines, it

14   would seem to assure, it would assure, that there is ample

15   opportunity to effectively litigate the merits of anything that        14:21:09

16   does arise, even things that we don't -- we can't say with

17   confidence now will arise.  But we would be assured that we

18   could deal with them if they arise.

19             MR. HADDAD:  You know, that's an interesting question,

20   Your Honor.  If the result of this litigation were to be an           14:21:32

21   injunction on the State setting forth how it would -- what

22   notice it would give and so forth, that would certainly address

23   some of our concerns.  But whether it would address all of them

24   I'm doubtful, although I want to obviously think about it and

25   brief it for Your Honor.                                               14:22:02

1          THE COURT:  I'm not asking anybody to commit to

2     anything.  I'm just having a discussion.

3          MR. HADDAD:  Right.  I mean, I feel as though we have

4     serious concerns about our ability to -- if the State, for

5     example, adheres as seems currently likely to midazolam and          14:22:17

6     hydromorphone as at least one of its options, if not its sole

7     option, I question our ability effectively to litigate it if we

8     lose this chance now to learn what we can from what happened in

9     the Wood execution.  I think that's extremely important to

10    being able to evaluate any future protocol that would include          14:22:42

11    those drugs or that wouldn't affirmatively bar the State from

12    reverting back to those drugs, you know, to lose the evidence

13    and the opportunity to understand what happened to Mr. Wood and

14    how it happened and why.

15         THE COURT:  Do you really think they are going to try          14:23:02

16    to go forward again with midazolam and hydromorphone after the

17    experience not just -- well, their experience is the most

18    dramatic.

19         MR. HADDAD:  One would hope not, Your Honor, but for

20    reasons Your Honor suggested, which I didn't hear and I don't          14:23:18

21    think the State's in a position to dispute today, they may feel

22    that that is their best option.

23         So I think we're a long way away from not having a

24    live controversy.  Our individual plaintiffs are on death row.

25    Some of them have exhausted their habeas challenges.  The State          14:23:41

 1   has them in custody.  The State has not taken away their death

 2   sentence.  We look forward to briefing why their claims are

 3   ripe.

 4          THE COURT:  But if we do proceed along one of those

 5   branches that I have just outlined, by hypothesis everything          14:24:03

 6   may go away and everything will be subject to very effective

 7   litigation, which almost certainly would include an injunction

 8   against any issued writ of execution simply because the time

 9   frame for the writs are too short for effective litigation if

10   we don't start until about then.                                     14:24:31

11          MR. HADDAD:  Well, if it's the case that we're --

12          THE COURT:  Actually, we don't enjoin the writ, we

13   enjoin the execution.

14          MR. HADDAD:  Enjoin the execution.  If we're then in a

15   posture where we're litigating a preliminary injunction then         14:24:47

16   we're facing the same challenges of effective appellate review

17   that Your Honor --

18          THE COURT:  Well, I think the Court is fully able to

19   project in all of those times to any preliminary injunction

20   schedule that might be ordered.                                      14:25:02

21          So --

22          MR. HADDAD:  But in terms of the standard of review,

23   Your Honor, I was just referring to that issue if we're working

24   in the preliminary injunction framework.

25          THE COURT:  Well, good point.  Good point.  And we --         14:25:13

1    well, in these public law litigations, we often proceed on an

2    accelerated way that gets to decision on the merits with the

3    discovery that's needed and a decision that's subject to the

4    usual appellate review.

5            All right.                                              14:25:49

6            MR. HADDAD:  Thank you, Your Honor.

7            THE COURT:  All right.  Mr. Binford, you don't have to

8    say anything.

9            MR. BINFORD:  Your Honor, we're happy to brief any

10   issues that you would like us to brief.                        14:26:00

11           THE COURT:  Well, I think -- let's continue to think

12   out loud.  I think I -- these two questions are related, but

13   the first thing I think I do want to address briefing is the

14   second item I brought up.  And that is, well, I guess I would

15   start by simply directing counsel to meet and confer.  I really 14:26:57

16   don't like litigation based on thoughts about what the other

17   side might do without having talked to the other side.  So I'm

18   going to -- I am going to direct counsel to meet and confer.

19           I do think, Mr. Binford, that the State really is

20   going to have to make a decision about timing and procedure.    14:27:23

21   You can't control when decisions will ultimately be made by

22   your clients, but matters of timing and procedure, we -- I

23   think we have to address.

24           So one -- I'm going to restate what I already said.

25   One option is that for the parties to simply discuss and see if 14:27:48

you can reach an agreement as to what decisions will have to be
made, including decisions about disclosure and nondisclosure.
And to me, that means principled explanations for why some
things are disclosed to the press and the prisoners and other
things are not.  I'm sure you are doing that already.  But it
would need to be a principled explanation, the kind of
explanation that you would be ready to defend in court.

