JON M. SANDS
Federal Public Defender, District of Arizona
DALE A. BAICH (OH Bar No. 0025070)
dale_baich@fd.org
ROBIN C. KONRAD (AL Bar No. N76K2194)
robin_konrad@fd.org
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602.382.2816 | 602.889.3960 facsimile

Counsel for Condemned Plaintiffs

MARK E. HADDAD (CA Bar No. 205945)
mhaddad@sidley.com
JOSHUA E. ANDERSON (CA Bar No. 211320)
janderson@sidley.com
ALYCIA A. DEGEN (CA Bar No. 211350)
adegen@sidley.com
AIMEE G. MACKAY (CA Bar No. 221690)
amackay@sidley.com
KATHERINE A. ROBERTS (CA Bar No. 259486)
Kate.roberts@sidley.com
COLLIN P. WEDEL (CA Bar No. 278461)
cwedel@sidley.com
MATT LIGHT (CA Bar No. 294007)
mlight@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
213.896.6000 | 213.896.6600 facsimile

Counsel for the Coalition and Condemned Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| First Amendment Coalition of Arizona, Inc.; Charles Michael Hedlund; Graham S. Henry; David Gulbrandson; Robert Poyson; Todd Smith; Eldon Schurz, and Roger Scott,<br><br>        Plaintiffs,<br><br>    v.<br><br>Charles L. Ryan, Director of ADC; James O'Neil, Warden, ASPC–Eyman; Greg Fizer, Warden, ASPC–Florence; and Does 1-10, Unknown ADC Personnel, in their official capacities as Agents of ADC,<br><br>    Defendants. | Case No: 2:14-cv-01447-NVW-JFM<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF 42 U.S.C. § 1983 AND EQUITABLE, INJUNCTIVE, AND DECLARATORY RELIEF** |

# Table of Contents

Introduction ...................................................................................................................3

Jurisdiction and Venue ...................................................................................................6

Parties to the Action ......................................................................................................6

The Rights at Issue .........................................................................................................9

Relevant Facts ...............................................................................................................12

   A. Obstacles to the Constitutional Use of Lethal Injection. ................................12

   B. Arizona's Long History of Deviating from Its Execution Plans. ..................18

   C. Wood's Failed Execution. ...............................................................................31

   D. Arizona's Continued Refusal to Cabin Its Discretion and Provide
      Transparency. ..................................................................................................37

      1. Unbounded Discretion. ..............................................................................40

      2. Concealment of Facts Critical to Due Process and the Public's
         Assessment of Arizona's Death Penalty Regime. ....................................41

      3. Rejection of Safety Measures ....................................................................44

Exhaustion of Administrative Remedies ......................................................................45

Claims for Relief ..........................................................................................................46

Prayer for Relief ...........................................................................................................55

Jon M. Sands ................................................................................................................59

District of Arizona ........................................................................................................59

1.     This action is brought pursuant to 42 U.S.C. § 1983 by Plaintiff First Amendment Coalition of Arizona, Inc. ("Coalition") and Plaintiffs Charles Michael Hedlund, Graham Henry, David Gulbrandson, Robert Poyson, Todd Smith, Eldon Schurz and Roger Scott (collectively, "Condemned Plaintiffs," and, with the Coalition, "Plaintiffs"). The Coalition and Condemned Plaintiffs jointly seek equitable, injunctive, and declaratory relief to require transparency with respect to the State of Arizona's execution process, and in particular, to redress past and prevent threatened violation by Defendants of Plaintiffs' First Amendment right of access to governmental proceedings.[1] Chief among these violations is Defendants' use of a paralytic agent that masks the inefficacy of the purportedly sedative first drug and hides from public view the pain caused by the third drug. The Condemned Plaintiffs (but not the Coalition) also seek to vindicate their additional rights under state law and the United States Constitution, including to stop and prevent violations and threatened violations by Defendants of the Condemned Plaintiffs' First Amendment right to petition the government for redress of grievances, their Eighth Amendment rights to be free from chemical experimentation and from suffering a cruel, unusual, undignified, or lingering death, and their Fourteenth Amendment rights to due process and equal protection.[2]

### Introduction

2.     Defendants carry out executions with unfettered discretion to depart from their written execution procedures in any manner, at any time, and without any advance notice. The result has been a series of executions-by-experiment, including an unprecedented two-hour execution in which Defendants administered 13 more doses than permitted of midozalam and of hydromorphone to Joseph Rudolph Wood III with

---

[1] The Coalition seeks relief for violations and threatened violations of only its First Amendment rights, and does not assert claims for violations of the Eighth or Fourteenth Amendments.

[2] Condemned Plaintiffs do not in this Complaint challenge their underlying capital convictions.

no advance or contemporaneous notice to any witness, counsel, or court. *See generally Lopez v. Brewer*, 680 F.3d 1084, 1093-94 (9th Cir. 2012) (Pregerson, J., dissental) (discussing series of mishaps and mistakes that have occurred during Arizona's deviations from its written execution procedures).

3.    Compounding the unconstitutionality of their absolute discretion, Defendants refuse to conduct their executions with the transparency the First Amendment requires. Defendants argued to the United States Supreme Court that Wood's pleas for transparency were unfounded because "*nearly every detail about his execution is provided* to him and to the general public, *including exactly what and how much lethal drugs will be used*, how they will be administered, and the qualifications of those placing the IV lines to administer them."[3] In reality, Wood's execution was an experiment, conducted ad hoc, in which Defendants injected Wood with 13 more than the maximum number of permitted doses of *each* of the two drugs in the protocol, midazolam and hydromorphone, thus administering 750 milligrams of each drug rather than the 50 milligrams that the State had promised to use.[4]

4.    When Wood's counsel sought the District Court's intervention through a telephonic hearing, Defendants falsely represented to the Court the dosages they had

[3] Reply Brief of State of Arizona in support of Application for Stay at 2, *Ryan v. Wood*, No. 14A82 (U.S. July 22, 2014) (emphases added). Similarly, Judge Bybee, dissenting from the Ninth Circuit Court of Appeals' grant of stay, expressly relied on the State's assurances in asserting that both Wood and "[t]he public know[] precisely how the State intends to end Wood's life and can investigate [based on already available information] whether the drugs are suited to that purpose," and, indeed, "[a]nyone who reads the protocol will know exactly how Arizona plans to carry out [his] execution." *Wood v. Ryan*, 759 F.3d 1076, 1100 (9th Cir. 2014) (Bybee, J., dissenting), *vacated*, 135 S. Ct. 21 (2014) (mem.).

[4] Fernanda Santos, *Executed Arizona Inmate Got 15 Times Standard Dose, Lawyers Say*, N.Y. TIMES, Aug. 1, 2014, http://nyti.ms/1ohRODF. The result of Defendants' improvisational and hidden-from-view execution was that Wood lingered alive for almost two hours after being first injected with what Defendants represented were lethal doses of the two drugs, gasping for air more than 640 times in manner that journalist witnesses described as "like a fish on shore gulping for air." Laurie Roberts, *Arizona Needs a Timeout After Botched Execution*, ARIZ. REPUBLIC July 23, 2014, 6:34 PM, http://www.azcentral.com/story/laurieroberts/2014/07/23/woods-execution-botched/13073777.

administered to Wood. Specifically, at 3:35 p.m. on the day of the execution (103 minutes after the drugs began to flow), Defendants told the Court that Wood had received a "[a] second dose of drugs." By 3:33 p.m., however, Wood had in fact received not just his second, but also his *third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, and twelfth* injections of the drugs; he would later receive three more undisclosed injections during the telephonic hearing. Yet no one, other than the State, knew this at the time of the hearing, because Defendants cloak their execution process. Thus, no witness present at the execution was able to observe Defendants' repeated injections of the drugs, none could know how many injections he had received, and none, including Wood's counsel, could contradict Defendants' false representations to the Court.

5.     Defendants' revised protocol abandons the combination of midazolam and hydromorphone, but replaces it with yet another combination that Arizona has never previously used. This three-drug combination begins with midazolam (ostensibly to render the prisoner insensate to pain), then adds a drug to paralyze the prisoner, and concludes with a painful drug that stops the prisoner's heart. The paralytic agent serves as a *chemical* curtain, masking whether midazolam is in fact effective in preventing the prisoner from suffering the intense pain of the heart-stopping drug, and furthermore creates its own suffering through slow suffocation. The press, the prisoners, and the people of Arizona have a right to know whether Arizona's execution process subjects prisoners to intense physical pain, and the use of a paralytic agent is just as effective in preventing disclosure of that fact as if the execution occurred without any public witness at all.

6.     Given Defendants' past broken promises to this Court, the U.S. Court of Appeals for the Ninth Circuit, and the U.S. Supreme Court, significant injunctive relief is essential to ensure that Defendants adhere to adequate written procedures.

**Jurisdiction and Venue**

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil-rights violations), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief). Plaintiffs invoke this Court's jurisdiction pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.

8.     Venue is proper pursuant to 28 U.S.C. § 1391(b). Condemned Plaintiffs are currently incarcerated at the Arizona State Prison Complex ("ASPC")–Eyman, Browning Unit, 4374 East Butte Avenue, Florence, Arizona, located in this District. Additionally, the Coalition resides in this District.

9.     All executions conducted by Defendants occur at the Central Unit at ASPC–Florence, which is in this District. Thus, events giving rise to this Complaint have occurred and/or will occur in this District.

**Parties to the Action**

10.     Plaintiff First Amendment Coalition of Arizona, Inc. ("Coalition"), is a non-profit corporation made up of organizations dedicated to advancing free speech, accountable government, and public participation in civic affairs. Founded in 1981, the Coalition is located in Phoenix, Arizona. Members of the Coalition include the Arizona Broadcasters Association; the Arizona Newspapers Association; the Arizona-New Mexico Cable Telecommunication Association; the Arizona Press Club; the Society of Professional Journalists, Valley of the Sun Chapter; and individual news media companies and reporters. The Coalition asserts a claim under only the First Amendment to vindicate the rights of access of the press and the public to government proceedings and information; the Coalition does not join the separate First, Eighth, and Fourteenth Amendment claims advanced by the Condemned Plaintiffs.

11.     Plaintiff Charles Michael Hedlund is a United States citizen and a resident of the State of Arizona. He is currently subject to a sentence of death imposed by the

Superior Court of Maricopa County. Hedlund is incarcerated at ASPC–Eyman, Browning Unit, in Florence, Arizona.

12. Plaintiff Graham S. Henry is a United States citizen and a resident of the State of Arizona. He is currently subject to a sentence of death imposed by the Superior Court of Mohave County. Henry is incarcerated at ASPC–Eyman, Browning Unit, in Florence, Arizona.

13. Plaintiff David Gulbrandson is a United States citizen and a resident of the State of Arizona. He is currently subject to a sentence of death imposed by the Superior Court of Maricopa County. Gulbrandson is incarcerated at ASPC–Eyman, Browning Unit, in Florence, Arizona.

14. Plaintiff Todd Smith is a United States citizen and a resident of the State of Arizona. He is currently subject to a sentence of death imposed by the Superior Court of Coconino County. Smith is incarcerated at ASPC–Eyman, Browning Unit, in Florence, Arizona.

15. Plaintiff Robert Poyson is a United States citizen and a resident of the State of Arizona. He is currently subject to a sentence of death imposed by the Superior Court of Mohave County. Poyson is incarcerated at ASPC–Eyman, Browning Unit, in Florence, Arizona.

16. Plaintiff Eldon Schurz is a United States citizen and a resident of the State of Arizona. He is currently subject to a sentence of death imposed by the Superior Court of Maricopa County. Schurz is incarcerated at ASPC–Eyman, Browning Unit, in Florence, Arizona.

17. Plaintiff Roger Scott is a United States citizen and a resident of the State of Arizona. He is currently subject to a sentence of death imposed by the Superior Court of Maricopa County. Scott is incarcerated at ASPC–Eyman, Browning Unit, in Florence, Arizona.

18.     Defendant Charles L. Ryan is the Director of ADC and is being sued in his official capacity for equitable, injunctive, and declaratory relief.

19.     Defendant James O'Neil is the Warden of ASPC–Eyman, where Condemned Plaintiffs are incarcerated, and is being sued in his official capacity for equitable, injunctive, and declaratory relief.

20.     Defendant Greg Fizer is the Warden of ASPC–Florence, where Condemned Plaintiffs will be executed, and is being sued in his official capacity for equitable, injunctive, and declaratory relief.

21.     Defendants John and Jane Does are unknown employees, staff, contractors, or agents of ADC or the State of Arizona who are ADC's officers, successors in office, agents, contractors, staff, and employees, along with those acting in concert with them, who have participated or will participate in Condemned Plaintiffs' executions in capacities involving, *inter alia*, setting IV lines, handling drugs that are classified as controlled substances, and developing and implementing ADC's execution procedures— including the protocols governing the preparation and administration of drugs chosen for executing people. Plaintiffs are not aware of the true identities of the John and Jane Does, but allege that when Plaintiffs discover their identities, Plaintiffs will amend this Complaint accordingly.[5]

22.     At all times herein mentioned, each of the Defendants was or will be the agent, servant, representative, officer, director, partner or employee of the other Defendants and, in doing the things herein alleged, was or will be acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

---

[5] Plaintiffs refer to Defendants variably as "Defendants," "the State," and/or "ADC" where appropriate. Plaintiffs note, however, that their use of any of these phrases should not be interpreted as limiting the scope of their claims, which are brought against each and all of the Defendants.

