MARK BRNOVICH
ARIZONA ATTORNEY GENERAL
Firm State Bar No. 14000

SOLICITOR GENERAL'S OFFICE
David D. Weinzweig (018687)
Senior Litigation Counsel

CAPITAL LITIGATION SECTION
Lacey Stover Gard (022714)
Section Chief Counsel
John Pressley Todd (003863)
Jeffrey L. Sparks (027536)
Assistant Attorneys General

1275 West Washington
Phoenix, Arizona 85007-2997
Telephone: (602) 542-3333
David.Weinzweig@azag.gov
CADocket@azag.gov

Attorneys for State Defendants

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| First Amendment Coalition of Arizona, Inc.; Charles Michael Hedlund; Graham S. Henry; David Gulbrandson; Robert Poyson; Todd Smith; Eldon Schurz; and Roger Scott,<br><br>Plaintiffs,<br><br>v.<br><br>Charles L. Ryan, Director of ADC; James O'Neil, Warden, ASPC-Eyman; Greg Fizer, Warden, ASPC-Florence,<br><br>Defendants. | No. 2:14-cv-01447-NVW<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>**Oral Argument Requested**<br><br>(Assigned to the Honorable Neil Wake) |

**PRELIMINARY STATEMENT**

While capital punishment can raise hard questions, this case does not.

This is largely an Eighth Amendment method-of-execution challenge. Plaintiffs are seven inmates who sit on death row (the "Death Row Inmates" or "Inmates"), awaiting their lawful and enforceable death sentences. The Inmates insist that their Eighth Amendment rights are in jeopardy because the State of Arizona intends to use a paralytic agent as the second of three drugs in their execution, which, they allege, creates a substantial and unnecessary risk of unconstitutional pain.

The Death Row Inmates have not met the pleadings requirements of Rule 8 and this Court must dismiss their Second Amended Complaint in its entirety under Rule 12(b)(6), Fed. R. Civ. P., for several independent yet equally dispositive reasons:

- **Binding precedent**. The U.S. Supreme Court rejected this very argument against this very drug in *Baze v. Rees*, 553 U.S. 35, 57-58 (2008), holding that use of a paralytic agent in a lethal injection protocol "does not offend the Eighth Amendment."

- **Fictional premise**. The paralytic agent is administered after an inmate is rendered insensate and unconscious by the first drug, midazolam; at least three minutes after. If insensate, then no pain. If no pain, then no Eighth Amendment claim. That's what the U.S. Supreme Court held just eight months ago in *Glossip v. Gross*, 135 S.Ct. 2726 (2015).

- **No plausible claim**. The Inmates plead no basis, plausible or otherwise, to believe that the paralytic agent is "sure or very likely" to cause serious illness and needless suffering and give rise to "sufficiently imminent dangers." Volume and rhetoric do not meet federal pleading requirements.

- **Failure to plead alternative**. *Baze* and *Glossip* impose an absolute pleading requirement on inmates in method-of-execution challenges to plead and prove a known and available alternative that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain. The Inmates made no effort to meet this requirement.

The Inmates fare no better with their First Amendment claims. When the underbrush is cleared away, the Inmates simply assert a First Amendment right to die in what they speculate will be pain and distress, as long as people can watch. But that's not what the First Amendment

2

protects. The First Amendment does not protect the right to create a spectacle and go viral. Indeed, *that* fanciful version of the First Amendment would collide *head on* with the express and textual Eighth Amendment right to be free from cruel and unusual punishment.

The other plaintiff, First Amendment Coalition, largely parrots the Inmates' First Amendment argument and likewise fails. Separately, however, the Coalition asserts unprecedented First Amendment rights to watch a separate room (not the execution chamber) where state employees administer the lethal chemicals via intravenous lines, and to receive all sorts of information about future Arizona executions. These claims must also be dismissed under Rule 12(b)(6) because no such First Amendment rights exist.

At bottom, the defendants here are public servants who only seek to perform their job, but end up chasing their own tails as opponents of the death penalty manipulate the judicial system and European pharmaceutical market. That must end. Plaintiffs and their advocates must no longer be permitted to start fires, sue, and watch from the sideline as state governments scramble to extinguish their fires. Nor should Plaintiffs and their advocates turn to federal courts as a vehicle to impose their beliefs and policy preferences on all Arizonans.