14:28:17

        And one possibility is you all can reach an agreement
on that.  The other possibility is that you do not, in which
event, I guess I would want to hear what the plaintiffs would
elect to do then.  Because one election would be to seek a
preliminary injunction that would be ordering a schedule.

14:28:42

        I don't think I can order the defendants not to seek a
writ of execution, but I can stay an execution.  So that would
be part of it.  But the time frame would be such that if the
defendants elect to seek a writ of execution ahead of that
schedule, we will have addressed and thought about ahead of
time whether it should be enjoined so the schedule that I am
persuaded to can be honored.

14:29:11

        So I'm thinking what that comes down to is after you
all have this meet and confer, and after the defendants have a
reasonable time to think about what I'm putting on the table,
bearing in mind the government takes time to make decisions,
then the defendants are going to have to elect whether you want
to seek a preliminary injunction of that type.

14:29:33

14:30:00

1          And I think the other obvious election is you don't

2     need to do that ahead of time.  You can just wait until they

3     start a process and then you can come in and remind me what I

4     just told you today and I can consider a request for a

5     preliminary injunction then geared toward assuring effective          14:30:18

6     litigation whenever it starts.  I think that would be the

7     plaintiffs' election, what to pose, when.

8          So I think for now, on that, I do have some more to

9     talk about, about the pending complaint.  But for now, I do

10    direct counsel to meet and confer to see whether counsel can          14:30:47

11    agree on a timing and a process to allow effective litigation

12    and avoid crisis litigation.  I'm thinking I really -- I do

13    want that to happen, and I really don't want to see anything

14    from the plaintiffs until that has been exhausted in good

15    faith.  And if that is not able to reach a resolution, then I          14:31:10

16    don't think I need to set a time frame for the plaintiffs.  The

17    plaintiffs can file a motion, or not.  If the plaintiffs keep

18    their silence and wait, I will understand that completely.  And

19    I will be ready to address the needs of orderly litigation at

20    that time.  And I suppose I can think of reasons why that might        14:31:34

21    be a better way to go.  But as I said, I think that's the

22    plaintiffs' election.

23          So for now, all I'm ordering is you all meet and

24    confer, and beyond that it's the plaintiffs' initiative as to

25    whether and when to seek preliminary injunctive relief as to          14:31:49

1    the timing of merits litigation.

2          Now I have the issue what to do with this pending

3    complaint.  I have this Partial Motion to Dismiss that the

4    defendants have filed which I don't see how I can decide the

5    merits of a Motion to Dismiss without having concluded that          14:32:28

6    there is, in fact, a justiciable case and controversy in the

7    current circumstances.

8          Well, I suppose if the plaintiffs do elect to proceed

9    with the kind of preliminary injunction that we're talking

10   about, plaintiffs may well want to amend their complaint, too.       14:33:02

11   Might not.  But -- and if we do either reach a resolution the

12   Court doesn't have to be involved in or the Court has to reach

13   a resolution to assure orderly timing of litigation, it does

14   seem that that would subsume and take care of ripeness

15   problems.  It would assure that there is effective litigation.       14:33:38

16         Right now the thought I'm having, and of course I

17   would want to have briefing on this, the thought I'm having is

18   that because of the likelihood that there will be protection

19   for effective litigation in the future, in one way or another,

20   the current complaint proceedings probably should be stayed.         14:34:11

21   There's really no reason to brief and decide these questions of

22   the Partial Motion to Dismiss really do look extremely

23   hypothetical and will not -- the plaintiffs will have no need,

24   probably have no need to resolve them in advance of this more

25   complete and orderly scheduling for resolution.  And if, in          14:34:40

1    fact, the State does affirm any protocol, either an old one or

2    a new one, it seems likely the plaintiffs will want to amend

3    their complaint to deal with that circumstance.

4          So one thing -- I guess the other thing I'm going to

5    invite you to brief is why I should not stay the proceedings on          14:35:15

6    the current complaint.  Actually, I haven't ordered you to file

7    anything yet.  Maybe I need to talk about that.  The second

8    question is briefing on why I should or should not stay the

9    current complaint.  But again, the premise of that entire

10   discussion is the assurance that there will be an effective               14:35:54

11   schedule for litigation for the merits of the claims.

12         So I think maybe I do want some briefing on that,

13   because if I am going to do that I should do that without

14   delay.  It's possible both sides will oppose the idea of a

15   stay, so you might be filing similar briefs.  But, you know,            14:36:26

16   let me think out loud.  I could see either side going first on

17   that briefing.  I don't believe in simultaneous briefing.  I am

18   thinking maybe it makes more sense to invite the defendants to

19   file a first brief on that question, you can take either side,

20   and then response and brief reply.                                      14:36:46

21         So Mr. Binford, when would you want to -- what

22   deadline would you suggest for filing that?