**The Rights at Issue**

23.     Executions carry out a public verdict that exacts retribution on the public's behalf. It is imperative—and mandated by the First Amendment—that members of the press have access to the preparation for and implementation of executions.

24.     Press coverage of executions is crucial to provide the public with the information needed to evaluate whether and how their elected officials are adhering to the Constitution as they carry out "a horrendous brutality on our behalf." *Wood v. Ryan*, 759 F.3d 1076, 1103 (9th Cir. 2014) (Kozinski, C.J., dissental), *vacated*, 135 S. Ct. 21 (2014) (mem.); *see Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868, 876 (9th Cir. 2002) ("To determine whether lethal injection executions are fairly and humanely administered, or whether they ever can be, citizens must have reliable information about the . . . [']procedures,' which are invasive, possibly painful and may give rise to serious complications. This information is best gathered first-hand or from the media, which serves as the public's surrogate."). Media access to the details of executions is particularly important because those few journalists allowed to witness an execution typically report to other media organizations what they observe.

25.     The media historically has had access not just to the event of an execution itself, but also to the state's pre-execution planning, the execution methods the state intends to use, the qualifications of the persons involved, and potential contingency procedures.[6] Knowing how the state plans to carry out its "precise execution-day routine" is crucial because, "by knowing what happens in a 'textbook' execution . . . reporters are not as likely to be surprised or traumatized, and will know if something goes wrong."[7]

---

[6] *E.g.*, STUART BANNER, THE DEATH PENALTY: AN AMERICAN HISTORY 158-61 (2002) (describing ability of spectators at executions to inspect the gallows, test the pulleys, play with the spring, examine the dangling corpse, and keep pieces of the rope as souvenirs).

[7] Cynthia Barnett, *Covering Executions*, AM. JOURNALISM. REV. (May 1995), *available at* http://ajrarchive.org/article.asp?id=1265.

26.     Prisoners also have First Amendment rights regarding information about their impending executions. The secrecy with which Arizona conducts its executions impairs those rights.

27.     In addition, condemned prisoners have unique rights tied to their impending executions. The Eighth Amendment to the Constitution, applicable to the States through the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments." Punishments are "cruel when they involve torture or a lingering death." *Baze v. Rees*, 553 U.S. 35, 46 (2008) (quoting *In re Kemmler*, 136 U.S. 436, 447 (1890)). They are also cruel and unusual when they involve gratuitous mutilation of the body. For more than a century, the States and the American public have sought to ensure the "most humane and practical method" for carrying into effect the sentence of death. *See, e.g.*, *Malloy v. South Carolina*, 237 U.S. 180, 185 (1915); STUART BANNER, THE DEATH PENALTY: AN AMERICAN HISTORY 192-93, 296-97 (2002) (describing the evolution of executions from hanging, to firing squad, to electrocution, to lethal gas, to lethal injection). *See generally* AUSTIN SARAT, GRUESOME SPECTACLES: BOTCHED EXECUTIONS AND AMERICA'S DEATH PENALTY (2014). A condemned prisoner is entitled to a humane death that does not cause "needless suffering," prolonged lingering, or deliberate infliction of pain. *See Farmer v. Brennan*, 511 U.S. 825, 846 & n.9 (1994). A condemned person cannot be subjected to a method of execution that is "sure or very likely to cause serious illness and needless suffering." *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015) (quoting *Baze*, 553 U.S. at 50).

28.     In addition to (and subsumed within) a condemned prisoner's Eighth Amendment right to be from the risk of harm or a lingering death, dozens of treaties, laws, and the interests in life and liberty protected by the Fourteenth Amendment protect a prisoner's right to dignity and to be free from non-consensual medical experiments.[8]

---

[8] *See, e.g.*, 42 U.S.C. § 3515b; 45 C.F.R. Part 46; 40 C.F.R. Part 26; G.A. Res. 217 (III) A, Universal Declaration of Human Rights (Dec. 10, 1948); G.A. Res. 2220 (XXI) A,

*See Beardslee v. Woodford*, 395 F.3d 1064, 1070 (9th Cir. 2005) ("[T]he Eighth Amendment prohibits punishments that . . . do not accord with 'the dignity of man . . . .'" (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976))).

29. Further, the Due Process and Equal Protection Clauses of the Fourteenth Amendment protect a prisoner's right to a state's consistent and nonarbitrary application of and adherence to its own announced procedures where those procedures concern a fundamental interest. *See, e.g.*, *Dist. Attorney's Office v. Osborne*, 557 U.S. 52, 68 (2009); *Bush v. Gore*, 531 U.S. 98, 103 (2000); *Perry v. Brown*, 671 F.3d 1052, 1082-85 (9th Cir. 2012) (explaining that a state cannot arbitrarily or selectively withdraw procedures concerning liberty interests once it has provided them, even if not constitutionally mandated *a priori*), *vacated and remanded on other grounds sub nom. Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013); *Myers v. Ylst*, 897 F.2d 417, 421 (9th Cir. 1990).

30. Finally, the Condemned Plaintiffs also have a right under the Fourteenth Amendment to bodily integrity, which encompasses the right to be free from harmful and unwarranted administrations of drugs without a compelling state interest for so doing. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 849 (1992) ("It is settled now . . . that the Constitution places limits on a State's right to interfere with a person's . . . bodily integrity."); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990); *Washington v. Harper,* 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty"); *Rochin v. California*, 342 U.S. 165, 173 (1952).

---

International Covenant on Civil and Political Rights (Dec. 16, 1966); G.A. Res. 39/46, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Dec. 10, 1984); G.A. Res. 3452, Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Dec. 9, 1975); World Conference on Human Rights, *Vienna Declaration and Programme of Action*, U.N. Doc. A/CONF. 157/23 (June 25, 1993); Geneva Convention Relative to the Treatment of Prisoners of War art. 3, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; THE NUREMBURG CODE (1947).

**Relevant Facts**

**A.    Obstacles to the Constitutional Use of Lethal Injection.**

31.    When the Supreme Court decided *Baze* in 2008, a majority of States used the same lethal injection formula of sodium thiopental, pancuronium bromide, and potassium chloride.

32.    Since *Baze*, many States have encountered difficulty obtaining sodium thiopental or pentobarbital which, as barbiturates, can reliably induce a coma-like state of deep unconsciousness and, in sufficient doses, cause death.  Manufacturers of sodium thiopental and pentobarbital have refused to make their products available for executions.[9] This is in part because, as then-Chief Judge Kozinski noted, lethal injection involves "[s]ubverting medicines meant to heal the human body to the opposite purpose . . . [resulting in] an enterprise doomed to failure."[10]

33.    As a result, some states have experimented with different untested drug combinations to execute prisoners.   States have also turned  to compounding pharmacies, whose products are not always reliable,[11] and to illegal methods[12] to obtain drugs for executions.

---

[9] *See* Deborah W. Denno, *Lethal Injection Chaos Post-*Baze, 102 GEO. L.J. 1331, 1360-66 (2014); *id.* at 1361 ("The shortage of sodium thiopental led prison officials to seek out questionable alternative sources of the drug throughout the world, ranging from England to Pakistan."); Makiko Kitamura & Adi Narayan, *Europe Pushes to Keep Lethal Injection Drugs From U.S. Prisons*, BLOOMBERG BUSINESS (Feb. 7, 2013), http://www.bloomberg.com/bw/articles/2013-02-07/europe-pushes-to-keep-lethal-injection-drugs-from-u-dot-s-dot-prisons (reporting announcement by Danish pentobarbital manufacturer H. Lundbeck A/S that it "would require customers to buy [pentobarbital] through a single wholesaler and to sign a form confirming they won't resell it, aren't a prison, and know Lundbeck opposes executions").

[10] *Wood v. Ryan*, 759 F.3d 1076, 1102 (9th Cir. 2014) (Kozinski, C.J., dissental), *vacated*, 135 S. Ct. 21 (2014) (mem.).

[11] Missouri and Texas, for instance, have turned to compounding pharmacies to create analogues of branded drugs. Reliance on compounding pharmacies is risky, however, because regulations governing such pharmacies are lax and vary from state to state, and instances of contamination abound; American Medical Association guidelines even warn doctors that prescribing compounded medications can lead to malpractice liability. *See* Denno, *supra* note 9, at 1366-68. Unsafe practices by compounding pharmacies have caused numerous public health crises over the years. *A Continuing Investigation into the*

34. The resort to experimental combinations and procedures, and to compounding and/or illegal means of obtaining drugs for execution has resulted in a disturbing series of executions.

35. One experiment has been to substitute midazolam, a benzodiazepine, for the barbiturate previously used as the first drug in a three-drug combination. Midazolam (also sold under the trade name Hypnovel™ and Versed™) is a short-acting, water-soluble benzodiazepine used most commonly as a premedication (*i.e.*, in advance of anesthesia) for sedation. The FDA-approved intravenous dose for an adult patient is 1 milligram to 2.5 milligrams to induce sedation. Labeling instructions caution that high

---

*Fungal Meningitis Outbreak and Whether it Could Have Been Prevented Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 113th Cong. 2 (2013) (statement of Margaret A. Hamburg, M.D., Comm'r, FDA) [hereinafter Hamburg Statement] (reporting multiple incidences over the past twenty years where compounded drugs have caused deaths and serious injuries). In 2012, injectable steroids produced by the New England Compounding Center (NECC) led to a tragic fungal meningitis outbreak across twenty states, infecting more than 800 individuals and resulting in 64 deaths. Kurt Eichenwald, *Killer Pharmacy: Inside a Medical Mass Murder Case*, NEWSWEEK (Apr. 16, 2015, 7:07 AM), http://www.newsweek.com/2015/04/24/inside-one-most-murderous-corporate-crimes-us-history-322665.html. An FDA inspection report of NECC facilities following the outbreak noted several alarming observations, including yellow and greenish residue lining on surfaces of equipment used in producing sterile drug products, "dark, hair-like discoloration" along the edges of a "Clean Room" used to formulate and fill sterile preparations, and multiple vials of sterile injectable drugs containing "greenish black foreign matter" and "white filamentous material." FDA, FORM FDA 483 ISSUED TO BARRY J. CADDEN OF NEW ENGLAND COMPOUNDING PHARMACY INC. 1, 7-8 (Oct. 26, 2012), *available at* http://www.fda.gov/downloads/AboutFDA/CentersOffices/OfficeofGlobalRegulatoryOperationsandPolicy/ORA/ORAElectronicReadingRoom/UCM325980.pdf. A subsequent FDA investigation of 55 compounding pharmacies found that more than 75% of those inspected had "serious issues," such as "lack of appropriate air filtration systems, insufficient microbiological testing, and other practices that create risk of contamination." Hamburg Statement at 5.

[12] Michael Kiefer, *Arizona Again Tries to Import Illegal Execution Drug*, ARIZ. REPUBLIC, Oct. 22, 2015, 9:27 AM, http://www.azcentral.com/story/news/arizona/investigations/2015/10/22/74406580 (detailing Arizona's second failed attempt to illegally import execution drugs); *see also* Ariane De Vogue, *DOJ Tells Arizona It Illegally Obtained Death Penalty Drug*, ABC NEWS, May 25, 2011, http://abcnews.go.com/Politics/Controversial-arizona-execution-set/story?id=13679827 (reporting on the U.S. Department of Justice's request that Arizona turn over its stores of illegally imported sodium thiopental mere hours before Donald Beaty's scheduled execution, belying the state's claims throughout the litigation leading up the litigation that it had obtained its drugs legally).

doses (*e.g.*, more than 1 milligram) must be titrated slowly in order to be effective. Specifically, the FDA-approved label counsels that doses of 1-to-2 milligrams be administered over the course of three minutes. To be effective, midazolam must be stored at temperatures between 68 and 77 degrees Fahrenheit. It typically has a shelf life of three years from manufacture.

36.     Hydromorphone (also sold under the trade name Dilaudid™) is a potent opioid drug, derived from morphine. The FDA-approved starting intravenous dosage for medicinal use is 0.2 to 1 milligram. To be effective, hydromorphone must also be stored at temperatures between 68 and 77 degrees Fahrenheit.

37.     To Condemned Plaintiffs' knowledge and belief, these drugs have never been tested on humans or non-human animals at anywhere near the levels used by Arizona to execute Joseph Wood.[13]

38.     On January 16, 2014, the State of Ohio executed Dennis McGuire using a combination of 10 milligrams of midazolam and 40 milligrams of hydromorphone—the same drugs used by Defendants in Wood's execution, albeit in much smaller amounts. This was the first time in the United States that a two-drug formula of midazolam and hydromorphone was used to execute a prisoner.