## BACKGROUND

**The Parties.**  Plaintiffs are seven inmates sentenced to death for 11 total murders in seven Arizona trial courts. Their victims included six men, four women, and a four-year old child—*each* of whom presumably died in some discomfort, but *none* of whom had any input in how or when they died.[1] The Inmates insist that Arizona's execution practices and its most recent lethal-injection protocol are unconstitutional under the Eighth Amendment, First

---

[1] Just consider the victim of Plaintiff Gulbrandson: "Irene was killed brutally ... [She] suffered at least 34 sharp-force injuries (stab wounds and slicing wounds), puncture wounds, and many blunt force injuries ... Her nose was broken, as were 2 ribs on the back of the chest and 5 ribs in front on the same side of her trunk. The tine from a wooden salad fork was embedded in her leg; a broken wooden fork was found in the bedroom. … The thyroid cartilage in front of her neck was fractured, ... She died from the multiple stab wounds and the blunt neck injury. The neck injury may have resulted in asphyxiation. *The pathologist believed that most, if not all, of the injuries were inflicted before death.*" *State v. Gulbrandson*, 184 Ariz. 46, 53, 906 P.2d 579, 586 (1995) (emphasis added).

3

Amendment, Due Process Clause, and Equal Protection Clause. (Second Am. Compl., ECF No. 94) (hereinafter "Am. Compl.").

Plaintiff First Amendment Coalition of Arizona, Inc. is a non-profit organization that purports to represent the interests of media companies and journalism groups. The Coalition asserts a First Amendment claim. (Am. Compl., ¶ 10).

Defendants are three officials from the Arizona Department of Corrections (the "Department"), including Director Charles Ryan, Warden James O'Neil, and Warden Greg Fizer; each is sued in his official capacity. (*Id*., ¶¶ 18-20).

**The Death Penalty**. The State of Arizona has recognized and enforced the death penalty since its founding, except between December 1916 and December 1918. On November 4, 1992, Arizona voters passed Proposition 103 by a wide margin (76.8 percent in favor), amending the Arizona Constitution to require, for compassionate reasons, that death row inmates be executed by lethal injection rather than cyanide gas. *See* 1992 General Election, Arizona Publicity Pamphlet at 16-17 (Nov. 3, 1992) ("Execution by lethal injection would result in a much quicker, less dramatic and less painful death.").[2]

Arizona law now authorizes that "[t]he penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity to cause death, under the supervision of the state department of corrections." A.R.S. § 13-757(A).

**Department Order 710**. The Department of Corrections carries out death sentences imposed by Arizona courts and juries. *Id*. The execution procedures of the Department are captured in Department Order 710, a comprehensive 34-page document that catalogues the method and manner in which all executions are carried out. The current version was published on October 23, 2015.[3] In fact, Plaintiffs had a hand in its creation, although they complain that

---

[2] Arizona Secretary of State, https://www.azsos.gov/sites/azsos.gov/files/pubpam92.pdf (last visited on Feb. 18, 2016).

[3] Department Order 710 is attached hereto as Exhibit A ("Ex. A") and bates-labeled for citation purposes. In deciding a Rule 12(b)(6) motion, the Court "may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to

the State accepted "only a handful of [their] material proposals." (Am. Compl., ¶ 126).

Department Order 710 covers all stages of an execution with calendar precision. It embraces national standards to avoid mishaps and expressly accounts for the constitutional rights of victims, media, and inmates. It directs that the Department shall (1) "make every effort in the planning and preparation of an execution," (2) "faithfully adhere[] to constitutional mandates against cruel and unusual punishment," (3) "accommodate[] the public's right to obtain certain information concerning the execution," and (4) "provide[] the opportunity for citizens to exercise their First Amendment Rights to demonstrate for or against capital punishment in a lawful manner." (Department Order 710 at 002).

**The Protocol**. Department Order 710 includes 10 pages dedicated to "Preparation and Administration of Chemicals," which in turn identifies four lethal-injection protocols. At issue here is the most recent three-drug protocol (the "Protocol"), which requires the sequential administration of three chemicals:

| Midazolam | 500 mg | "MZ" |
| --- | --- | --- |
| Vecuronium Bromide, or Rocuronium Bromide, or Pancuronium Bromide | 100 mg | "Bromide" |
| Potassium Chloride | 240 mEq | "PC" |

MZ is a sedative that renders an inmate unconscious and insensate for the remainder of his execution. Akin to a knockout punch, MZ permits the second and third chemicals to be administered without causing pain. *Glossip v. Gross*, 135 S.Ct. 2726, 2736, 2739-42 (2015) (collecting cases). Bromide is a paralytic neuromuscular blocking agent that prevents voluntary muscle contraction. *Cook v. Brewer*, 637 F.3d 1002, 1005 (2011) (hereinafter "*Cook I*"). As this

---

the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). Plaintiffs heavily rely upon and frequently reference Department Order 710 in their Complaint, it is central to their claim here—indeed, the core of their case, and Plaintiffs cannot question its authenticity.