23         MR. BINFORD:  Can I have a few moments to discuss with

24   co-counsel?

25         THE COURT:  Sure.                                                 14:37:10

```
 1                (Discussion off the record.)

 2           MR. BINFORD:  If we could have 30 days we could get

 3      that done.

 4           THE COURT:  Any problem with that, Mr. Haddad, or --

 5           MR. HADDAD:  No, Your Honor.  In terms of the timing        14:37:36

 6      for their brief on standing, that's fine.

 7           THE COURT:  All right.  This is actually a brief on --

 8      it's rather limited.  It's a brief on whether I should or

 9      should not stay the proceeding on the current complaint.

10           MR. HADDAD:  I'm sorry.                                     14:37:52

11           THE COURT:  Well, the short of it, I don't set any

12      deadlines Thanksgiving week, so you want it before then or the

13      week after then?

14           MR. BINFORD:  Before.

15           THE COURT:  Then we'll set Friday, November 21 as the       14:38:30

16      deadline for the plaintiffs' brief.  And I'm thinking, Mr.

17      Haddad, I'm going to do you a favor and maybe set your deadline

18      on Thursday, December 18, so you can't put it off too long.

19           MR. HADDAD:  Thank you, Your Honor.  That enforced

20      good will is just fine with us.                                 14:38:53

21           THE COURT:  And I don't require anybody to do anything

22      in the last two weeks of December, so I will -- how about

23      January 10th or thereabouts for any reply.

24           All right.  Let's see.  Well, actually, January 9th

25      would give you a full week after the holidays.  Is that enough  14:39:13
```

1    or do you need more time?

2         MR. ZICK:  That's fine.

3         THE COURT:  We'll set January 9th as the deadline for

4    any reply.  Counsel, I think that's everything on my list of

5    what I wanted to talk about.  Is there anything else either of          14:39:28

6    you would like to bring up at this time?

7         MR. HADDAD:  Your Honor, just to clarify, Your Honor

8    has also asked the parties to meet and confer.  And is that to

9    be on a parallel track and did Your Honor --

10        THE COURT:  Well, I was kind of hoping not to set time          14:39:56

11   frames because it seems authoritarian.  On the other hand,

12   lawyers do everything better with a schedule, don't they?  So

13   what do you -- do you think 30 days is enough for that?  I'm

14   not in a great hurry because I plan on maintaining -- I have a

15   current stay on the briefing on the motion.  I plan on          14:40:19

16   maintaining that until we have this broader resolution of

17   whether to stay that case.

18        So I can -- what do you think, Mr. Haddad?  Do you

19   want to go faster or shorter?  I absolutely want to have all

20   this resolved before the holiday season because it's hard to          14:40:33

21   get anything done then.

22        MR. HADDAD:  I would agree, Your Honor.  I think it

23   benefits the parties and the process to have us engage in the

24   conversation Your Honor requested.

25        THE COURT:  Let me think out loud, because what I'm          14:40:50

1 | talking about, I do believe it's a serious matter for the

2 | State.  It's not things that lawyers can do without their

3 | clients.  How about if we set, oh, say Friday, December 12.

4 | That gives you about six weeks and still has it done before the

5 | holidays.  And that's the time frame in which I -- now, if you   14:41:12

6 | all reach an impasse before then, then you have reached your

7 | impasse.  But that's the time frame in which I want you to have

8 | had those discussions in earnest.  Probably a good idea to have

9 | them in person.  I'm not going to micromanage this because I'm

10 | relying on all counsel to handle in an effective and serious   14:41:34

11 | way.  So I will set that deadline of December 12.  And again,

12 | as I said before, if it doesn't come to anything it's the

13 | plaintiffs' initiative what to do next.

14 |         Anything else from the defendants?

15 |         MR. BINFORD:  Nothing further from the defendants,   14:41:55

16 | Your Honor.

17 |         THE COURT:  Very well.  Thank you all for coming.  And

18 | thank you all for your patience in listening to me all this

19 | time.

20 |         MR. HADDAD:  Thank you, Your Honor.   14:42:04

21 |         THE COURT:  We'll be adjourned.

22 |         (Proceeding concluded at 2:42 p.m.).

23 |

24 |

25 |

1

2

3

4                    C E R T I F I C A T E

5

6         I, LAURIE A. ADAMS, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9         I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14        DATED at Phoenix, Arizona, this 29th day of October,

15   2014.

16

17                              s/Laurie A. Adams

18                              _____

                                Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25