39.     Documents obtained through discovery in other litigation show that, in advance of McGuire's execution, Ohio officials exchanged emails with various medical professionals about how the combination of midazolam and hydromorphone would work. These emails and other documents revealed that Ohio was warned that these drugs could cause a prisoner to "gasp" and "hyperventilate" as he died, and that using these drugs to execute a person could end in "disaster," "a terrible, arduous, tormenting execution that is also an ugly visual and shameful spectacle," in part because, before

---

[13] *See* Ashby Jones, *Lethal-Injection Drug Is Scrutinized*, WALL ST. J., June 1, 2014, 8:25 PM, http://online.wsj.com/articles/lethal-injection-drug-is-scrutinized-1401668717 ("Anesthesiologists say they typically administer midazolam to a patient only a few milligrams at a time and therefore know little about the effects of much larger doses . . . . 'It's uncharted territory' said David Waisel, an anesthesiologist at Boston Children's Hospital who has testified on behalf of death-row inmates. 'States literally have no idea what they're doing to these people.'").

losing consciousness, the patient likely would be "subjected to the intoxicating effects of these drugs, which include hallucinations."[14] Ohio officials expressed their concern about going forward with something that might become "a distasteful and disgusting spectacle" that "would create the appearance, at least, of suffering, which would upset witnesses and inspire litigation."[15]

40.     Those concerns materialized at McGuire's execution. Those who witnessed the 26-minute execution reported that McGuire struggled and gasped loudly for air "like a fish lying along the shore puffing for that one gasp of air that would allow it to breathe."[16] After reviewing how McGuire's execution could have gone so badly, the State of Ohio announced that it would increase the dosages of hydromorphone and midazolam to 50 milligrams each in its next execution.[17] Subsequently, a federal court ordered all executions in the State of Ohio stayed for a year pending review of the State's lethal-injection protocol.[18] Further executions in the State of Ohio are now postponed until at least 2017.[19]

41.     On April 29, 2014, the State of Oklahoma executed Clayton Lockett. Officials took 51 minutes to place an IV line, eventually believing they had properly inserted the IV in a vein in Lockett's groin, after unsuccessfully attempting to place the

---

[14] Ben Crair, *Exclusive Emails Show Ohio's Doubts About Lethal Injection*, NEW REPUBLIC, Aug. 17, 2014, http://www.newrepublic.com/article/119068/exclusive-emails-reveal-states-worries-about-problematic-execution.

[15] *Id.*

[16] Lawrence Hummer, *I Witnessed Ohio's Execution of Dennis McGuire. What I Saw Was Inhumane*, GUARDIAN (Jan. 22, 2014, 1:51 PM), http://www.theguardian.com/commentisfree/2014/jan/22/ohio-mcguire-execution-untested-lethal-injection-inhumane.

[17] Josh Sweigart, *Ohio Increases Drug Dosage for Executions*, Dayton Daily News (Apr. 28, 2014, 6:45 PM), http://www.daytondailynews.com/news/news/crime-law/ohio-increases-drug-dosage-for-executions/nfj9T/.

[18] *See* Order, *In re: Ohio Execution Protocol Litig.*, No. 2:11-cv-1016 (S.D. Ohio Aug. 8, 2014), ECF No. 494.

[19] *See* Press Release, Ohio Dep't of Rehab. & Corr., *Execution Dates Revised* (Oct. 19, 2015), http://www.drc.ohio.gov/Public/press/press439.htm.

IV in his jugular vein and other locations.[20] Oklahoma used an untested three-drug formula that relied on an initial injection of 100 milligrams of midazolam intended to render the prisoner unconscious, after which time the state planned to administer vecuronium bromide (a paralytic) and then potassium chloride (to induce cardiac arrest).[21]

42.    The 43-minute execution did not go as planned. More than 20 minutes after the drugs had been administered, Lockett was still conscious, and he struggled to speak. He was reported as saying "Man," "I'm not," and "something's wrong." Witnesses also reported that Lockett, at points, was "twitching" and "convulsing" so violently that "it looked like his whole upper body was trying to lift off the gurney."[22] Officials then drew the blinds and discovered that femoral catheter that was placed by the physician-executioner had, at some point during the execution, failed. Some of the drugs eventually massed in Lockett's tissue, creating a swelling under his skin "smaller than a tennis ball, but larger than a golf ball."[23] Because the insertion point had been obscured from the view of both the witnesses and the physicians, no one had previously noticed the swelling. The curtains were then closed. The physician-executioner then tried to insert the IV into Lockett's left femoral vein, but penetrated Lockett's femoral *artery* instead. After all of this, the physician-executioner reported that Lockett's heart was still beating. At that point, the governor of Oklahoma called off the execution, 43 minutes after it had begun.[24] Ten minutes later, Lockett died.

43.    On July 23, 2014, Arizona executed Joseph Wood after reportedly injecting him with 75 times the amount of midazolam used in McGuire's botched

---

[20] Erik Eckholm & John Schwartz, *Timeline Describes Frantic Scene at Oklahoma Execution*, N.Y. TIMES, May 1, 2014, http://nyti.ms/1ktZUJa.

[21] Jones, *supra* note 13.

[22] Josh Levs, Ed Payne & Greg Botelho, *Oklahoma's Botched Lethal Injection Marks New Front in Battle over Executions*, CNN (last updated Sept. 8, 2014), http://www.cnn.com/2014/04/30/us/oklahoma-botched-execution/.

[23] OKLA. DEP'T OF PUB. SAFETY, THE EXECUTION OF CLAYTON D. LOCKETT 18 (2014).

[24] *Id.* at 18-19.

execution, and 7.5 times the amount of midazolam used in Lockett's botched execution. This was only the second execution carried out in the United States using a combination of midazolam and hydromorphone. Arizona proceeded with the execution even though the press had disclosed the documents from Ohio that documented that medical professionals were concerned with using those two drugs for executions.[25]

44. On January 15, 2015, Oklahoma executed Charles Warner. His last words were that his "body [wa]s on fire."[26] Despite having represented to Warner's counsel and, later, to the United States Supreme Court, that Warner was executed with a combination of midazolam, rocuronium bromide, and potassium chloride, Oklahoma's representations were later found to be false. Rather than using potassium chloride, it was later revealed, the state somehow instead used potassium acetate. That inexplicable mistake—which, not without irony, occurred during litigation about Oklahoma's claims of secrecy over the source and identity of the drugs it uses in executions—became apparent only after Oklahoma attempted to execute *another* prisoner, Richard Glossip, on September 30, 2015, again using potassium acetate. After the state realized that it had the wrong drug, mere minutes before Glossip's execution was to begin, it stayed indefinitely his execution along with all others in Oklahoma pending the outcome of an investigation into how Oklahoma acquired the wrong drug.[27] Several prison officials are now the subjects of a grand jury investigation.[28]

---

[25] *See, e.g.*, Sweigart, *supra* note 17 (reporting in April 2014—three months before Wood's execution—that the combination of midazolam and hydromorphone posed severe risks if used for executions).

[26] *'My Body is on Fire': Oklahoma Proceeds with Executions Using Controversial Method*, RT (Jan. 16, 2015, 5:50 PM), https://www.rt.com/usa/223431-oklahoma-execution-onfire-warner/.

[27] Eyder Peralta, *Oklahoma Used the Wrong Drug to Execute Charles Warner*, NPR (Oct. 8, 2015, 2:40 PM), http://www.npr.org/sections/thetwo-way/2015/10/08/446862121/oklahoma-used-the-wrong-drug-to-execute-charles-warner.

[28] One of those officials is Robert Patton, who was the Director of the Oklahoma Department of Corrections during the time of the Lockett, Warner, and attempted Glossip's execution; Patton announced his resignation in December 2015. *See* Graham Lee Brewer, *Oklahoma Dep't of Corr. director resigns*, OKLAHOMAN, Dec. 4, 2015, http://newsok.com/article/5464745. Patton was formerly the Division Director of Offender Operations at the ADC, and was a defendant in previous litigation before

## B. Arizona's Long History of Deviating from Its Execution Plans.

45. Long before Joseph Wood was taken to the execution chamber, Arizona had failed repeatedly to execute other condemned prisoners in a constitutional manner, no matter the method used.

46. On February 21, 1930, Arizona executed Eva Dugan, the first (and last) woman to be executed in the State. At her execution by hanging, the snap of the rope decapitated her, sending her severed head into the crowd of witnesses, five of whom fainted as a result. In part because of Dugan's horrific execution, Arizona abandoned hanging as its preferred method of execution.[29]

47. Arizona switched its execution method to the gas chamber, which it used until the ugly execution of Donald Harding, on April 6, 1992. Harding's death by asphyxiation in the gas chamber took 11 minutes, much of which time he spent cursing and screaming epithets at the state attorney general.[30] One reporter who witnessed the "ugly event," during which Harding turned red and purple while writhing in pain, remarked that "animals [are put to] sleep more humanely."[31] Conflicting press accounts reported that the scene was so disturbing that the attorney general became physically ill from watching it.[32]

---

challenging the Arizona lethal injection protocol. *See infra* ¶ 93; *see also* Nolan Clay & Rick Green, *Embattled Oklahoma Corrections Department Director Testifies Before Multicounty Grand Jury*, OKLAHOMAN, Oct. 21, 2015, http://newsok.com/article/5455039.

[29] *See Wood v. Ryan*, 759 F.3d 1076, 1083 (9th Cir. 2014) ("Public outcry over a reportedly botched hanging in Arizona led to debate over methods of execution and the eventual adoption in that state of the gas chamber."), *vacated*, 135 S. Ct. 21 (2014) (mem.); AUSTIN SARAT, GRUESOME SPECTACLES: BOTCHED EXECUTIONS AND AMERICA'S DEATH PENALTY 54-60 (2014).

[30] *Gruesome Death in Gas Chamber Pushes Arizona Toward Injections*, N.Y. TIMES (Apr. 25, 1992), http://www.nytimes.com/1992/04/25/us/gruesome-death-in-gas-chamber-pushes-arizona-toward-injections.html.

[31] SARAT, *supra* note 29, at 112 n.168.

[32] *See* Elizabeth Weil, *It's Not Whether to Kill, but How*, N.Y. TIMES, Nov. 4, 2007, http://www.nytimes.com/2007/11/04/weekinreview/04weil.html?pagewanted=all&_r=0 ("One 1992 lethal gas execution in Arizona caused an attorney general to throw up and a warden to threaten to quit if he had to execute by that method again.").

48.     In response to Donald Harding's execution, Arizona voters, by a margin of 77% to 23%, approved adopting lethal injection as Arizona's method of execution. At first, Arizona adopted the three-drug protocol used in other states and later approved by the Supreme Court in *Baze*: sodium thiopental, a fast-acting barbiturate that, in very large doses, will act as anesthesia; pancuronium bromide, a paralytic agent that paralyzes voluntary muscles; and potassium chloride, a drug that at lethal doses causes cardiac arrest.

49.     Arizona used the same *Baze* three-drug protocol to execute 21 prisoners between 1993 and 2000. In at least one execution, the prisoner was punctured eight times in his arms and punctured in his foot. In another execution, the prisoner had five puncture marks on his arms and there was evidence of surgical cutdown on his foot. In yet another execution, the prisoner's head was seen to jerk back and forth several times after the lethal drugs were administered.

50.     Then, from 2000 to 2007, it executed no prisoners. This was due primarily to the pending federal litigation involving the constitutionality of Arizona's death sentencing scheme. *See generally Ring v. Arizona*, 536 U.S. 584 (2002) (finding unconstitutional Arizona's law that aggravating factors are determined by a judge rather than a jury); *Schriro v. Summerlin*, 542 U.S. 348 (2004) (reversing Ninth Circuit decision and holding that *Ring* was not retroactive). After this moratorium, on May 22, 2007, Arizona executed Robert Comer, a prisoner who waived his appeals.

51.     On July 13, 2007, Arizona then sought a warrant of execution for Jeffrey Landrigan. While the State's motion for a warrant was pending, several prisoners filed a civil complaint against the State challenging Arizona's lethal-injection procedures under the Eighth Amendment. *See* Complaint, *Dickens v. Brewer*, No. 07-cv-1770-NVW (D. Ariz. Sept. 14, 2007), ECF No. 1.

52.     On September 25, 2007, the Arizona Supreme Court issued a warrant of execution for Landrigan, *see State v. Landrigan*, No. CR-90-0323-AP (Ariz. Sept. 25, 2007); that same day, the United States Supreme Court granted certiorari in *Baze*. On

October 11, the Arizona Supreme Court stayed Landrigan's execution in light of the grant of certiorari in *Baze*. *Landrigan*, No. CR-90-0323-AP (Ariz. Oct. 11, 2007). Arizona then amended its execution procedures twice in the next month, while the civil litigation in *Dickens* was ongoing. After discovery, the State agreed to "fix" all of the concerns raised by the plaintiffs (except for plaintiffs' request that the State switch from a three-drug to a one-drug protocol) by amending its written protocol. Based on the State's promises in its briefing and at oral argument, this Court granted summary judgment on July 1, 2009. Order, *Dickens v. Brewer*, No. 07-cv-1770-NVW (D. Ariz. July 1, 2009), ECF No. 138. In so doing, this Court warned that "to the extent [Defendants] deviate from [their promises], they're taking great risks." *See* Transcript of Oral Argument at 22:19-20, *Dickens*, No. 07-cv-1770-NVW, ECF No. 136.

53.     Arizona again sought a warrant to execute Landrigan. At the time of its renewed request for a death warrant, in April 2010, Defendants' written procedures still prescribed a three-drug lethal-injection combination, using sodium thiopental as the first chemical.

54.     While Arizona's efforts to obtain a warrant for his execution were under way, Landrigan learned of a nationwide shortage of sodium thiopental, a fact that he presented to the Arizona Supreme Court. In response to an order from the Arizona Supreme Court, Defendants promised the court that they had a sufficient quantity of drugs to execute Landrigan.

55.     Defendants refused, however, to disclose how they had obtained their sodium thiopental. At oral argument before the Arizona Supreme Court, Arizona's counsel would admit only that it was *not* manufactured by Hospira—which, at the time, was the only FDA-sanctioned domestic manufacturer of sodium thiopental.