Court explained, Bromide "mitigates involuntary muscle spasms often caused by potassium chloride, which may be unpleasant for witnesses to watch." *Dickens v. Brewer*, 07-cv-1770-NVW, 2009 WL 1904294 (D. Ariz. July 1, 2009) (plaintiffs in *Dickens* included two plaintiffs here, Smith and Hedlund). Bromide "does not affect consciousness, sensation, cognition, or the ability to feel pain and suffocation." *Id*. at *11. Bromide has been used in Arizona executions since 1993 and in at least 30 other states. PC induces cardiac arrest.

The Department has been forced to change its drug protocols over time, almost always in reaction to opponents of the death penalty who wage guerilla warfare in courts and international commerce—suing and sabotaging in order to erect obstacle after obstacle in the State's path to acquire court-approved chemicals. *Glossip*, 135 S.Ct. at 2733-34.

**Safeguards**. The Protocol includes safeguards to ensure that an inmate is unconscious and insensate three minutes after MZ is administered. Bromide and PC are not administered until the Intravenous Team ("IV Team") Leader "physically confirm[s]" the inmate is and remains unconscious. (Ex. A at 033, ¶¶ 4-5). It requires that IV Team members be qualified, well-trained and experienced. (*Id*. at 007.) ("All team members shall be currently certified or licensed within the United States to place IV lines."). It explains what the IV Team must do and where the Team must do it. *Id*.

**News Media**. The Department of Corrections ensures that media is well represented and well served. It invites 12 or more reputable citizens to witness the execution, including up to five Arizona-market media. These official media witnesses also agree to serve as pool reporters. (*Id*. at 011.)

The Department also makes a press room available and provides regular briefings to the media by the Media Relations Director and Public Information Officer. (*Id*. at 020-21).

**Witnesses**. The media and public share identical rights and opportunities to witness an execution. All witnesses can observe the inmate from the moment he walks into the execution chamber until the moment that death is pronounced. (Am. Compl., ¶ 126 ("And defendants

6

agreed to allow witnesses to observe the prisoner entering the execution chamber."); Ex. A at 030 ("At the designated time, the overhead microphone will be turned on and the inmate will be brought into the execution room and secured on the table by the prescribed means with the inmate's arms positioned at an angle away from the inmate's side. Existing closed-circuit monitors will allow witnesses in the designated witness room to observe this process."); *id*. at 031 ("Existing closed-circuit monitors will allow witnesses in the designated witness room to observe the IV Team's vein assessment and placement of IV catheters in the inmate. In addition, the audio feed from the overhead microphone will be turned off following the IV Team's assessment and placement of IV catheters.")).

**This Lawsuit**. Plaintiffs filed their Second Amended Complaint on January 26, 2016. (ECF No. 94). The Inmates assert an Eighth Amendment method-of-execution challenge with ancillary First Amendment, Due Process, and Equal Protection components—all of which are baked into and rely on the Eighth Amendment challenge. The Coalition asserts a First Amendment claim.

At this Court's suggestion, the State agreed to deviate from standard practice and litigate Plaintiffs' claims before a warrant of execution is sought and issued, and before the Inmates move to stay their executions. (Joint Stip. for Temporary Stay ECF No. 67).

## I. THE DEATH ROW INMATES FAIL TO STATE A CLAIM FOR RELIEF UNDER RULE 12(b)(6)

Four points merit emphasis at the outset. First and foremost, the death penalty is constitutional and long has been. *See*, *e.g.*, *Glossip*, 135 S.Ct. at 2731-33 (collecting decisions from 1879 to 2008). Indeed, "the [U.S. Supreme] Court has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Id*. at 2732 (internal quote marks omitted) (including death by firing squad and electric chair). The Death Row Inmates here offer no path or reason for this Court to depart from a 137-year line of binding U.S. Supreme Court precedent.