56.     This led to a federal lawsuit seeking information about the source of Arizona's execution drugs. *See Landrigan v. Brewer*, No. 2:10-cv-2246-ROS (D. Ariz. Oct. 21, 2010). The district court granted Landrigan a temporary stay of execution to allow him to proceed with his challenge to the use of non-FDA-sanctioned sodium

thiopental from an unidentified source, Order Granting Motion for a Temporary Restraining Order, No. 2:10-cv-2246-ROS, ECF. No. 21, and the Court of Appeals for the Ninth Circuit affirmed. *Landrigan v. Brewer*, 625 F.3d 1144 (9th Cir. 2010). The Supreme Court, however, in a 5-4 order, vacated the stay, and Landrigan was executed on October 26, 2010. *Brewer v. Landrigan*, 562 U.S. 996 (2010) (mem.). He was pronounced dead approximately 11 minutes after the first drug was injected, and approximately four minutes after the potassium chloride was injected. After Landrigan was declared dead, the State continued to inject additional doses of the backup chemicals into his body until the physician-executioner advised Defendant Ryan that, if they continued with the injections, Landrigan's inferior vena cava could rupture.

57. The press later discovered and reported that Arizona obtained the sodium thiopental used to execute Landrigan from "a pharmaceutical company operating out of a west London driving school."[33]

58. Shortly after Landrigan's execution, on December 10, 2010, the Court of Appeals for the Ninth Circuit heard oral argument in *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011). Among other things, the *Dickens* litigation concerned Defendants' repeated errors in carrying out executions, and their refusal to follow their own written protocol for executions. Chief among these errors was Arizona's decision to hire and give responsibility for carrying out the execution to a medical team member who later testified that he knowingly "improvised" the doses of lethal-injection drugs and never adhered to any protocol. *Dickens*, 631 F.3d at 1147. Another of Arizona's medical team members had had his nursing license suspended and had a lengthy arrest record. *Id.*

59. During oral argument, Defendants argued that the problems identified by plaintiffs had been fixed, and contended that it was "purely speculative" to say

---

[33] Owen Bowcott, *London Firm Supplied Drugs for US Executions*, GUARDIAN (Jan. 6, 2011, 12:45 PM), http://www.theguardian.com/world/2011/jan/06/london-firm-supplied-drugs-us-executions.

Defendants would not follow their procedures. Defendants assured the Court of Appeals that they had "every incentive" to follow their protocol as written.[34]

60.　On February 9, 2011, based on Arizona's promises to adhere to its new procedures, the Ninth Circuit Court of Appeals in *Dickens* affirmed this Court's rejection of plaintiffs' claims. The Court noted that Arizona's past problems with its execution regime apparently had been fixed and that, based on Defendants' promises to adhere to their new, *Baze*-compliant protocol, "[t]he notion that Arizona might adopt and use a new, unconstitutional protocol can only be dismissed as rank speculation." *Dickens*, 631 F.3d at 1150.

61.　On March 29, 2011, Arizona executed Eric King. He was pronounced dead approximately 17 minutes after the first drug (sodium thiopental) began to flow. After the three-drug formula was administered, King was then given an additional dose of potassium chloride, followed by an additional dose of sodium thiopental. No valid explanation was provided for injecting these additional doses.

62.　Donald Beaty's execution was then scheduled for May 25, 2011. On May 24, 2011—eighteen hours before Beaty's execution was to begin, Defendants provided notice that, in accordance with federal concerns regarding the legality of the State's acquisition of its drugs, Defendants would not be using sodium thiopental, which they had illegally acquired and used in two prior executions (Landrigan and King). Instead, Defendants advised Beaty that they would replace sodium thiopental with pentobarbital. That evening, Beaty filed a motion with the Arizona Supreme Court asking it to vacate the warrant or stay the execution. On May 25, 2011, the Arizona Supreme Court allowed his execution to go forward based on "the State's avowal that the only change in the execution protocol is to substitute pentobarbital for sodium thiopental." Order, *State v. Beaty*, No. CR-85-0211-AP/PC (Ariz. May 25, 2011). *But see id.* at 2-3 (Hurwitz, J.,

---

[34] During oral argument, the Court of Appeals ordered Defendants to submit the final written protocol that was at issue; Defendants subsequently filed a notice stating that the protocol they intended to follow consisted of the challenged protocol along with all of the unwritten amendments to it to which Defendants had agreed during the course of litigation.

dissenting) (noting that although he doubted that Beaty could demonstrate harm from pentobarbital, he would nevertheless stay the execution because "the application now before us was created by the State's last-minute decision to substitute one barbiturate for another, and we have been compelled to address this issue literally overnight."). Beaty was pronounced dead approximately 11 minutes after the first drug began to flow.

63. On June 30, 2011, Defendants executed Richard Bible using the same pentobarbital-based three-drug combination used in Beaty's execution. He was pronounced dead approximately 6 minutes after the first drug began to flow.

64. On July 16, 2011, three days before Thomas West was scheduled to be executed, West and other plaintiffs filed a complaint alleging that Defendants' unwillingness to follow their written protocol, as well as Defendants' application of their protocol, violated the Eighth Amendment. Complaint, *West v. Brewer*, No. 2:11-cv-01409-NVW (D. Ariz. July 16, 2011), ECF No. 1. The plaintiffs alleged that Defendants failed to conduct required trainings, failed to obtain drugs legally from a safe and reputable source, and failed to administer drugs through peripheral instead of femoral lines—all in violation of the State's own written protocol. Also on July 16, West filed a motion for a TRO or preliminary injunction.

65. This Court denied West's motion for an injunction, and the Court of Appeals for the Ninth Circuit affirmed. *West v. Brewer*, 652 F.3d 1060 (9th Cir. 2011). In its order, the panel specifically relied upon representations made by Defendants through counsel. Of note, ADC's counsel represented that the written lethal-injection protocol adopted in *Dickens* "had been followed in the past and, more importantly, will be followed in West's execution." *Id.* at 1060. The court also relied upon counsel's representations that the drugs as specified in the protocol were available and in ADC's possession and that ADC would follow the IV insertion locations as outlined in the protocol. *Id.* at 1060-61. After his further appeals failed, West was executed on July 19, 2011. He was pronounced dead approximately 8 minutes after the first drug began to

flow. West was the last of five prisoners that Arizona executed using a three-drug combination.

66. Despite West's execution, the civil case he had spearheaded proceeded. After discovery, eighteen depositions, and a three-day bench trial—which demonstrated that ADC had repeatedly deviated from its protocol in past executions and had imported sodium thiopental in violation of federal law—this Court denied plaintiffs the relief they sought, *see West v. Brewer*, No. CV-11-1409-PHX-NVW, 2011 WL 6724628 (D. Ariz. Dec. 21, 2011). One month later, on January 25, 2012, ADC changed its protocol again.

67. Like the prior protocols, the January 2012 protocol provided the ADC Director with unfettered discretion to determine the manner in which a prisoner would be executed, and expanded that discretion by allowing the Director to choose any one of four different drug protocols. The Director had to inform the prisoner only seven days before the execution which drug protocol would be used. The January 2012 protocol also removed safeguards related to screening and training of individuals placing IV lines, and removed the requirement that the peripheral veins be the default method of access. It also removed the requirement of a backup line and removed the ability for a prisoner to have a legal visit on the morning of an execution.

68. The abrupt and substantial January 2012 change in lethal-injection procedures prompted another lawsuit by prisoners scheduled for execution. *See* Complaint, *Towery v. Brewer*, No. 12-cv-00245 (D. Ariz. Feb. 6, 2012), ECF No. 1. The plaintiffs identified three main problems with the January 2012 procedures: (1) the procedures removed safeguards critical to a constitutionally acceptable means of execution under *Baze*; (2) they treated similarly situated condemned prisoners differently with no rational or compelling basis; and (3) they interfered with condemned prisoners' right of access to the court by denying in-person legal visits on the day of a scheduled execution.

69.     On February 23, 2012, this Court denied plaintiffs' motion for a preliminary injunction. The plaintiffs appealed, and the Court of Appeals for the Ninth Circuit set argument for 4:00 p.m. on February 27, 2012.

70.     At 10:35 a.m. on February 27, 2012—five hours before oral argument was set to begin—ADC notified plaintiffs of its intent to change its intended method of execution by administering a one-drug protocol (specifically, one injection of a five-gram dose of pentobarbital). ADC explained that it had overlooked, until the very morning of oral argument and two days before the execution itself, that the pancuronium bromide it had planned to inject in the prisoner had expired *six weeks* prior to the event. ADC did not explain how it had overlooked the expiration of its drug when it had sought execution warrants for two upcoming executions more than a month earlier. Nor did it explain why it did not comply with the written terms of its protocol, which required ADC officials to ensure that the chemicals were ordered and available at the time that a warrant of execution is issued.

71.     During oral argument on February 27, 2012, the Court of Appeals asked how ADC would carry out the impending executions, because the procedures were unclear. Defendants made several promises about how the protocol would be changed to ensure that team members were duly qualified, that IV lines would be properly placed, and that prisoners would have access to counsel on the morning of their executions.

72.     On February 28, 2012, the Court of Appeals issued an opinion affirming the denial of relief, based *not* on ADC's written procedures but rather on the avowals made by Defendants' counsel during oral argument. *See Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012) (per curiam). In its decision, the court expressed its exasperation with Defendants' repeated failures to follow their execution procedures. With respect to Defendants' last-minute "discovery" of the expired pancuronium bromide, the Court complained that, "[h]ow such a discovery escaped the State for the past six weeks is beyond us, and gives us pause as to the regularity and reliability of Arizona's protocols."

*Id.* at 653. The court also took issue with Arizona's repeated deviations from its procedures and string of broken promises:

> Over time, the State of Arizona, however, has insisted on amending its execution protocol on an ad hoc basis—through add-on practices, trial court representations and acknowledgments, and last minute written amendments— leaving the courts with a rolling protocol that forces us to engage with serious constitutional questions and complicated factual issues in the waning hours before executions. **This approach cannot continue.**
>
> . . . . We are mindful of the admonition requiring us to refrain from micro-managing each individual execution, but the admonition has a breaking point. . . . **Unless permanent changes are made in the manner in which Arizona amends its protocols**, Arizona's ongoing conduct may require us to **monitor every execution** on an ad hoc basis, **because the State cannot be trusted to fulfill its otherwise lawful duty to execute inmates sentenced to death**.

*Id.* (emphases added) (internal quotation marks and citation omitted).

73.     On February 29, 2012, Robert Moorman was executed with five grams of pentobarbital. He was pronounced dead approximately 10 minutes after the administration of pentobarbital.

74.     On March 8, 2012, Towery's execution went forward. It took 59 minutes to set the IV lines, one minute shy of *Baze*'s upper limit on an unconstitutionally lengthy attempt to place an IV line. ADC did not allow witnesses to view the insertion of the lines.

75.     ADC told Towery that it would shut off the microphone during his last statement if he said anything disparaging about ADC. Therefore, prior to his execution, Towery and his attorney devised a code so that Towery could communicate any problems when the IV lines were inserted. While Towery was speaking his last words, he indicated—through code—that he was hurt repeatedly during the insertion of the lines

and that the team made many attempts to set the IV lines, and also that he had been prevented from speaking with his counsel.

76. Towery was executed with five grams of pentobarbital. Towery was pronounced dead 9 minutes after the administration of pentobarbital. *See Lopez v. Brewer*, 680 F.3d 1084, 1091 (9th Cir. 2012) (Berzon, J., concurring in part and dissenting in part) ("[Arizona's] secrecy restrictions and refusals of public and attorney access, taken together, leave condemned prisoners, their attorneys, the district court, and this court with precious little indication of whether past executions have actually been conducted in a constitutional manner. The condemned clients, without access to their attorneys, are left to communicate with them in elaborate codes during their last statements, while we are left to parse cryptic execution logs and autopsy reports in an effort to determine whether an inmate suffered pain, and if so, how much."); *id.* at 1095-96 (Reinhardt, J., dissental) (explaining the "chilling" details of ADC's treatment of Towery and concluding that, "if a skilled lawyer were instructing the state on how best to avoid *any* meaningful review of the constitutionality of its execution procedures, he would be hard pressed to improve on the unconscionable regime that the state has adopted").

77. A private autopsy was performed on Towery on March 16. The autopsy revealed that Towery was punctured at least eleven times—three or more times on each arm (at the antecubital fossa), one or more on the right hand, and at least four in the femoral region.

78. On April 25, 2012, Thomas Kemp was executed as scheduled, but not as planned. As Judge Pregerson later recounted, "[s]oon after receiving the lethal injection in his central femoral line, Kemp's right arm and torso began shaking 'violently.' . . . [In addition, a]n autopsy report revealed that despite Kemp's good veins that were quite prominent, Kemp had 'at least three or more' punctures, including 'at least one puncture in the right femoral area and at least two punctures over the left upper extremity.'" *Lopez*, 680 F.3d at 1093-94 (Pregerson, J., dissental). Kemp was executed with five

grams of pentobarbital. Kemp was pronounced dead 7 minutes after the administration of pentobarbital.

79.     The next prisoner scheduled for death, Samuel Lopez, filed a motion for a preliminary injunction to stay his execution on May 1, 2012. The district court denied the motion. On appeal, the Court of Appeals affirmed, but warned Arizona yet again that its constant deviations from its procedures could not continue. "Although we uphold the district court's decision, we caution, yet again, that Arizona's ad hoc approach risks going beyond *Baze*'s safe harbor." *Id.* at 1075.