Second, a Rule 12(b)(6) motion "tests the legal sufficiency of a claim" and this lawsuit

7

fails. Pleading requirements "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Plaintiffs cannot meet federal pleading requirements with speculation or passion. Rather, the Plaintiffs must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *Cook I*, 637 F.3d 1002 (affirming 12(b)(6) dismissal of Eighth Amendment claim alleging that state obtained lethal injection drug from a foreign source).

Third, "challenges to lethal injection protocols test the boundaries of the authority and competency of federal courts. Although we must invalidate a lethal injection protocol if it violates the Eighth Amendment, federal courts should not 'embroil [themselves] in ongoing scientific controversies beyond their expertise.'" *Glossip*, 135 S.Ct. at 2740 (quoting *Baze*, 553 U.S. at 51).

And last, the Constitution does not articulate (much less pinpoint) any pain threshold that cannot be surpassed; it does not require that executions be painless, nor does it mandate that execution methods represent the least painful alternative. *Glossip*, 135 S.Ct. at 2733. As the U.S. Supreme Court has explained: "[B]ecause some risk of pain is inherent in any method of execution, we have held that the Constitution does not require the avoidance of all risk of pain. After all, while most humans wish to die a painless death, many do not have that good fortune. Holding that the Eighth Amendment demands the elimination of essentially all risk of pain would effectively outlaw the death penalty altogether." *Id.*; *accord Lopez v. Brewer*, 680 F.3d 1084, 1086 (9th Cir. 2012) ("But the risk of some pain and discomfort, resulting from the subject's own physiology, is not intolerable. Many medical procedures cause pain and discomfort, sometimes severe: tooth extraction; rabies vaccinations; knee surgery; skin grafts; cystoscopies, to name just a few. People endure these nonetheless as part of ordinary human existence. An execution need not be totally painless, nor is the state required to go to extraordinary lengths to avoid the possibility that the condemned criminal will suffer some pain

8

incident to procedures designed to carry out his lawful sentence.") (Kozinski, J., concurrence).

The State does not seek to impose, exacerbate, or maximize pain. It seeks only to perform its job—namely, to discharge the valid and enforceable capital sentences imposed for 11 murders. If pain were the goal, it could be accomplished with far more primitive techniques—from the gas chamber to the electric chair.

### A. The Death Row Inmates fail to state a claim for relief under the Eighth Amendment (Counts 1 and 6)

Just eight months ago, the U.S. Supreme Court set forth three absolute requirements for stating an Eighth Amendment method-of-execution claim:

| | |
|---|---|
| 1 | The method of execution must present "a risk that is *sure* or *very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers." |
| 2 | The method of execution must present "a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" |
| 3 | The Death Row Inmates must plead and prove the existence of "a reasonable alternative to the method of execution that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." |

*Glossip*, 135 S. Ct. at 2737-39 (decided only 235 days ago) (emphasis in original) (omitting internal quote marks and cites). *Each* must be satisfied. Far from meeting *each* requirement of this seminal and dispositive test, the Eighth Amendment claim fails at *each* step.

#### 1. No Eighth Amendment claim based on administration of Bromide

Having exhausted their arsenal of Eighth Amendment arguments against the first drug in the Protocol (MZ), without success, the Inmates and their advocates now direct their rhetoric at Bromide, the second of three drugs administered. In particular, the Inmates allege that Bromide violates the Eighth Amendment because it masks their pain. (Am. Compl. ¶¶ 137, 151-153).

This claim fails for four independent reasons. Each is dispositive. To begin, the argument is foreclosed by binding U.S. Supreme Court authority in *Baze* and *Glossip*, where the

Court considered and rejected the very argument resurrected here.  This paragraph from *Baze* leaves nothing in doubt:

> ***Petitioners also contend that Kentucky should omit the second drug, pancuronium bromide***, because it serves no therapeutic purpose while suppressing muscle movements that could reveal an inadequate administration of the first drug. The state trial court, however, specifically found that pancuronium serves two purposes. First, it prevents involuntary physical movements during unconsciousness that may accompany the injection of potassium chloride. The Commonwealth has an interest in preserving the dignity of the procedure, especially where convulsions or seizures could be misperceived as signs of consciousness or distress. Second, pancuronium stops respiration, hastening death. ***Kentucky's decision to include the drug does not offend the Eighth Amendment.***

*Baze*, 553 U.S. at 57-58 (emphasis added).  End of lawsuit.