80.     In her separate opinion concurring in part and dissenting in part, Judge Berzon described some of the ways in which ADC had deviated from the promises it had made just months earlier regarding the qualifications of the IV Team and the prisoners' access to counsel. *Id.* at 1080 (Berzon, J., concurring in part and dissenting in part). In her view, ADC's "approach to devising, announcing, and recording the execution procedures it uses effectively denied Lopez of his procedural due process right to have his Eighth Amendment challenge heard at a meaningful time [and] in a meaningful manner." *Id.* at 1079.

81.     Lopez petitioned for rehearing en banc, which the Court of Appeals denied. In a dissent from rehearing en banc, Judge Reinhardt, joined by six other judges, expressed the judges' frustration with Arizona, noting that, after Kemp's and Towery's botched executions, it was apparent that "the State of Arizona has subjected prisoners whose lives it takes—and has subjected this court—to a mockery of the constitutional requirement of due process." *Id.* at 1094 (Reinhardt, J., dissental); *see also id.* at 1093-94 (Pregerson, J., dissental).

82.     On June 27, 2012, Arizona executed Lopez. For the first time, witnesses were able to observe the insertion of the IV lines through a closed-circuit monitor. Lopez was executed with five grams of pentobarbital. He was pronounced dead approximately 29 minutes after the administration of pentobarbital.

83. On August 8, 2012, Arizona executed Daniel Cook. Again, witnesses were able to observe the insertion of the IV lines through a closed-circuit monitor. Cook was executed with five grams of pentobarbital. He was pronounced dead approximately 37 minutes after the administration of pentobarbital.

84. On September 21, 2012, Arizona published new lethal-injection procedures.

85. On December 5, 2012, Arizona executed Richard Stokley. Again, witnesses were able to partially observe the insertion of the IV lines through a closed-circuit monitor. It took 50 minutes to set the IV and it was set in the femoral vein. Stokley was executed with five grams of pentobarbital. He was pronounced dead approximately 19 minutes after the administration of pentobarbital.

86. The next prisoners scheduled to be executed were Edward Schad and Robert Jones. They filed a motion for a temporary restraining order aimed at obtaining the identity and sourcing of the pentobarbital Arizona planned to use for their executions. Lundbeck, the only legally authorized manufacturer of pentobarbital, had announced in July 2011 that it would no longer sell or make available to prisons any pentobarbital.[35] Akorn, another drug company, took over Lundbeck's distribution of pentobarbital, but it, too, continued Lundbeck's restrictions. Thus, Schad and Jones asserted that they had a First Amendment right to know how and where Arizona had obtained sufficient quantities of non-expired pentobarbital for their executions, scheduled for more than a year after all sales to prisons had stopped.

87. The district court agreed with Schad and Jones, and held that the plaintiffs established a "First Amendment right to access information regarding the manufacturer of the lethal-injection drugs, the National Drug Code of the drugs, the lot numbers of the

---

[35] Kitamura & Narayan, *supra* note 9 (reporting announcement by pentobarbital manufacturer Lundbeck that it "would require customers to buy [pentobarbital] through a single wholesaler and to sign a form confirming they won't resell it, aren't a prison, and know Lundbeck opposes executions"); *see also* Press Release, H. Lundbeck A/S, *Lundbeck divests several products in the US as part of long-term business strategy* (Dec. 22, 2011), http://investor.lundbeck.com/releasedetail.cfm?ReleaseID=635094.

drugs, and the expiration date of the drugs." Order at 1, *Schad v. Brewer*, No. 2:13-cv-2001-ROS (D. Ariz. Oct. 4, 2013), ECF No. 23. The court ordered ADC to provide such information no later than 12:00 p.m., on October 5. ADC did not appeal the decision. Instead, it complied with the court's order and disclosed that the pentobarbital to be used in Schad's and Jones's executions was manufactured by Lundbeck.

88.    On October 9, 2013, Schad was executed as scheduled. Witnesses were able to observe the insertion of the IV lines through a closed-circuit monitor. Schad was executed with five grams of pentobarbital. He was pronounced dead approximately 9 minutes after the administration of pentobarbital.

89.    On October 23, 2013, Arizona executed Robert Jones. It took nearly 50 minutes for the IV lines to be set and it was set in the femoral vein. Jones was executed with five grams of pentobarbital. He was pronounced dead approximately 17 minutes after the administration of the pentobarbital. Jones's execution was the last of eight executions in which ADC used a one-drug protocol of pentobarbital.

90.    On March 26, 2014, Defendants adopted new Procedures, which provided for, among others, a new execution drug combination—one dose of 50 milligrams each of midazolam and hydromorphone. The next prisoner to be executed, and the only prisoner executed under those procedures, was Joseph Wood.

91.    Since *West*, Arizona's last nine executions have gone as follows:

| Prisoner Name | Date | Drug | Time to Die After Injecting Drug(s) | Difficulty setting IV | Strong Physical Reaction |
|---|---|---|---|---|---|
| Robert Moorman | Feb. 29, 2012 | 5 grams pentobarbital | 10 min. | | |
| Robert Towery | Mar. 8, 2012 | 5 grams pentobarbital | 9 min. | Nearly hour-long attempt to place IV successfully; punctured artery; at least 11 punctures; set femoral line | |
| Thomas Kemp | Apr. 25, 2012 | 5 grams pentobarbital | 7 min. | Multiple punctures from botched IV attempts; set femoral line | Violent seizures |

| Prisoner Name | Date | Drug | Time to Die After Injecting Drug(s) | Difficulty setting IV | Strong Physical Reaction |
|---|---|---|---|---|---|
| Samuel Lopez | June 27, 2012 | 5 grams pentobarbital | 29 min. | | |
| Daniel Cook | Aug. 8, 2012 | 5 grams pentobarbital | 37 min. | Several attempts in the right arm; set line that failed | |
| Richard Stokely | Dec. 5, 2012 | 5 grams pentobarbital | 19 min. | Set right arm on first attempt; three unsuccessful attempts on left arm; set femoral line; 50 total minutes to set IVs | |
| Edward Schad | Oct. 9, 2013 | 5 grams pentobarbital | 9 min. | | |
| Robert Jones | Oct. 23, 2013 | 5 grams pentobarbital | 17 min. | At least 3-4 attempts to set IV; nearly 50 minutes for IV lines to be set in femoral vein | |
| Joseph Wood | July 23, 2014 | 750 mg midazolam; 750 mg hydromorphone | 117 min. | | Loud, prolonged gasping |

## C.     Wood's Failed Execution.

92.     Prior to Wood's execution, Wood and other condemned prisoners filed suit to confirm exactly what drugs Defendants would use, how Defendants would use them, and how the persons charged with administering them were qualified to do so.

93.     On behalf of the public, on May 12, 2014, a reporter from the Arizona Republic requested information from Defendants regarding communications between Defendant Ryan and Robert Patton, then the Division Director of Offender Operations at the ADC. Defendants did not respond to this request until August 15, 2014, several weeks after Wood's execution had been carried out.

94.     Wood filed a motion for a preliminary injunction to stay his execution. This Court denied his motion, but, on July 19, 2014, the Court of Appeals for the Ninth Circuit reversed, and granted a "conditional preliminary injunction, staying Wood's execution until the State of Arizona has provided him with (a) the name and provenance

of the drugs to be used in the execution and (b) the qualifications of the medical personnel, subject to the restriction that the information provided will not give the means by which the specific individuals can be identified." *Wood v. Ryan*, 759 F.3d 1076, 1088 (9th Cir. 2014), *vacated*, 135 S. Ct. 21 (2014) (mem.).

95.     In the case litigated by Schad and Jones, ADC did not appeal the district court's decision ordering ADC to disclose facts about the pentobarbital at issue in their executions and complied with that order. With Wood's execution, however, Defendants opposed revealing similar information about the midazolam and hydromorphone to be used in Wood's execution and petitioned the United States Supreme Court to lift the stay.

96.     In their petition, Defendants argued that Wood's pleas for greater transparency in Arizona's execution process were unfounded because, in Defendants' words, Wood "blithely ignores that nearly every detail about his execution is provided to him and to the general public, including exactly what and how much lethal drugs will be used, how they will be administered, and the qualifications of those placing the IV lines to administer them."[36]

97.     The Supreme Court lifted the stay, but Defendants did not keep their promise. Wood's execution went wrong in many ways, chief among them that he received thirteen doses more than the initial dose plus one backup dose set forth in Defendants' Procedures. Defendants never disclosed to Wood ahead of his execution that they contemplated this radical departure from their procedures; rather, they affirmatively represented to the courts that Wood had no reason to be concerned about the dosages he would receive.

98.     At the outset, witnesses were able to watch and listen via closed-circuit television as Wood's IVs were inserted. After the IVs were set, the closed-circuit television was turned off, and the audio feed was turned off, but the curtains over the

---

[36] Reply Brief of State of Arizona in support of Application for Stay, *Ryan v. Wood*, No. 14A82, at 2 (U.S. July 22, 2014).

window to the chamber were opened. For the remainder of the execution, witnesses' views were restricted to line-of-sight observation of Wood in the execution chamber, (but not of the room in which the drugs were being mixed and injected).

99.    Because the microphone was turned off, the only audio that witnesses were able to hear came when members of Defendants' execution team briefly reported certain updates to the witnesses via a microphone in the same chamber as Wood. It was only during these brief updates that witnesses and the media—and, by extension, the Arizona public—could hear the sounds that accompanied the movements they had been observing.

100.    Wood remained alive for 117 minutes after the drugs were first administered. Defendants knew early on, however, that Wood's execution was not going as planned.

101.    Twelve minutes into his execution, after having appeared to be sedated, Wood rose upward against his restraints and gulped for air. He would eventually gasp for air more than 640 times.[37]

102.    Within minutes of Wood's arousal, Defendants chose to depart from the execution protocol without informing Wood's counsel, the public, or the court.  At the 18- and 24-minute marks, but without giving notice to any observers, Defendants administered second *and third* doses of the midazolam-hydromorphone combination. Neither the administration of the second and third doses, nor the subsequent twelve doses, were visible to witnesses.

103.    Defendants administered these secondary and tertiary doses to Wood without first performing a consciousness check, as provided under the terms of the written protocol.

104.    Witnesses did not know that Defendants secretly were improvising with the amounts of drugs they were injecting into Wood. It was obvious, however, that long

---

[37] Patrick McNamara, *Tucson Killer's Execution Takes Two Hours*, ARIZ. DAILY STAR (July 23, 2014, 10:00 PM), http://tucson.com/news/state-and-regional/3ac6d417-866e-5884-a09b-7244a9c18b46.html.

after the execution had begun, Wood was still alive. Roughly an hour after Defendants had begun injecting the drugs, Wood's counsel sought to stop Defendants from proceeding any further. Because Defendants barred Wood's counsel (though not everyone present) from bringing cell phones to the execution or having cell phones near the execution chamber, it took nine minutes before Wood's counsel, accompanied by ADC personnel, was provided with a phone to call co-counsel to begin the process of contacting this Court. During this time, Defendants injected Wood with at least one additional dose of midazolam and of hydromorphone.

105. Once this Court was contacted and a hearing commenced, Defendants falsely represented the dosages they had administered to Wood. At one point, just over 100 minutes into Wood's ordeal, Defendants told this Court that they had only injected Wood twice when, by that time, they had actually injected him twelve times with each drug.

106. The labeling instructions for midazolam state that doses of 1 to 2 milligrams should be administered over the course of three minutes. Defendants ultimately administered Wood 750 milligrams of midazolam over 117 minutes—an average of more than 6 milligrams per minute.

107. Defendants represented to the court, during the telephonic hearing in the course of the execution, that Wood was "brain dead," and thus beyond resuscitation or experiencing pain. Defendants did not have available, or use, the medical equipment and diagnostic techniques needed to diagnose brain death. In reality, Wood was not brain dead, because if a person is drawing breaths without assistance, that person is not brain dead, and Wood was visibly gasping.

108. Defendants also did not have on hand any of the drugs that could reverse the effects of the drugs they had administered in case the execution did not proceed as anticipated. Such drugs are well known and readily available to Defendants.

109. The reports of journalists who witnessed Wood's execution describe suffering and a lingering death beyond what the Constitution permits:

- "like a fish on shore gulping for air";[38]

- "gulp[ing] like a fish on land";[39]

- "death by apnea";[40]

- "a snoring, sucking, similar to when a swimming-pool filter starts taking in air, a louder noise than I can imitate";[41] and

- "I saw a man who was supposed to be dead, coughing—or choking, possibly even gasping for air."[42]

110.   Other news reports similarly describe Wood's execution as one of agony:

- "snoring, gasping and gurgling";[43]

- "gasping and struggling to breathe";[44]

- "in grotesque agony, choking his way to death";[45]

- "another unexpectedly prolonged execution using disputed lethal injection drugs";[46] and

---

[38] Roberts, *supra* note 4.

[39] Michael Kiefer, *Reporter Describes Arizona Execution: 2 Hours, 640 Gasps*, ARIZ. REPUBLIC (Nov. 6, 2014, 10:01 AM ), http://www.azcentral.com/story/news/arizona/politics/2014/07/24/arizona-execution-joseph-wood-eyewitness/13083637/.