Next, *if* MZ is effective and does its job, *then* the Inmates have no Eighth Amendment argument for cruel and unusual punishment based on Bromide.  Again, MZ is a tranquilizer that renders an inmate unconscious and insensate.  *If* unconscious and insensate, *then* the inmate suffers no pain.  On that score, too, the U.S. Supreme Court leaves nothing to the imagination.  The Court held that 500 milligrams of MZ (the identical amount used under Arizona's Protocol) is likely to render an inmate insensate to pain that might result from the administration of the second and third drugs. *Glossip*, 135 S. Ct. at 2739 (collecting cases from "numerous courts" that reached the same decision); *cf*. *Beardslee v. Woodford*, 395 F.3d 1064, 1076 (9th Cir. 2005) ("objections to the use of pancuronium bromide become irrelevant upon the proper administration of sodium pentothal.").  The Complaint thus fails to state a claim.  *Cook v. Brewer*, 649 F.3d 915 (9th Cir. 2011) (hereinafter "*Cook II*") (dismissing § 1983 action under Rule 12(b)(6) which speculated the first drug in Arizona would not be effective).

Third, Plaintiffs do not allege any plausible basis for their claim that Bromide is *sure* or *very likely* to *cause* serious pain and needless suffering. *Glossip*, 135 S. Ct. at 2737.  Just the opposite.  Rather than *cause* pain, the Inmates insist that the paralytic *masks* pain.  The Eighth Amendment, however, protects neither the right to die in visual pain and discomfort, nor the

right to watch it.  The claim must be dismissed.

And last, Plaintiffs have not pled "a known and available alternative" to the challenged Protocol that entails a lesser risk of pain.  *Glossip*, 135 S.Ct. at 2739 (2015) ("[T]he prisoners failed to identify a known and available alternative method of execution that entails a lesser risk of pain, a requirement of all Eighth Amendment method-of-execution claims.").  Plaintiffs thus fail to state an Eighth Amendment claim.  *Id*.; *Gissendaner v. Ga. Dep't of Corrections*, 803 F.3d 565, 568 (11th Cir. 2015) (affirming 12(b)(6) dismissal in part because plaintiff failed to plead an alternative method).

### 2. No Eighth Amendment claim based on past executions

The Death Row Inmates have no Eighth Amendment claim based on prior executions or, in particular, the Wood execution.  Again, the Eighth Amendment protects the inmates against the risk of future harm, but only if the harm is "sufficiently imminent" and it is "sure or very likely" to cause serious illness and needless suffering. The Complaint meets neither element.

Plaintiffs spend large swaths of their Complaint on the execution of Joseph Wood.  (Am. Compl. ¶¶ 2-4, 37-38, 43, 45, 90-114).  The Court should not chase those butterflies.  For starters, even if "botched" (… and it was not), the Wood execution used a different two-drug protocol that (1) ***did not*** include Bromide, (2) included a drug (hydromorphone) not in the challenged Protocol, and (3) is no longer in use.  (Am. Compl., ¶ 120).  Those undisputed facts, alone, end the inquiry because an execution conducted without Bromide cannot prove a "sure or very likely" risk that Bromide causes needless pain.

What is more, the U.S. Supreme Court has explained that "an isolated mishap" does not create a "substantial risk of serious harm" under the Eighth Amendment.  *Baze*, 553 U.S. at 50 (quoting *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947)) (upholding the death penalty "when presented with a case in which a State's initial attempt to execute a prisoner by electrocution was unsuccessful").

The Inmates also spend much time on historical executions, including (1) three out-of-

11

state executions, one of which did not use Bromide (Am. Compl., ¶¶ 38-42, 44), (2) two Arizona executions in 1930 and 1992 with different execution methods altogether—hanging and the gas chamber (*id*., ¶¶46-47), and (3) fourteen Arizona executions since 2007—*nine* of which did not even use Bromide (*id*., ¶¶46-47).

The first two points are irrelevant. This is Arizona and lethal injection will be used to execute the death row inmates. And Plaintiffs' chart of past Arizona executions (*id*., ¶ 91) militates against, rather than for, the Inmates. The chart lists the nine most recent Arizona executions. In *eight* of them, the inmate was pronounced dead within 7 to 37 minutes for an average of 17.1 minutes. At best, this shows that Wood's execution was anomalous in its length, which cannot meet the heightened "sure or very likely" standard. *Baze*, 553 U.S. at 50.