[40] *Id.*

[41] *Id.*

[42] Mauricio Marin, *Witness to a 2-hour Arizona Execution: Joseph Wood's Final 117 Minutes*, GUARDIAN (July 24, 2014, 7:35 AM), http://www.theguardian.com/commentisfree/2014/jul/24/witness-arizona-execution-joseph-wood-died.

[43] Editorial, *Problems with Execution Drugs Must Be Solved*, KNOXVILLE NEWS SENTINEL (July 28, 2014, 3:00 AM), http://www.knoxnews.com/opinion/editorials/editorial-problems-with-execution-drugs-must-be-solved_43109448.

[44] Charles P. Pierce, *It's Time to End Our State-Sponsored Barbarism*, ESQUIRE (July 24, 2014, 5:15 AM), http://www.esquire.com/blogs/politics/Another_Execution_Horror_Story.

[45] James Poulos, *Dysfunction and the Death Penalty*, ORANGE CNTY. REGISTER (Aug. 9, 2014, 7:00 AM), http://www.ocregister.com/articles/death-631022-penalty-punishment.html.

[46] Erik Eckholm, *Arizona Takes Nearly 2 Hours to Execute Inmate*, N.Y. TIMES, July 23, 2014, at A1.

35

- "[like] catch[ing] a fish and throw[ing] it on the shore, the way the fish opens and closes its mouth."[47]

111. Senator John McCain, a survivor of barbaric treatment during the Vietnam War, initially described Wood's execution as "torture."[48] Then-Governor Jan Brewer issued a statement noting her "concern" about "the length of time it took for the administered drug protocol" to kill Wood. Although she expressed her confidence in ADC, Governor Brewer directed the ADC immediately to begin an investigation in light of her concerns.[49]

112. That the Governor determined that an investigation was needed confirms that Defendants did not, at any time, provide the media, the public, Wood's counsel, or the court with relevant facts concerning the planning for of the execution. Defendants also prevented the witnesses of Wood's execution from seeing, hearing, or learning much of what transpired during the execution.

113. In the aftermath of Wood's execution, on July 31, 2014, reporters from the Arizona Republic again asked Defendants for information about Wood's execution and Defendants' lethal-injection procedures. Defendants did not adequately respond. Another public records request was sent to the Arizona Department of Corrections, on June 2, 2015, and ADC spokesman Andrew Wilder responded to the reporter to confirm

---

[47] Megan McCracken & Jennifer Moreno, *Botched Executions Can't Be New Norm*, CNN (Sept. 8, 2014, 7:14 AM), http://www.cnn.com/2014/07/26/opinion/mccracken-moreno-botched-executions.

[48] Burgess Everett, *McCain: Arizona Execution 'Torture'*, POLITICO (July 24, 2014, 4:59 PM), http://www.politico.com/story/2014/07/john-mccain-arizona-execution-109350.html.

[49] *Id.*; *see also* Press Release, Ariz. Dep't of Corr., Independent Review Process for Wood Execution Underway (Aug. 1, 2014), https://corrections.az.gov/article/independent-review-process-wood-execution-underway; Press Release, Ariz. Dep't of Corr., Department of Corrections Statement on Review of July 23 Execution (July 24, 2012), https://corrections.az.gov/article/department-corrections-statement-review-july-23-execution; Press Release, Ariz. Dep't of Corr., Convicted Murderer Joseph Wood Executed (July 23, 2014), https://corrections.az.gov/article/convicted-murderer-joseph-wood-executed. The company chosen for the review issued a report on December 15, 2014.

the request had been received. After the department failed to timely produce the requested records, Republic reporter Michael Kiefer followed up with Wilder on June 12, 2015, and Wilder said the ADC "would be in touch." That was the last Kiefer heard from him. On October 21, 2015, Kiefer sent the identical request to the Arizona Attorney General and was told the information sought had already been released. However, the state never provided Kiefer with a copy of the requested documents. Rather, the documents' limited "release" was made only as part of discovery in other litigation. The ADC has failed to respond to any further questions about the requested documents or the state's amended lethal injection protocol

114.   Like the executions of Eva Dugan and Donald Harding, Wood's execution should mark a turning point. Arizona's written execution procedures should not keep the lethal injection process cloaked in secrecy, and defendants should follow the written protocol.

### D.   Arizona's Continued Refusal to Cabin Its Discretion and Provide Transparency.

115.   In the wake of Wood's execution, Plaintiffs filed their First Amended Complaint ("FAC"), on September 18, 2014, alleging a series of constitutional violations flowing from Defendants' pattern of botched executions, clandestine execution processes, and repeated and arbitrary deviations from their written procedures.

116.   On October 9, 2014, Defendants filed a motion to dismiss only four of Plaintiffs' nine claims.

117.   On October 29, 2014, before ruling on the motion to dismiss, this Court held a status conference hearing, during which this Court expressed concern about Defendants' pattern of broken promises, crisis litigation, and deviations from their written procedures. At the end of the hearing, this Court ordered the parties to meet and confer to implement ways to remedy the problems that have long plagued Arizona's death penalty regime, and litigation respecting that regime.

118. Consequently, the parties stipulated to stay this litigation until Defendants published revised execution procedures. The parties further agreed that Defendants would solicit Plaintiffs' input on the new proposed procedures before publishing them.

119. On December 22, 2014, ADC announced in a press release the completion of the investigation ordered by the Governor. The investigative report fails to address who made the decision to deviate from the protocol and administer to Wood an additional thirteen doses of midazolam/hydromorphone, and how the decision was made. The press release indicated that ADC should "develop contingencies if a similar delay occurs in the future."

120. Not until September 23, 2015, nearly ten months after this Court stayed this litigation, did Defendants finally transmit a draft of their revised procedures to Plaintiffs. The revised procedures identify four separate drug protocols, none of which involves a combination of midazolam and hydromorphone. The procedures also commit to provide prisoners with qualitative information about the use of any compounded pentobarbital, and agree to give notice at the time a warrant is sought of the chemicals that Defendants would use for an execution.

121. On October 6, 2015, Plaintiffs transmitted to Defendants a set of proposed modifications to Defendants' revised procedures.

122. On October 8, 2015, pursuant to the parties' stipulation, counsel for Plaintiffs and Defendants met in person to confer about the revised procedures and Plaintiffs' proposed changes thereto.

123. During that meet-and-confer, Defendants did not identify which of the four drug protocols they planned to use.

124. Nor did Defendants identify any expiration dates for midazolam or other drugs in their possession.

125. Defendants also did not mention that, in July 2015, while the stay was in place, they attempted to purchase and to unlawfully import 1,000 vials of sodium thiopental, at a cost of $26,700, from an unlicensed seller in India. The FDA seized the

shipment upon arrival because, under Federal law, non-FDA-approved sodium thiopental may not be imported into the United States. The press first reported Defendants' importation on October 22, 2015.[50]

126. As a result of the meet-and-confer discussion, Defendants published their new Procedures, on October 23, 2015. Defendants accepted only a handful of Plaintiffs' material proposals. Among them, Defendants agreed to provide a condemned prisoner's counsel with a workspace at the prison on the day of an execution and a telephone to be used during an execution in the event that Court intervention is again needed. Defendants also agreed to provide a qualitative report for any compounded chemical used in an execution, rather than just pentobarbital. And Defendants agreed to allow witnesses to observe the prisoner entering the execution chamber.

127. Defendants' new Procedures continue to lack, however, elements falling into three broad categories that are critical to the constitutionally permissible administration of the death penalty in Arizona: namely, (1) cabining Defendants' unbounded discretion, (2) providing the public and the prisoners with the transparency required under the First, Eighth, and Fourteenth Amendments, and (3) ensuring that the executions are humane and comport with the Eighth Amendment.

---

[50] *See* Chris McDaniel & Chris Geidner, *Arizona, Texas Purchased Execution Drugs Illegally Overseas, But FDA Halts The Import*, BUZZFEED NEWS (Oct. 22, 2015), http://www.buzzfeed.com/chrismcdaniel/arizona-texas-purchased-execution-drugs-illegally#.mrxzamj9Q (reporting that Arizona Corrections Department contracted with Harris Pharma, a purported pharmaceutical manufacturer and distributor located in India, to illegally import 1,000 vials of sodium thiopental from India, which the FDA seized at the airport); Tasneem Nashrulla, Chris McDaniel & Chris Geidner, *Three States Bought Illegal Execution Drugs From Supplier In India*, BUZZFEED NEWS (Oct. 23, 2015), http://www.buzzfeed.com/tasneemnashrulla/three-states-bought-illegal-execution-drugs-from-supplier-in#.smWva8A7RW (noting that Arizona paid Chris Harris of Harris Pharma $26,000 for 1,000 vials of sodium thiopental); Chris McDaniel & Tasneem Nashrulla, *This Is The Man In India Who Is Selling States Illegally Imported Execution Drugs*, BuzzFeed News (Oct. 20, 2015), http://www.buzzfeed.com/chrismcdaniel/this-is-the-man-in-india-who-is-selling-states-illegally-imp#.qxvyzQM81 (describing communications between four death penalty states and Chris Harris, the same drug salesman in India who arranged Arizona's illegal importation of sodium thiopental, regarding the states' purchase of sodium thiopental).

### 1. *Unbounded Discretion.*

128. Defendants' new Procedures continue to grant them absolute and unreviewable discretion to change the Procedures in any way, and at any time they "determine[]" that "deviation or adjustment is required." Defendants expressly confirmed at the meet-and-confer with Plaintiffs that they believe their discretion includes: (a) the discretion to use chemicals, combinations, and/or dosages not reflected in the written Procedures, including the same combination of midazolam and hydromorphone administered to Wood; (b) the discretion to change the chemicals to be used, at any time and in any way, even after the death warrant has been sought and obtained, and without notice to the prisoner; (c) the discretion to change any of the purported timeframes that would otherwise protect the constitutional rights of condemned prisoners, the public, and the press; and (d) the discretion to close the blinds and/or otherwise obstruct the witnesses' ability to view and hear the execution at any time.

129. Defendants will continue to take advantage of this unfettered discretion to alter critical aspects of the new Procedures at the last minute or even during executions. Such discretion renders any other protection in the new Procedures meaningless.

130. Defendants' unbounded discretion, on its own, violates the Constitution's protections for prisoners, the public, and the press. Notwithstanding the 35-page document that Defendants, in litigation, have held out as identifying "exactly" how they will execute their prisoners, Defendants, in practice, exercise unfettered discretion to deviate from any portion of the Procedures, at any time, and in any way, without giving notice to counsel and the courts while doing so, and thus defeating any meaningful effort by the public, the prisoners, or the courts to subject the State's executions to meaningful oversight. Indeed, among the first words of the Procedures, in the section entitled "Purpose," the Procedures state that they "shall be followed as written *unless deviation or adjustment is required*, as determined by the Director of the Arizona Department of

Corrections (Department). This Department Order outlines internal procedures and *does not create any legally enforceable rights or obligations*."

131.    The Procedures also purport to retain the discretion "to change the timeframes established" by the Procedures whenever there are (undefined) "exigent circumstances." In Landrigan's execution, Defendants used this discretion to administer drugs into Landrigan's body after he was pronounced deceased. In King's execution, Defendants used this discretion to administer an additional dose of potassium chloride despite failing to first conduct a consciousness check or administer additional sodium thiopental. In Beaty's execution, Defendants used this discretion to change the intended drug merely 18 hours before the execution. For Moorman's and Towery's executions, Defendants used this discretion to change the intended drug mere days before their executions, and five hours before oral argument in the Court of Appeals. In Wood's execution, Defendants used this discretion to administer 13 injections more than the Procedures had prescribed as a maximum.[51]   Without fundamental change, Defendants will be free in future executions to "deviat[e from] or adjust[]" the Procedures again.

> 2.    *Concealment of Facts Critical to Due Process and the Public's Assessment of Arizona's Death Penalty Regime.*

132.    Defendants' Procedures also continue to shroud in secrecy much of their execution processes

133.    The Procedures themselves, because they are rules made by the ADC, are exempt from Arizona's Administrative Procedures Act. ARIZ. REV. STAT. ANN. § 41-1005(A)(23). As a result, they were not required to undergo the notice and comment protections that are required for other State regulations and that ensure that State regulations afford due process to those affected by them. Moreover, as the above history has demonstrated, Defendants' discretionary changes to their Procedures have so far

---

[51] The Procedures provide that: "If deemed appropriate, the Director may instruct the Special Operations Team to administer ***an*** additional dose of the lethal chemical(s)." ARIZ. DEP'T OF CORR., DEPARTMENT ORDER MANUAL, EXECUTION PROCEDURES, attachment D, at 7 (Oct. 23, 2015) (emphasis added), *available at* https://corrections.az.gov/sites/default/files/policies/700/0710_-_effective_10-23-15.pdf.

been shielded from meaningful judicial scrutiny.[52] *See, e.g.*, *State v. Cook*, 281 P.3d 1053, 1058 (Ariz. Ct. App. 2012) (noting that although ADC "has not yet violated the Arizona Constitution's separation of powers doctrine[,]" the court "underscore[s], however, the concern [it has] regarding the Department's past practice of altering the protocol on a last-minute basis. If the Department were to continue the practice in such a way as to unreasonably limit or hamper the courts from exercising meaningful judicial review of its actions, then, depending on the facts, we might be presented with a separation of powers violation.").

134.    Most critically, the new Procedures and the new Protocol C (a combination of midazolam, a paralytic, and potassium chloride) hide critical information from the public, the prisoners, and the press behind a pharmaceutical cloak.