The Inmates next argue that multiple attempts to set IV lines in past executions violates their Eighth Amendment rights and that Arizona has come close to and exceeded "*Baze*'s upper [one hour] limit on an unconstitutionally lengthy attempt to place an IV line." (Am. Compl., ¶¶ 74, 91).

Hardly. Plaintiffs have not articulated or pled a plausible basis to believe that those past executions make it "sure or very likely" that Plaintiffs will suffer severe and imminent pain in their executions. *Cook I*, 637 F.3d 1002. What is more, *Baze* does not declare a one-hour deadline for setting IVs. It actually says: "The IV team has one hour to establish both the primary and backup IVs, a length of time the trial court found to be 'not excessive but rather necessary.'" *Baze*, 553 U.S. at 55.

The Ninth Circuit's decision in *Cook I* exemplifies the proper analysis and required decision here. *Cook I*, 637 F.3d at 1003 (dismissing under Rule 12(b)(6) an Eighth Amendment method-of-execution claim). There, like here, a death row inmate challenged Arizona's method of execution under the Eighth Amendment. There, like here, the death row inmate relied on "speculation and conclusory allegations." And there, like here, a Rule 12(b) dismissal was appropriate because the inmate's allegations were "insufficient to state a facially plausible claim

that the sodium thiopental the ADC has obtained is '*sure or very likely* to cause serious illness and needless suffering' in violation of his Eighth Amendment right to be free from cruel and unusual punishment." *Cook II*, 649 F.3d at 918 (emphasis in original).

In the end, the Inmates and their advocates construct a false narrative that lacks any foothold in the real world. A syringe *might* contain an air bubble and *could* contain battery acid, but Plaintiffs allege no factual basis to sue based on either. *See*, *e.g.*, *Cook I*, 637 F.3d at 1006 ("Cook also fails to allege any facts to support his claim that the drug might not actually be sodium thiopental or that it could be contaminated, compromised, or otherwise substandard such that it may not effectively anesthetize him and cause him unconstitutional pain when the next two drugs are administered.").

### B. The Death Row Inmates state no claim for relief under the First Amendment (Counts 1, 4, and 5)

The Death Row Inmates next claim the State has or will violate their First Amendment rights by (1) administering Bromide in the Protocol (Am. Compl. ¶¶ 152, 153); and (2) depriving them of information about "the means by which the state intends to carry out executions" (*id*. ¶¶ 165, 166, 173, 174). These theories find no basis in the Constitution. Each fails.

The Inmates first argue that Bromide—a paralytic used for decades in Arizona and across the United States—somehow infringes upon their First Amendment right to express pain, suffering, and emotion during the execution. But that fanciful version of the First Amendment *collides head on* with the Eighth Amendment and its express textual protections that prohibit the State from inflicting cruel and unusual punishment.

The second and third arguments are conjoined and both fail. Though all inmates have a First Amendment right to petition the government for redress of grievances, which includes "a reasonable right of access to the courts," *Bounds v. Smith,* 430 U.S. 817, 823 (1977), *that* discrete and well-defined First Amendment right looks nothing like the putative right described in the Second Amended Complaint.

The actual First Amendment right, as judicially-recognized, protects only "the capability of bringing contemplated challenges to sentences or conditions of confinement." *Lewis v. Casey*, 518 U.S. 343, 354 (1996) (explaining scope of actual right and holding that inmate lacked Article III standing to assert same); *Jones v. Comm'r, Ga. Dep't of Corrections*, _ F.3d _, 2016 WL 384723 at *2 (11th Cir. Feb. 1, 2016) (dismissing death row inmate's claim on 12(b)(6) grounds because no circuit court has recognized a right-of-access claim to execution-related information). It does not articulate or embrace any right to "discover" information, and federal courts have expressly rejected the notion that inmates have an expansive First Amendment right to all execution-related information. *See*, *e.g.*, *id.; see also Zink v. Lombardi*, 783 F.3d 1089, 1108-09 (8th Cir. 2015) (holding that limited right did not include timely and adequate notice of information regarding execution method).

In sum, the Inmates have no Eighth or First Amendment right to remove the second drug from the Protocol to create a spectacle with the objective of swaying public opinion and ultimately abolishing the death penalty. To grant such relief would encourage Plaintiffs to press on with gamesmanship that saps the limited resources of this and other federal courts; not to mention the State's limited resources.

And even if the Constitution somehow protected that perverse right, the Inmates' larger plan and argument is constructed upon a false premise—namely, that MZ will not work. The U.S. Supreme Court just said it did. *Glossip*, 135 S.Ct. at 2739-42.