135.    Midazolam belongs to a class of drugs called benzodiazepines. Midazolam has no pain-relieving effects, and it is not used as a sole agent to maintain unconsciousness in painful procedures. Because of midazolam's mechanism of action, there is a point at which additional doses of midazolam cease to affect the central nervous system (the brain and spinal cord). Midazolam, at any dose, will not reliably keep a person insensate during the administration of painful stimuli.

136.    Sodium thiopental and pentobarbital belong to a class of drugs called barbiturates. The mechanism of action for barbiturates is different than that for benzodiazepines. Unlike benzodiazepines, barbiturates can keep a person insensate to painful stimuli and, in high doses, will cause death.

137.    Defendants have now adopted and stated their intention to use a three-drug protocol to execute the condemned plaintiffs that depends upon midazolam to render them insensate to pain, upon a paralytic to prevent them from moving or vocalizing, and upon potassium chloride to stop their hearts.

---

[52] In contrast, California recently released a new set of proposed execution procedures, which it submitted for public notice and comment. *See* Maura Dolan & Paige St. John, *California Proposes New Single-Drug Method for Executions*, L.A. TIMES (Nov. 6, 2015, 1:45 PM), http://www.latimes.com/politics/la-me-pol-ca-execution-protocol-20151105-story.html.

138.    There is no valid governmental interest served by using the paralytic in an execution. The paralytic's suppression of breathing does not hasten the death subsequently caused by the potassium, nor does it protect against the condemned prisoner's pain. If midazolam, despite its ceiling effect, actually were effective at maintaining unconsciousness despite painful stimuli, then the paralytic would be a gratuitous and arbitrary administration of an unwarranted chemical, amounting to an assault and a battery of the prisoner; if midazolam is *not* effective, on the other hand, then the paralytic serves a pernicious purpose—to mask the burning pain caused by a lethal dose of potassium chloride, and the sensation of suffocation caused by the paralytic itself. The paralytic prevents a prisoner from alerting observers, through sound or movement, that he is experiencing pain and suffering.

139.    Arizona's public, and the Condemned Plaintiffs, have a right to know whether midazolam reliably keeps prisoners unconscious and insensate to the pain of potassium chloride.  Defendants could not constitutionally carry out a painful execution behind closed curtains; they similarly ought not be permitted to carry out a painful execution behind a chemical curtain

140.    The Procedures also do not allow any observers—not even counsel or just one member of the press—to witness the entire execution visually or aurally. While the IVs are being inserted behind closed curtains, witnesses can hear the proceedings but must watch them only on a closed-circuit television screen. After the IVs are inserted, the curtains open, but the television screens and audio feed are turned off.  The Procedures allow viewing curtains to be drawn at any point Defendants choose, thus preventing public evaluation of the State's actions, its real-time deviations from the Procedures, and whether the prisoner is or has become aware of the procedure and is substantially likely to be experiencing pain

141.    Especially troubling, the Procedures do not allow real-time evaluation of Defendants' administration of the drugs, which takes place in a separate room. Because much of the execution takes place out of sight or is obscured, witnesses do not have the

ability to confirm that Defendants have administered the correct[53] and unexpired drugs in the execution; witnesses cannot observe whether and when Defendants are administering a drug called for in the Procedures; witnesses cannot observe which drug (or saline) Defendants have selected for any given injection; and witnesses cannot observe how many doses of drugs Defendants have administered. Absent such real-time tracking, the press has no way effectively to report to the public how Arizona is carrying out its executions and whether Arizona is following its written protocol, and counsel for Condemned Plaintiffs has no way effectively to challenge Defendants' representations about what they are doing to a prisoner during an execution, and whether an execution should be abandoned because the State has departed from the Procedures and the risks of harm or indignity warrant such relief.

142.   Before the execution takes place, moreover, the Procedures do not provide a mechanism for notifying the prisoner of the qualifications and selection of the Special Operations and IV Team members to administer the drugs selected for the execution, let alone within a meaningful time-frame to allow for judicial review. Nor do the Procedures provide for disclosure of the chain of custody and storage conditions of the drugs procured for and to be used in the execution, thus defeating any ability of the public to learn and prisoners to evaluate whether the drugs have been continuously stored within, *e.g.*, the temperature limits indicated on the drugs' FDA-approved labeling, or whether the drugs will have passed their expiration date by the time of the scheduled execution.

### 3.   Rejection of Safety Measures

143.   Defendants' Procedures also reflect a rejection of proposals from Plaintiffs to make the State's executions more humane. Those include requiring that any member of the IV team possess certification or licensure that would at least meet the minimal

---

[53] The Procedures provide that the "source of the execution chemicals" is confidential, ARIZ. DEP'T OF CORR., *supra* note 51, at 2, despite Schad and Jones's success in establishing that the source of the drugs is not and need not be confidential, and despite the lack of any detrimental impact from such disclosure.

qualifications necessary for IV insertion recommended by the Arizona State Board of Nursing; and requiring that any member of the IV team charged with inserting a central femoral line have experience with successfully inserting a central venous catheter under clinical supervision.

144.   The Procedures also do not require ADC to maintain, possess, and know how to use the equipment, drugs, and procedures that would be needed to reverse or ameliorate the effect of the administered drugs in the event the patient is suffering from air hunger or pain caused by the potassium chloride, despite the ready availability of drugs to reverse the effects of the drugs called for in Defendants' Procedures.

*   *   *

145.   In light of Defendants' past failures and departures from the Procedures, there is a substantial likelihood of immediate irreparable injury resulting from Defendants' violations of the Constitution. Change is required, and such change should be ordered and supervised by this Court.

**Exhaustion of Administrative Remedies**

146.   Condemned Plaintiffs do not believe that exhaustion is necessary under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, because this suit does not challenge prison conditions, and because there are no available administrative remedies that could address the challenged constitutional violations. Despite the inapplicability of the PLRA, Condemned Plaintiffs have exhausted all the remedies available to them in an effort to resolve these issues.

**Claims for Relief**

**Claim One (by all Plaintiffs): By deliberately concealing the effects of midazolam and potassium chloride behind a chemical curtain created by the paralytic, Defendants have violated Plaintiffs' First Amendment right of access to governmental proceedings, and have violated the Condemned Plaintiffs' rights to be free from severe harm, experimentation, and unnecessary body mutilation under the Eighth Amendment's Cruel and Unusual Punishments Clause and the Fourteenth Amendment's Due Process Clause.**

147. Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Complaint as if fully rewritten here.

148. The First Amendment, made applicable to the states by the Fourteenth Amendment, guarantees designated members of the public and the press a qualified right of access to government proceedings, including executions.

149. The First Amendment also protects the right to petition the government for redress of grievances including the right of access to the courts. That right of access to the courts is especially critical for prisoners, because their access to other remedies is limited. State action that denies a plaintiff the opportunity to litigate gives rise to a claim that the state is violating the plaintiff's right of access to the courts.

150. Defendants intend to use a three-drug protocol to execute the Condemned Plaintiffs, using midazolam as the first drug, a paralytic as the second, and potassium chloride as the third.

151. Defendants' use of midazolam in a three-drug protocol cannot reliably ensure that Petitioner will remain in a state in which he will be unable to experience pain caused by the potassium chloride. Consequently, Defendants' intended and imminent use of the paralytic in the Condemned Plaintiffs' executions will violate the Condemned Plaintiffs' rights under the Eighth and Fourteenth Amendment to be free from severe pain, experimentation, and the gratuitous invasion of the body.

152. There is no governmental interest served by using a paralytic. The paralytic drug, as used in the state's protocol, does not serve the statutory function of causing death, nor does it protect against the prisoner's experience of pain. If midazolam

is not effective at maintaining unconsciousness despite painful stimuli, then the paralytic only masks the immense pain caused by the potassium chloride; if midazolam is effective, on the other hand, then the paralytic is, at best, a gratuitous and arbitrary administration of an unwarranted and harmful chemical that has its own, non-visible torturous effects.

153.   Critically, through Defendants' use of a paralytic as the second drug in their midazolam-based protocol, Defendants deprive and have a policy of depriving Plaintiffs of their First Amendment rights by preventing them from observing midazolam's efficacy at maintaining unconsciousness and the pain and suffering caused by the administration of the paralytic itself and the third drug, potassium chloride, and, if warranted, to challenge the constitutionality of that pain.

154.   Obstructing the press and other witnesses from observing the reality of the condemned prisoner's experience of sequential injections of midazolam and potassium chloride necessarily deprives the Arizona public of informed and accurate media coverage of that critical event, and serves as a content-based restriction on important expression. As such, Defendants' use of the paralytic is subject to strict scrutiny, in which the burden is on Defendants to show that it is narrowly tailored to bring about a compelling interest. There is no compelling, nor legitimate, nor even rational reason for this deprivation.

155.   Defendants in future executions will continue to deprive Plaintiffs and others similarly situated of their First Amendment rights, and will violate the Condemned Plaintiffs' Eighth and Fourteenth Amendment rights if Defendants are not required to cease using the paralytic.

**Claim Two (by Condemned Plaintiffs only): Defendants use of the paralytic, which is at best superfluous and at worst masking immense pain, invades Condemned Plaintiffs' liberty interests in bodily integrity protected by the Due Process Clause of the Fourteenth Amendment.**

156.   Condemned Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Complaint as if fully rewritten here.

157.   The Condemned Plaintiffs have a right under the Fourteenth Amendment to be free from harmful and unwarranted administrations of drugs without a compelling state interest for so doing. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 849 (1992) ("It is settled now . . . that the Constitution places limits on a State's right to interfere with a person's . . . bodily integrity."); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990); *Washington v. Harper,* 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty"); *Rochin v. California*, 342 U.S. 165, 173 (1952).

158.   As set forth above, Defendants have made clear their intent to use a three-drug protocol based on midazolam, a paralytic, and potassium chloride to execute the Condemned Plaintiffs. Condemned Plaintiffs' execution under that protocol is imminent.

159.   As set forth above, the paralytic is at best entirely superfluous, and at worst, masks immense pain. Defendants' execution of Condemned Plaintiffs using a drug protocol with midazolam as the first drug that involves a paralytic will be invasive, offensive, disfiguring, and/or torturous.

160.   Defendants have no rational basis, much less a compelling interest, for executing Condemned Plaintiffs in this manner.

**Claim Three (by Coalition only): By deliberately concealing necessary information from the public and the media, Defendants have violated the Coalition's First Amendment right of access to governmental proceedings.**

161.   The Coalition incorporates by reference each and every statement and allegation set forth throughout this Complaint as if fully rewritten here. The Coalition does not, however, assert claims based on alleged violations of the Eighth or Fourteenth Amendments.

162.   Defendants deprived the Coalition of its First Amendment rights by preventing it from aurally and visually observing the full execution proceeding without interruption, including observing the provenance and amounts of drugs actually used, the timing and method of their administration, and their effect upon the prisoner—from the

time the prisoner is escorted to the execution chamber until the prisoner dies—and by failing to disclose, in advance of the execution, details about the drugs used, the rationale for the selection of these drugs and their dosages, the chain of custody in how the drugs were obtained and stored, the qualifications and training of the persons administering them, and Defendants' ability to respond and preparation for responding to complications. This obstruction, by extension, deprived the Arizona public of informed and accurate media coverage of a critical event that is carried out in on the public's behalf.

163. Defendants will continue to deprive the Coalition, and others similarly situated, of their First Amendment rights in future executions if Defendants are not required to disclose the information described above and to allow witnesses meaningfully to observe the entire execution procedure, including the details listed above, both in preparation for the execution and from the moment the condemned prisoner enters the execution chamber until the time the condemned prisoner is declared dead.

**Claim Four (by Condemned Plaintiffs only): By deliberately concealing necessary information from Condemned Plaintiffs, Defendants have violated Condemned Plaintiffs' First Amendment right to be informed about the manner in which Defendants implement the most serious penalty available in the criminal justice system.**

164. Condemned Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Complaint as if fully rewritten here.

165. Prisoners also have a First Amendment interest, no less powerful than that of the public and the press, in being informed of the means by which the state intends to carry out executions, especially where the prisoner has been condemned to death.

166. Defendants' deliberate concealment of information that would enable Condemned Plaintiffs to determine how Defendants intend to carry out their death sentences, including by failing to disclose in advance of the execution details about the drugs used, the rationale for the selection of these drugs and their dosages, the chain of

custody in how the drugs were obtained and stored, the qualifications and training of the persons administering them, and Defendants' ability to respond and preparation for responding to complications, deprives Condemned Plaintiffs of their First Amendment right of access to governmental proceedings. Defendants' further decision to prevent Condemned Plaintiffs' counsel and other witnesses from aurally and visually observing the full execution proceeding without interruption, including the provenance and amounts of drugs actually used, the timing and method of their administration, and their effect upon the prisoner, deprives Condemned Plaintiffs of their First Amendment right of access to governmental proceedings.

167.   Defendants will continue to deprive Condemned Plaintiffs of their First Amendment rights if Defendants are not required to provide timely access and disclosure to prisoners scheduled for execution as described above.

**Claim Five (by Condemned Plaintiffs only): By deliberately concealing necessary information from Condemned Plaintiffs regarding the violation of the Eighth Amendment, Defendants have violated Condemned Plaintiffs' First Amendment right to petition the government for redress of grievances.**

168.   Condemned Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Complaint as if fully rewritten here.

169.   Defendants' refusal to adhere to the Procedures as written and to provide Condemned Plaintiffs with information sufficient to enable them to determine how Defendants intend to execute them violates Condemned Plaintiffs' First Amendment right to petition the government for redress of grievances.