**C.    The Substantive Due Process and Equal Protection Claims must also be dismissed for failure to state a claim (Counts 2, 7, and 8)**

The Death Row Inmates next repackage their Eighth Amendment claims as Due Process and Equal Protection claims. It doesn't work.

14

### 1. No due process claim (Counts 2 and 7)

The Inmates claim the State violates their Fourteenth Amendment substantive due process right "to be free from harmful and unwarranted administration of drugs" when it administers Bromide because that drug "is at best entirely superfluous, and at worst, masks immense pain" (Am. Compl., ¶¶ 157, 159); and violates their "right to know how ADC intends to execute them" (*id.*, ¶¶ 182, 183).

For starters, the Eighth Amendment's express textual protections trump "the more generalized notion of substantive due process." *U.S. v. Lanier*, 520 U.S. 259, 272 n. 7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.").

And federal courts have uniformly rejected the argument that death row inmates have a due process right-of-access claim to information about their method of execution. *Jones*, 2016 WL 384723 at *2 ("[N]o other circuit court has ever recognized the kind of due process right-of-access claim that Jones now asserts."); *Zink*, 783 F.3d at 1109 ("We agree with the Eleventh and Fifth Circuits that the Constitution does not require such disclosure."), *cert. denied*, 135 S.Ct. 2941 (2015); *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014) (same).

Unsurprisingly then, Plaintiffs' "supporting" authorities distinguish themselves. This case does not concern abortion rights, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992); the right to die, *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990); forcible medical treatment, *Washington v. Harper*, 494 U.S. 210 (1990); or seizing evidence inside a human stomach, *Rochin v. California*, 342 U.S. 165 (1952). (Am. Compl., ¶¶ 30, 157).

Nor do the Inmates state a claim with mere speculation that the Department might depart from the notice provisions in Department Order 710 (Am. Compl. ¶¶ 128-31). *See Cook I*, 637 F.3d at 1006 ("speculative and conclusory allegations" insufficient to survive 12(b)(6) challenge). And inmates have been able to challenge the State about the drug protocol in the

1 two past executions.  (Am. Compl. ¶¶ 62, 70-72).

### 2. No equal protection claim (Count 8)

Plaintiffs next toss in an equal protection claim based on their allegation that the State has "unfettered discretion to follow or not follow their procedures at will and without a principled basis for determining when deviations are warranted" (Am. Compl. ¶ 188), and on some "pattern of deviating from procedures and exercising discretion in inhumane ways."  (Am. Compl. at p. 53).  To establish an equal protection violation, Plaintiffs have the burden to demonstrate a discrimination against them of some substance and must point to disparate treatment between two similarly situated groups. *Clements v. Fashing*, 457 U.S. 957, 967 (1982); *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) (equal protection claim requires plaintiffs to identify a 'similarly situated' class for comparative purposes).

The Inmates allege no such facts in their Complaint.  They never identify the equal treatment allegedly denied to them, which is the "gravamen" of an equal protection claim. *Mlikotin v. City of Los Angeles*, 643 F.2d 652 (9th Cir. 1981) (affirming 12(b)(6) dismissal of equal protection claim).  Nor do Plaintiffs identify a similarly situated class receiving favorable treatment, against which to compare their treatment.  *Id.*  These omissions are not surprising. The State treats all death row inmates the same, all within constitutional parameters.

Plaintiffs cannot meet the "class of one" requirement.  "Absent any pattern of generally exercising the discretion in a particular manner while treating one individual differently and detrimentally, there is no basis for Equal Protection scrutiny under the class-of-one theory." *Towery v. Brewer*, 672 F.3d 650, 660 (9th Cir. 2012).  Plaintiffs fail to allege any facts suggesting the State has exercised its discretion in a way that treated one inmate "different and detrimentally," or otherwise "less favorably than others generally are." *Id.* at 659.

Next, the Inmates cannot pursue an equal protection claim without an underlying Eighth Amendment violation.  *Towery*, 672 F.3d at 659 (holding that "fundamental rights prong" of

16

equal protection claim is not met because "there has been no showing here of any burden on the right to be free of cruel and unusual punishment.").