170.   The First Amendment right to petition the government for redress of grievances includes the right of access to the courts.

171.   The right of access to the courts is especially critical for prisoners, because their access to other remedies is limited.

172.   State action that denies a plaintiff the opportunity to litigate gives rise to a claim that the state is violating the plaintiff's right of access to the courts.

173. The right of access to the courts is an ancillary claim, which is necessary for the vindication of underlying rights.

174. By deliberately concealing information about the efficacy of midazolam and the pain caused by an execution (through use of the paralytic), the specific drugs, expiration dates, provenance, storage, dosages, administration technique, and other details about how Defendants intend to execute Condemned Plaintiffs, and by retaining absolute discretion to change at any time and without notice how Condemned Plaintiffs will die, Defendants have erected a condition that frustrates Condemned Plaintiffs' ability to litigate their claims relating to the constitutionality of their executions. This frustrating condition deprives Condemned Plaintiffs of their First Amendment right to petition the government for redress of grievances. This frustrating condition also deprives Condemned Plaintiffs of their due-process right of access to the courts, as well as their ability to challenge the constitutionality of their executions under the Eighth Amendment and Fourteenth Amendment.

175. Indeed, Defendants' repeated mistakes in past executions establish that a condemned prisoner needs much more detailed information, and much sooner, than Defendants currently provide—and needs to be able to depend on the fact that such information will not change during litigation or before his execution—in order to effectively assess whether there is a substantial risk that the prisoner will suffer physical harm, a lingering death, or some other cruel and unusual means of execution.

176. Defendants' deliberate concealment of information that would enable Condemned Plaintiffs to determine how Defendants intend to carry out their death sentences, including information relating to lethal-injection drugs, Defendants' plans and reasons for the dosages they intend to administer, the competence, training, and authority of Defendants to handle controlled substances, and the qualifications of the execution personnel, deprives Condemned Plaintiffs of their right not to be deprived of their lives without due process of law, and their ability to determine whether Defendants

are capable of carrying out Condemned Plaintiffs' executions in a lawful, constitutional manner.

**Claim Six (by Condemned Plaintiffs only): Defendants' past experimentation and improvisation with unprecedented methods and dosages of drugs amounts to a cruel and unusual punishment, in violation of the Eighth Amendment's Cruel and Unusual Punishments Clause and the Fourteenth Amendment's Due Process Clause.**

177.    Condemned Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Complaint as if fully rewritten here.

178.    Defendants have created, maintained, and implemented lethal-injection protocols, procedures, practices, customs, and training and execution methods that they intend to use to execute Condemned Plaintiffs. As designed and applied, Defendants' lethal-injection execution Procedures are constitutionally flawed. Defendants have no legitimate penological justification for adopting lethal-injection Procedures that make it sure or very likely that Defendants will needlessly and gratuitously inflict severe pain and a lingering death on Condemned Plaintiffs.

179.    The excessive discretion vested in ADC, Defendants' proven failure to adhere to any stable and reliable method of execution, and Defendants' improvised decision to give Wood thirteen doses more than was permitted under the Procedures, demonstrate that each execution carried out by Defendants constitutes an experiment conducted on prisoners to determine how they react to drugs intended to kill them. This violates the Eighth and Fourteenth Amendments' guarantee of dignity even in punishment, and the right to be free from unusual punishments.

180.    Defendants' freedom to experiment on Condemned Plaintiffs pursuant to the Procedures violates Condemned Plaintiffs' rights under the Eighth Amendment and their rights to substantive and procedural Due Process under the Fourteenth Amendment of the United States Constitution.

52

**Claim Seven (by Condemned Plaintiffs only): Defendants' refusal to abide by the notice provisions in their Procedures deprives Condemned Plaintiffs of their right to know and challenge their method of execution, in violation the Fourteenth Amendment's Due Process Clause.**

181. Condemned Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Complaint as if fully rewritten here.

182. Defendants' Procedures arbitrarily, irrationally, and without a compelling State interest, deny Condemned Plaintiffs their right to know how ADC intends to execute them.

183. By deliberately concealing information about the specific drugs, expiration dates, provenance, storage, dosages, administration technique, and other details about how ADC intends to execute Condemned Plaintiffs, and by refusing to agree to be bound by the notice provisions in their Procedures, Defendants have deprived Condemned Plaintiffs of their right to notice and an opportunity to be heard, in violation of the Due Process Clause of the Fourteenth Amendment. Condemned Plaintiffs have no meaningful opportunity to challenge the method of execution or the drugs or dosages selected if, as in Wood's case, they and the courts are given grossly inaccurate, undependable, or likely-to-change information as to the amount or type of drugs that will be used.

**Claim Eight (by Condemned Plaintiffs only): Defendants' pattern of deviating from their Procedures and exercising thei discretion in inhumane ways increases the risk of being subjected to an unusual or lingering death, in violation the Fourteenth Amendment's Equal Protection Clause.**

184. Condemned Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Complaint as if fully rewritten here.

185. The Fourteenth Amendment to the United States Constitution requires that similarly situated persons be treated alike, and further requires that a state's practices and procedures concerning fundamental rights be administered in a nonarbitrary fashion.

186.   Condemned Plaintiffs, individually, are each a "class of one," similarly situated relative to one another and to any other prisoner facing execution in Arizona because all such individuals face execution under the Procedures.

187.   Defendants' Procedures concern prisoners' fundamental rights, including the right to be free from cruel and unusual punishment.

188.   Defendants' unfettered discretion to follow or not follow their Procedures at will and without a principled basis for determining when deviations are warranted means that Defendants have (and will) apply their Procedures to Condemned Prisoners in an arbitrary fashion, leading to disparate treatment across executions.

189.   Where disparate treatment burdens a fundamental right, strict scrutiny applies, and the state action will be upheld only if the state can show that such action is narrowly drawn to serve a compelling state interest.

190.   Further, where a state has purported to provide procedures governing the administration of a process affecting fundamental rights, the state cannot arbitrarily or selectively deviate from those procedures once it has provided them, even if not constitutionally mandated *a priori*.

191.   Defendants have created, maintained, and implemented lethal-injection protocols, procedures, practices, customs, and training and execution methods that they intend to use to execute Condemned Plaintiffs. As designed and applied, Defendants' lethal-injection execution Procedures are constitutionally flawed. Defendants have no legitimate penological justification, nor rational basis, nor compelling state interest in permitting Defendants to, at whim, administer any amount, of any drug, without notice, to a prisoner who is being executed.

192.   The Procedures provide no guidelines or standards for determining when and under what circumstances such distinctions may be warranted. Clear standards must exist, and arbitrary deviations from those standards result in equal protection violations. Defendants have adopted Procedures that codify unbridled discretion and arbitrary

treatment. Deviation is the standard, as demonstrated by Defendants' administration of Wood's execution.

### Prayer for Relief

Wherefore, the Coalition and Condemned Plaintiffs jointly pray for:

1. Temporary, preliminary, and permanent injunctive relief to enjoin the Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from concealing execution-related, non-personally identifying information that the Coalition and Condemned Plaintiffs require in order to ensure their First Amendment right of access to governmental proceedings, including but not limited to:

   a. The efficacy of midazolam and the pain caused by potassium chloride, which Defendants conceal through use of a paralytic;

   b. The manufacturer(s) and other suppliers of the lethal-injection and other drugs that Defendants will or may use in Condemned Plaintiffs' executions;

   c. The lot numbers of the lethal-injection and other drugs that Defendants will or may use in Condemned Plaintiffs' executions;

   d. The National Drug Codes ("NDCs") of the lethal-injection and other drugs that Defendants will or may use in Condemned Plaintiffs' executions;

   e. The expiration dates of the lethal-injection and other drugs that Defendants will or may use in Condemned Plaintiffs' executions;

   f. Documentation (not including personally identifying information) establishing that each person who will handle controlled substances in the executions have the appropriate DEA authorization to do so;

   g. Documentation sufficient to establish from whom the drugs were purchased;

   h. Documentation sufficient to establish what efforts Defendants made, including unsuccessful efforts, to obtain drugs for use in executions;

i. Documentation sufficient to establish where and how the drugs that have been and/or are proposed to be used for executions have been or will be transported and stored, at all stages from the point of purchase to their use in an execution;

j. Documentation (not including personally identifying information) establishing that those who will be responsible for inserting any IVs are qualified to do so;

k. The precise dosage and administration process of the lethal-injection drugs that Defendants will or may use in Condemned Plaintiffs' executions;

l. The rationale for Defendants' selection of the drugs, dosages, and process it will use in Condemned Plaintiffs' executions;

m. The ability for witnesses to observe visually and aurally the entirety of an prisoner's execution, unfettered, from the time that the prisoner is brought into the death chamber, and before any procedures are begun or needles or intravenous lines administered, until death; and

n. Information detailing emergency contingency procedures and the qualifications of personnel who are expected to intervene if medical intervention is necessary;

2. An order granting Plaintiffs their reasonable attorneys' fees under 42 U.S.C. § 1988 and the laws of the United States; and

3. Any such other relief as the Court deems just and proper.

The Condemned Plaintiffs additionally pray for:

4. An order declaring that Defendants' current means, methods, practices, procedures, and customs regarding execution by lethal injection violate the First, Eighth, and Fourteenth Amendments to the United States Constitution;

5. Temporary, preliminary, and permanent injunctive relief barring Defendants from executing Condemned Plaintiffs under the current or any future protocol, so long as such execution would violate Condemned Plaintiffs' federal

constitutional rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution;

6. Temporary, preliminary, and permanent injunctive relief to enjoin the Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from concealing information that is not related to the identification of persons participating in executions, and that is necessary to ensure Condemned Plaintiffs' First Amendment right to petition the government for redress of grievances, including but not limited to:

a. The efficacy of midazolam and the pain caused by potassium chloride, which Defendants conceal through use of a paralytic

b. The manufacturer(s) and other suppliers of the lethal-injection drugs that Defendants will or may use in Condemned Plaintiffs' executions;

c. The lot numbers of the lethal-injection drugs that Defendants will or may use in Condemned Plaintiffs' executions;

d. The NDCs of the lethal-injection drugs that Defendants will or may use in Condemned Plaintiffs' executions;

e. The expiration dates of the lethal-injection drugs that Defendants will or may use in Condemned Plaintiffs' executions;

f. Documentation (not including personally identifying information) establishing that each person who will handle controlled substances in the executions have the appropriate DEA authorization to do so;

g. Documentation sufficient to establish from whom the drugs were purchased;

h. Documentation sufficient to establish what efforts Defendants made, including unsuccessful efforts, to obtain drugs for use in executions;

i. Documentation sufficient to establish where and how the drugs that have been and/or are proposed to be used for executions have been or will be

transported and stored, at all stages from the point of purchase to their use in an execution;

j.  Documentation (not including personally identifying information) establishing that those who will be responsible for inserting any IVs are qualified to do so;

k.  The precise dosage and administration process of the lethal-injection drugs that Defendants will or may use in Condemned Plaintiffs' executions;

l.  The rationale for Defendants' selection of the dosages and process it will use in Condemned Plaintiffs' executions;

m.  The ability for Condemned Plaintiffs' counsel to observe visually and aurally the entirety of a prisoner's execution, unfettered, from the time that the prisoner is brought into the death chamber, and before any procedures are begun or needles or intravenous lines administered, until death; and

n.  Information detailing emergency contingency procedures and the qualifications of personnel who are expected to intervene if medical intervention is necessary;

7.  Appropriate and necessary discovery and an evidentiary hearing to permit Condemned Plaintiffs to prove their constitutional claims;

8.  Appointment of an independent monitor to assess Defendants' creation of and adherence to a constitutional execution protocol;

9.  An order granting Condemned Plaintiffs their reasonable attorneys' fees under 42 U.S.C. § 1988 and the laws of the United States; and

10. Any such other relief as the Court deems just and proper.

Respectfully submitted this 26th day of January, 2016.

Jon M. Sands
Federal Public Defender
District of Arizona
Dale A. Baich
Robin C. Konrad

s/ Dale A. Baich
Counsel for Plaintiffs Charles Michael
Hedlund; Graham S. Henry; David
Gulbrandson; Robert Poyson; Todd Smith;
Eldon Schurz, and Roger Scott

Mark E. Haddad (*admitted pro hac vice*)
Joshua E. Anderson (*admitted pro hac vice*)
Alycia A. Degen (*admitted pro hac vice*)
Aimee G. Mackay (*admitted pro hac vice*)
Katherine A. Roberts (*admitted pro hac vice*)
Collin P. Wedel (*admitted pro hac vice*)
Matt Light (*admitted pro hac vice*)
SIDLEY AUSTIN LLP

s/ Mark E. Haddad
*Counsel for Plaintiffs* First Amendment
Coalition of Arizona, Inc.; Charles Michael
Hedlund; Graham S. Henry; David
Gulbrandson; Robert Poyson; Todd Smith;
Eldon Schurz; and Roger Scott

**Certificate of Service**

I hereby certify that on January 26, 2016, I electronically filed the foregoing Second Amended Complaint for Violations of 42 U.S.C. § 1983 and Equitable, Injunctive, and Declaratory Relief with the Clerk's Office by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


s/ Chelsea Pitman
Legal Assistant
Capital Habeas Unit