And last, unsurprisingly, Plaintiffs' supporting authorities miss the mark. (Am. Compl., ¶ 29). This is not an election case, *Bush v. Gore*, 531 U.S. 98 (2000); not a same-sex marriage case, *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012); not a DNA case, *Dist. Atty Off. v. Osborne*, 557 U.S. 52 (2009); and not a jury pool case, *Myers v. Ylst*, 897 F.2d 417 (9th Cir. 1990).

## II. THE COALITION FAILS TO STATE A PLAUSIBLE FIRST AMENDMENT CLAIM UNDER RULE 12(b)(6) (Counts 1 and 3)

The Media Coalition members argue the State infringes on their First Amendment rights when it (1) prevents them from watching an inmate die in visual pain and distress (Am. Compl., ¶¶ 138, 139, 152, 153, 154); (2) "prevent[s] [them] from aurally and visually observing the full execution chamber without interruption," which really just means the State (i) limits their visual access to the actual execution chamber, (ii) doesn't let them watch the action in a separate room where state employees administer the lethal chemicals via IV, and (iii) forces them to watch part of the proceedings via closed circuit TV with audio feed (*id.*, ¶¶ 140, 141, 162, 163); and (3) "fail[s] to disclose, in advance of the execution, details about the drugs used, the rationale for the selection of these drugs and their dosages, the chain of custody in how the drugs were obtained and stored, the qualifications and training of the persons administering them, and the defendants' ability to respond and preparation for responding" (*id.*, ¶¶ 162).

Not so. For starters, the First Amendment right to watch an execution is the same for media and the public. It is time limited—akin to a ticket for admission. It begins at a discrete and singular moment, which the Ninth Circuit describes as "the moment the condemned enters the execution chamber through, to and including, the time the condemned is declared dead." *Cal. First Amendment Coalition v. Woodford*, 299 F.3d 868, 886 (9th Cir. 2002).

That is *precisely* what Department Order 710 envisions and provides. "And defendants agreed to allow witnesses to observe the prisoner entering the execution chamber." (Am. Compl., ¶ 126).

17

The Ninth Circuit has never recognized the broad and malleable First Amendment right described in the Complaint. The First Amendment includes no right to demand that a state government change the drugs it uses in an execution; no right for witnesses to hear an inmate's every utterance; and no right to watch an entirely separate room in which state employees administer the lethal chemicals via intravenous lines.

The Coalition has no First Amendment right to the broad array of sensitive and confidential information either. Federal courts have rejected this argument. *See*, *e.g., Zink*, 783 F.3d at 1112 (First Amendment right of access does not extend to information regarding the source of the execution chemicals). This Court should do the same.

Nor would the disclosure of this information play a significant positive role in the functioning of executions. *Cal. First Amendment Coalition*, 299 F.3d at 875. Just the opposite. Release of that information would further inhibit and delay the execution process in Arizona (and across the Nation) as opponents of the death penalty work to block those channels, too. *Glossip*, 135 S. Ct. at 2733.

This Court reached the same conclusion in this very case. Inmate J. Wood sought information from the State regarding the method of his execution, and argued that by withholding this information, the State had violated his First Amendment rights. This Court denied a preliminary injunction. And a unanimous U.S. Supreme Court affirmed. *Wood v. Ryan*, 135 S.Ct. 21 (2014).

**CONCLUSION**

For the foregoing reasons, this Court must dismiss the Second Amended Complaint in its entirety pursuant to Rule 12(b)(6), Fed. R. Civ. P. Plaintiffs fail to state any plausible First Amendment, Eighth Amendment, equal protection, or due process claims.

DATED February 19, 2016.

OFFICE OF THE ARIZONA ATTORNEY GENERAL

/s/ David D. Weinzweig
David D. Weinzweig
Lacey Stover Gard
John Pressley Todd
Jeffrey L. Sparks
Attorneys for State Defendants

I hereby certify that the foregoing document was electronically filed using the CM/ECF System on February 19, 2016.

I further certify that a copy of the foregoing was transmitted by a Notice of Electronic Filing to the CM/ECF registrants on record in this matter on February 19, 2016.

By: /s/ David D. Weinzweig

**CERTIFICATE OF CONFERRAL**

I certify that pursuant to this Court's order of July 18, 2014 (ECF No. 25), on February 18, 2016, the parties conferred to determine whether an amendment could cure a deficient pleading. Based on the conferral, Defendants do not believe that an amendment could cure any deficiency in the Second Amended Complaint.

DATED this 19th day of February, 2016

s/ Jeffrey L. Sparks<br>
Assistant Attorney General