JON M. SANDS
Federal Public Defender, District of Arizona
DALE A. BAICH (OH Bar No. 0025070)
dale_baich@fd.org
ROBIN C. KONRAD (AL Bar No. N76K2194)
robin_konrad@fd.org
850 West Adams Street, Suite 201
Phoenix, Arizona  85007
602.382.2816  |  602.889.3960 facsimile

Counsel for Condemned Plaintiffs

MARK E. HADDAD (CA Bar No. 205945)
mhaddad@sidley.com
JOSHUA E. ANDERSON (CA Bar No. 211320)
janderson@sidley.com
ALYCIA A. DEGEN (CA Bar No. 211350)
adegen@sidley.com
AIMEE G. MACKAY (CA Bar No. 221690)
amackay@sidley.com
KATHERINE A. ROBERTS (CA Bar No. 259486)
Kate.roberts@sidley.com
COLLIN P. WEDEL (CA Bar No. 278461)
cwedel@sidley.com
MATT LIGHT (CA Bar No. 294007)
mlight@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California  90013
213.896.6000  |  213.896.6600 facsimile

Counsel for the Coalition and Condemned Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| First Amendment Coalition of Arizona, Inc.; Charles Michael Hedlund; Graham S. Henry; David Gulbrandson; Robert Poyson; Todd Smith; Eldon Schurz, and Roger Scott, Plaintiffs, *v.* Charles L. Ryan, Director of ADC; James O'Neil, Warden, ASPC–Eyman; Greg Fizer, Warden, ASPC–Florence; and Does 1-10, Unknown ADC Personnel, in their official capacities as Agents of ADC, Defendants. | Case No. 2:14-cv-01447-NVW-JFM **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...........................................................................................................3

I.     Claim One States a Claim Under the First, Eighth, and Fourteenth
Amendments Based on Defendants' Use of a Chemical Curtain to Hide
Pain. ..........................................................................................................3

II.    Claim Two States a Claim for Relief Under the Fourteenth Amendment's
Protection of a Person's Bodily Integrity. ................................................7

III.   Claims Three and Four State Claims for Relief Under the First
Amendment's Guarantee of Access to Governmental Proceedings. ........9

IV.   Claim Five States a Claim for Relief under the First Amendment's
Protection of the Condemned Prisoners' Right of Access to Courts.......11

V.    Claim Six States a Claim for Relief Based on Defendants' Unchecked
Discretion and Pattern of Deviation from Their Procedures. .................12

VI.   Claim Seven States a Claim for Relief under the Fourteenth Amendment's
Guarantee of Procedural Due Process. ...................................................14

VII.  Claim Eight States a Claim for Relief Under the Equal Protection Clause
Based on Defendants' Pattern of Arbitrarily Adhering to Their Written
Procedures.................................................................................................15

CONCLUSION ......................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Title Ins. Co. v. Lacelaw Corp.*,
  861 F.2d 224 (9th Cir. 1988) ...................................................................................5

*Arthur v. Thomas*,
  674 F.3d 1257 (11th Cir. 2012) ........................................................................13, 16

*Associated Press v. Otter*,
  682 F.3d 821 (9th Cir. 2012) ....................................................................................9

*Baze v. Rees*,
  553 U.S. 35 (2008) ...........................................................................................4, 5, 6

*Beardslee v. Woodford*,
  395 F.3d 1064 (9th Cir. 2005) .................................................................................12

*Bush v. Gore*,
  531 U.S. 98 (2000) ...................................................................................................15

*Cal. First Amend. Coal. v. Woodford*,
  299 F.3d 868 (9th Cir. 2002) ...........................................................................*passim*

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ...........................................................................................15, 16

*Coleman v. City of Mesa*,
  230 Ariz. 352 (2012) ...............................................................................................17

*Cooey v. Kasich*,
  801 F. Supp. 2d 623 (S.D. Ohio 2011) ....................................................................16

*Cty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998) ...........................................................................................7, 8, 9

*Fontana v. Haskin*,
  262 F.3d 871 (9th Cir. 2001) ....................................................................................9

*La. ex rel. Francis v. Resweber*,
  329 U.S. 459 (1947) ..................................................................................................9

*Gerhart v. Lake Cty. Mont.*,
  637 F.3d 1013 (9th Cir. 2011) .................................................................................16

*Glossip v. Gross*,
    135 S. Ct. 2726 (2015) ............................................................. 3, 4, 5, 11

*Halet v. Wend Inv. Co.*,
    672 F.2d 1305 (9th Cir. 1982) ...................................................... 16

*Hall v. Florida*,
    132 S. Ct. 1986 (2014) ............................................................ 12, 14

*Hebbe v. Pliler*,
    627 F.3d 338 (9th Cir. 2010) ..................................................... 11, 12

*Johnson v. Meltzer*,
    134 F.3d 1393 (9th Cir. 1998) ...................................................... 7, 8

*Jones v. Commissioner*,
    811 F.3d 1288 (11th Cir. 2016) ..................................................... 10

*Lewis v. Casey*,
    518 U.S. 343 (1996) ........................................................... 7, 11, 12

*Lopez v. Brewer*,
    680 F.3d 1084 (9th Cir. 2012) ...................................................... 15

*Marsh v. Cty. of San Diego*,
    680 F.3d 1148 (9th Cir. 2012) ....................................................... 8

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ............................................................... 7, 14

*Myers v. Ylst*,
    897 F.2d 417 (9th Cir. 1990) ....................................................... 16

*NAACP, W. Region v. City of Richmond*,
    743 F.2d 1346 (9th Cir. 1984) ...................................................... 13

*Nat'l Archives & Records Admin. v. Favish*,
    541 U.S. 157 (2004) .................................................................. 8

*In re Ohio Exec. Protocol Litig.*,
    840 F. Supp. 2d 1049 (S.D. Ohio 2012) ....................................... 16, 17

*Perry v. Brown*,
    671 F.3d 1052 (9th Cir. 2012) ...................................................... 15

*Smith v. Marsh*,
    194 F.3d 1045 (9th Cir. 1999) ....................................................... 7

*State v. Beaty*,
No. CR-85-0211-AP/PC, at 2-3 (Ariz. May 25, 2011) .................................... 15

*Towery v. Brewer*
672 F.3d 650, 653 (9th Cir. 2012) ........................................................... 14, 16

*Trottie v. Livingston*,
766 F.3d 450 (5th Cir. 2014) ....................................................................... 4

*Turner v. Safley*,
482 U.S. 78 (1987) ....................................................................................... 8

*United States v. Marion*,
404 U.S. 307 (1971) ..................................................................................... 8

*Vill. of Willowbrook v. Olech*,
528 U.S. 562 (2000) ................................................................................... 16

*Washington v. Harper*,
494 U.S. 210 (1990) ..................................................................................... 7

*Wolff v. McDonnell*,
418 U.S. 539 (1974) ................................................................................ 8, 12

*Zink v. Lombardi*,
783 F.3d 1089 (8th Cir. 2015) .................................................................. 10

**Constitutions and Statutes**

U.S. Const. amend. I ........................................................................... *passim*

U.S. Const. amend. VIII ....................................................................... *passim*

U.S. Const. amend. XIV ....................................................................... *passim*

42 U.S.C § 1983 ........................................................................................ 12

Ariz. Const. art. II, § 6 ............................................................................. 17

Ariz. Const. art. II, § 11 ........................................................................... 17

Ariz. Rev. Stat. § 13-757 ................................................................... 8, 9, 10

**Other Authorities**

DPIC, *Execution List 2016*, www.deathpenaltyinfo.org/execution-list-2016 ....................... 4

DPIC, *Execution List 2015*, www.deathpenaltyinfo.org/execution-list-2015 ....................... 4

iv

**PRELIMINARY STATEMENT**

Arizona's Department of Corrections ("ADC" or "Director") routinely deviates from its written execution procedures ("Procedures") and breaks its promises to the courts and the public about how it carries out executions. *See* Second Am. Compl. ("SAC") ¶¶ 3-4, 6, 45-91, 97, 102-107, 128-31. ADC has changed drug protocols hours before an execution, *id.* ¶¶ 62, 131, injected chemicals into already-dead prisoners, *id.* ¶¶ 56, 131, and injected prisoners with painful drugs without checking whether they were unconscious, *id.* ¶¶ 61, 131. ADC hides these actions from public scrutiny, and conceals key facts about the drugs it uses, the qualifications of persons administering them, and the reality of its execution process and how condemned prisoners experience it. *Id.* ¶¶ 98-104, 162-63, 140-42, 166-67, 174. Even now, after first resisting all pre-execution requests for information about its novel combination of midazolam and hydromorphone and then presiding over the longest execution in American history, *id.* ¶¶ 2-3, 97, 119, 131, 179—which Defendants insist was not "botched," Mot. at 11—the Director continues to assert a right to depart from the Procedures in any way, at any time, and without notice, *id.* ¶ 128. ADC's erratic and unaccountable execution process is neither what the Arizona public has authorized nor what the Constitution permits. This Court should put a stop to it now.

In asking the Court to dismiss the case before hearing the evidence, Defendants seek to keep the public in the dark about what executions in Arizona have become. Defendants' motion makes clear that the last thing they want the public to know is what Arizona's prisoners experience during lethal injections. Yet if the process works as ADC professes it will, then ADC would have nothing to fear from transparency. It is precisely because transparency will reveal fundamental flaws in ADC's execution process that ADC cloaks the reality from public view.

In the new protocol, midazolam is purported to anesthetize the prisoner until potassium chloride ("KCl") stops his heart. *Id.* ¶¶ 5, 48, 137. But midazolam does not maintain unconsciousness during pain, and KCl causes intense pain. *Id.* ¶¶ 5, 135. To hide

1

the prisoner's pain from public view, the Director will inject the prisoner with a paralytic,[1] immobilizing the prisoner and effectively drawing a chemical curtain over the reality of the process. The paralytic constricts breathing, but neither relieves pain nor stops the heart. *Id.* ¶ 48, 138. A recipient of the paralytic feels the agony of asphyxiation, but cannot move, blink, or vocalize to respond to the feelings of suffocation or the pain of the injection of KCl. *Id.*

Defendants admit their fear that an execution without the paralytic would cause such a "spectacle" of "pain and distress" that it would "go viral" and "sway[] public opinion." Mot. at 3, 14. They thus ask this Court to condone their concealment of that "pain and distress" from public view.

Defendants' proposed use of a paralytic with midazolam and KCl is constitutionally indefensible. If, as Plaintiffs[2] contend (and Defendants seem worried is true), midazolam is ineffective to prevent the acute pain and suffering that the paralytic and KCl cause, then the use of the paralytic to disguise the prisoner's pain and suffering violates the Constitution. Conversely, if midazolam *could* prevent the pain of KCl, then administering the paralytic defeats accurate monitoring for unconsciousness and violates the prisoner's fundamental right to bodily integrity. Defendants can no more inject a prisoner with a gratuitous dose of a paralytic than they could with any other drug; prisoners may be executed, but not mutilated or experimented on.

Taken together, the Director's concealment of matters of public concern, boundless discretion, and cruel and unusual execution protocols violate Plaintiffs' fundamental rights under the First, Eighth, and Fourteenth Amendments. Plaintiffs' claims asserting those rights are sufficiently pleaded, and should now proceed to discovery and resolution on the merits.

---

[1] "Paralytic" refers to pancuronium bromide, vecuronium bromide, or rocuronium bromide.

[2] "Plaintiffs" are divided into two subgroups: (a) the First Amendment Coalition of Arizona, Inc. ("Coalition"), and (b) Charles Michael Hedlund, Graham Henry, David Gulbrandson, Robert Poyson, Todd Smith, Eldon Schurz and Roger Scott ("Condemned Plaintiffs").

**ARGUMENT**

I.     **Claim One States a Claim Under the First, Eighth, and Fourteenth Amendments Based on Defendants' Use of a Chemical Curtain to Hide Pain.**

Using a paralytic to mask midazolam's deficiencies violates Plaintiffs' rights under the Eighth Amendment, First Amendment, and Fourteenth Amendment.

*First*, the SAC alleges all of the facts necessary to sustain a claim that the serial administration of midazolam, a paralytic, and KCl violates the Eighth Amendment. *See Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015) (method-of-execution claim requires alleging a "substantial risk of serious harm" and "an alternative that is feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain" (quotations omitted)). When midazolam fails to maintain unconsciousness throughout painful stimuli, then it is "sure or very likely" that the paralytic and KCl will "cause serious illness and needless suffering." *Id.*; SAC ¶¶ 151-52. Conversely, if midazolam truly does prevent the experience of pain, then the paralytic is gratuitous, violative of bodily integrity, and "unusual." U.S. Const. amend. VIII; SAC ¶¶ 151-52, 159, 178-80.

Either way, the paralytic serves no legitimate purpose. SAC ¶¶ 152, 178. The Director admits that the paralytic "does not affect consciousness, sensation, cognition, or the ability to feel pain and suffocation." Mot. at 6. His only rationale for using it is that it may "hasten[] death" or "preserv[e] the dignity of the procedure" by preventing "convulsions" that "could be misperceived as signs of consciousness or distress." Mot. at 6, 10 (quoting *Baze v. Rees*, 553 U.S. 35, 57-58 (2008)). But, as Plaintiffs allege and expert testimony will confirm, neither ground is valid: the paralytic does not hasten death (the KCl is lethal before the prisoner suffocates), nor does it "preserve dignity" through paralysis, as a properly anesthetized prisoner would not "convuls[e]" *unless* he was in pain. SAC ¶¶ 138, 151-52.

*Glossip* does not foreclose this claim. The Court in *Glossip* had no occasion to weigh a challenge to the paralytic. Even as to midazolam, the Court held only that an Oklahoma district court "did not commit clear error when it found that midazolam is highly likely to render a person unable to feel pain during an execution." 135 S. Ct. at 2739. *Glossip* did not

3

enshrine one court's findings after an emergency injunction hearing as scientific fact beyond future challenge, let alone endorse midazolam's constitutionality in all cases. *Glossip* did not bar litigants from proving facts to the contrary, which Plaintiffs will do here.

*Baze* is not controlling here, either, because the protocol there began with a barbiturate, which Plaintiffs here accept as a constitutional alternative. And unlike in *Baze*, Plaintiffs' expert testimony here will directly rebut any presumption that the paralytic serves a legitimate purpose. SAC ¶¶ 32, 136.

*Glossip* and *Baze* also are distinguishable because Plaintiffs here allege alternative methods that are "feasible, readily implemented, and in fact significantly reduce[] a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2737; SAC ¶¶ 135-38, 152. Simply removing the paralytic from Defendants' protocol is obviously feasible and readily implemented; by eliminating the substantial likelihood of awareness of suffocation-through-paralysis, the alternative of removing the paralytic also would significantly reduce a risk of severe pain.[3] SAC ¶¶ 152-53. This alternative alone meets the *Glossip* test. Plaintiffs also have alleged that less-risky alternatives to midazolam (such as pentobarbital) are also readily available throughout the United States.[4] SAC ¶¶ 86-87. Plaintiffs' Eighth

---

[3] Defendants' assertion that SAC does not allege pain from the paralytic, *see* Mot. 10, ignores allegations that it inflicts pain through slow suffocation. *See* SAC ¶¶ 5, 138.

[4] Defendants have obstructed Plaintiffs' efforts to ascertain how Arizona obtains its execution drugs and to test Defendants' claims that they are uniquely unable to obtain barbiturates, despite four states' ability to get pentobarbital for dozens of recent executions. *See* Death Penalty Information Ctr. [DPIC], *Execution List 2015*, www.deathpenaltyinfo .org/execution-list-2015; DPIC, *Execution List 2016*, www.deathpenaltyinfo.org/execution-list-2016 (showing Georgia, Missouri, Texas, and Virginia have conducted 24 executions with pentobarbital in last 12 months). Because that information remains in Defendants' control, and because of Defendants' dispute with the FDA regarding sodium thiopental, Plaintiffs reserve their right to identify which drugs are "available" to Defendants until after discovery. If this Court finds that Plaintiffs must now allege that another specific drug (other than the midazolam/KCl combination) is available to Defendants, however, Plaintiffs would amend their Complaint to allege that pentobarbital and sodium thiopental, among other barbiturates, properly procured or compounded in accordance with FDA regulations, and duly tested for identity, potency, purity, and contamination, are available. *See, e.g., Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014) (prisoner "will be executed with a

4

Amendment challenge is thus distinct from those in *Glossip* and *Baze* and should be decided, as those cases were, on a factual record.

*Second*, using a paralytic to hide the impact of the lethal injection process on the prisoner independently violates the First Amendment—yet another issue never addressed in *Glossip* or *Baze*. "[I]t is critical for the public to be reliably informed about the lethal injection method of execution." *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 884 (9th Cir. 2002). The "public has a First Amendment right to view executions," including "aspects of a lethal injection execution [that] would be perceived as brutal by the public." *Id.* at 875. States may not infringe the public's right to witness the reality of an execution unless doing so advances a legitimate government interest and allows for alternative ways of exercising the right. *Woodford*, 299 F.3d at 878.

Protecting this right is particularly important in Arizona, where there can be no question that the degree to which the new protocol imposes unnecessary suffering is a matter of serious public concern. SAC ¶¶ 5, 23-25, 109-11, 139. The Director admits that, "for compassionate reasons," Arizona voters "amend[ed] the Arizona Constitution" to ensure a "more humane" and "less painful death." Mot. at 4 (citing 1992 General Election, Arizona Publicity Pamphlet ["Voter Pamphlet"] at 16-17 (Nov. 3 1992)); *see also* Voter Pamphlet at 16-17 (76.8 percent of Arizona voters agreed that "[a] civilized society should not inflict unnecessary suffering on any person, even those who are condemned to die").[5] Death after suffocation and searing pain could not be what Arizona voters had in mind when they "compassionate[ly]" voted for lethal injection. Indeed, Defendants, in seeking credit for not pursuing the "goal" of inflicting pain with "more primitive techniques" like "the gas

---

5g dose of pentobarbital obtained from a licensed compounding pharmacy within the United States . . . that has been tested by an independent laboratory").

[5] Defendants' reliance upon the facts stated within the Voter Pamphlet may be considered an adoption and judicial admission of the same. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224 (9th Cir. 1988). Plaintiffs have also requested judicial notice of the Election Pamphlet, the authenticity of which Defendants cannot dispute. *See* Pls.' Req. Jud. Notice.

chamber [or] electric chair," Mot. at 9, forget that it was Arizona voters who expressly denied them those alternatives.

The SAC's allegations establish the Director's violation of the First Amendment. There is no legitimate penological interest in using the paralytic to hide the effects of midazolam and KCl. *E.g.*, SAC ¶ 138. The paralytic's sole purpose is to "conceal the harsh reality of executions from the public," which is illegitimate, *Woodford*, 299 F.3d at 880; SAC ¶¶ 152-53. Defendants offer no defense of this aim other than through citation to *Baze*, which is inapposite here. *See* pages 3-4, *supra*. Plaintiffs' allegations are sufficient to state a claim without considering other factors. *Woodford*, 299 F.3d at 883 (holding once first factor is resolved, "other factors need not be considered").

Furthermore, there is no other way for the public to learn how Arizona's drugs actually affect the condemned, or whether midazolam actually keeps prisoners unconscious throughout the otherwise excruciating execution, without removing the paralytic. SAC ¶¶ 5, 135-39. The only way to inform the public about whether Arizona complies with its mandate of a "compassionate" method of execution or subjects prisoners to intense pain is by prohibiting the paralytic veil. *Id.* ¶¶ 138, 152-53, 159. Thus, the Director's use of the paralytic impermissibly and "entirely eliminates independent, public eyewitness observation of [this] crucial [part] of the execution process." *Woodford*, 299 F.3d at 883.

In arguing for dismissal of the First Amendment claim, Defendants seem willfully to misunderstand it. Defendants claim that the "First Amendment does not protect the right to create a spectacle and go viral." Mot. at 2-3, 14. Plaintiffs have no desire to undergo a painful execution or to create a spectacle. But if the "harsh reality" of a midazolam-KCl execution is that the prisoner experiences pain and distress then, as *Woodford* holds, "it is critical for the public to be reliably informed" about that pain. 299 F.3d at 884. The State can no more cloak that reality behind a chemical screen than behind a prison wall. If the result is so horrific that reports of it would "go viral" and alter "public opinion," as Defendants predict, Mot. at 3, 14, then the First Amendment will have served its vital

purpose of "ensur[ing] that this constitutionally protected 'discussion of governmental affairs' is an informed one." *Woodford*, 299 F.3d at 874 (quotations omitted).

*Third*, the use of the paralytic violates procedural due process because it "stymie[s]" Plaintiffs from "meaningful[ly]" challenging the "actionable harm" caused by midazolam and KCl, impairing their liberty interests in, *inter alia*, free expression, bodily integrity, and a non-cruel, non-unusual execution. *Lewis v. Casey*, 518 U.S. 343, 351 (1996); *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976) (requiring access to judicial process before state risks erroneously depriving prisoner of liberty interest). Defendants do not address this violation, and thus waive any objection. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[A]rguments not raised by a party in its opening brief are deemed waived.").

## II.   Claim Two States a Claim for Relief Under the Fourteenth Amendment's Protection of a Person's Bodily Integrity.

Defendants' injection of the paralytic also violates the Condemned Plaintiffs' rights of bodily integrity under the Fourteenth Amendment. *See* SAC ¶¶ 156-60; *Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting [prisoner's] body represents a substantial interference with that person's liberty."); *Johnson v. Meltzer*, 134 F.3d 1393, 1397 (9th Cir. 1998) (holding that a prisoner's "liberty interest in bodily integrity is one of the personal rights accorded substantive protection under the Due Process Clause"). A state actor violates that right when its conduct "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

Injecting a prisoner with a paralytic under Defendants' procedures causes significant suffering, yet does not hasten death; it is painful, yet gratuitous. SAC ¶ 138. Even if Defendants could prove that midazolam eliminates the prisoner's experience of pain, however, they cannot show that the administration of the paralytic is anything other than gratuitous. Either the paralytic compounds (and disguises) the prisoner's pain, or it is superfluous to the execution process. Whichever the reality may be, the injection of a drug that neither causes the prisoner to die nor relieves his pain may not be used in a lethal

injection. Injecting a prisoner with chemicals for no legitimate purpose whatsoever is unconstitutionally "arbitrary," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), and "shocks the conscience." *Johnson*, 134 F.3d at 1397.

That a prisoner is condemned to die does not give the state a license to inject him with drugs. Even behind prison walls, prisoners retain their right to be free from procedures that serve no valid penological purpose, *see Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."), including those procedures that affect the disposition and treatment of their bodies after death, *see Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 167-68 (2004); *cf. Marsh v. Cty. of San Diego*, 680 F.3d 1148, 1155 (9th Cir. 2012) ("Mutilation of a deceased . . . body . . . [is] the kind of conduct that . . . 'shocks the conscience' and 'offend[s] the community's sense of fair play and decency'" (citation omitted)). If the law were otherwise, condemned prisoners would become convenient subjects for medical experimentation. Who better to test for the immediate side effects of an unproven drug than a dying prisoner, a state might ask? Yet a state could not constitutionally conscript prisoners in nonconsensual testing without violating their Fourteenth Amendment rights.

Defendants' sole response is that this claim may be brought only under the Eighth Amendment. *See* Mot. at 15. That argument fails, because the due process clause is inapplicable only where a "claim is 'covered by'" another amendment. *Lewis*, 523 U.S. at 843. Here, the Eighth Amendment does not "cover" Claim Two; the gratuitous battery of a dying body with unnecessary chemical injections is not part of the "punishment" imposed. Arizona defines the "penalty of death" as "an intravenous injection of a substance or substances in a lethal quantity ***sufficient to cause death***." Ariz. Rev. Stat. § 13-757(A) (emphasis added). The administration of a drug that neither "cause[s] death" nor mitigates pain is not a component of the "punishment."

Defendants also ignore the Supreme Court's warning against "wrench[ing]" specific amendments from their "proper context" to fit claims that are properly analyzed under the due process clause. *United States v. Marion*, 404 U.S. 307, 322 (1971) (holding that claims

about excessive delay pre-indictment are better analyzed under the due process clause rather than the Sixth Amendment's speedy trial clause). It is not unusual, much less constitutionally forbidden, to evaluate bodily integrity claims as due process violations even though they relate to other claims under the Eighth Amendment. *See id.*; *Sacramento*, 523 U.S. at 843 (holding the Fourteenth, not Fourth, Amendment applies to police misconduct during high-speed chase antecedent to arrest); *La. ex rel. Francis v. Resweber*, 329 U.S. 459, 471 (1947) (Frankfurter, J. concurring) (explaining that the due process clause, not the Eighth Amendment, would prohibit "a series of abortive attempts at electrocution").[6]

## III.   Claims Three and Four State Claims for Relief Under the First Amendment's Guarantee of Access to Governmental Proceedings.

Plaintiffs have sufficiently pleaded Claims Three and Four for denial of access to facts such as the source, quality, and amounts of drugs to be used in executions, and the timing, method, and effect on the prisoner. SAC ¶¶ 161-67. "The public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Woodford*, 299 F.3d at 877; *see Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012).

The "process of putting the condemned inmate to death" by lethal injection necessarily includes obtaining and using chemicals for the injection. *Woodford*, 299 F.3d at 877. The nexus is one of common sense—indeed, if the drugs were administered openly, a witness could glean source information from the drug labels—but the Procedures and Arizona law confirm the connection. Specifically, in the Procedures, the Director claims that Ariz. Rev. Stat § 13-757(C) protects the drug source from disclosure. *See* Mot., Ex. A at 003. That statute, in turn, provides that "the identity of executioners and other persons who

---

[6] Even though the "shocks the conscience" standard is at least as exacting as any test under the Eighth Amendment—and Plaintiffs' claims would meet it, *see Fontana v. Haskin*, 262 F.3d 871, 881-82 & nn.6-7 (9th Cir. 2001) (holding "shocks the conscience" test *a fortiori* satisfies Fourth Amendment "unreasonableness")—if this Court finds that Plaintiffs' Claim Two must be brought as an Eighth Amendment claim, Plaintiffs would replead it as such.

participate or perform ancillary functions *in an execution* and any information contained in records that would identify those persons is confidential." Ariz. Rev. Stat § 13-757(C) (emphasis added). By claiming that the drug sources "participate or perform ancillary functions *in* an execution" for the purposes of § 13-757(C), the Director effectively concedes that those sources are "inextricably intertwined" with the "process of putting the condemned inmate to death," and thus, subject to the First Amendment right of access.

Under *Woodford*, a defendant may overcome the First Amendment right of access only by showing: (1) an overriding interest based on findings that concealment is essential to preserve higher values and (2) that its concealment is narrowly tailored to serve that interest. *Woodford*, 299 F.3d at 877 (citations omitted). But Defendants do not mention these factors—which would be fact-dependent in all events—thus waiving their right to do so and providing reason enough to deny the Motion. In any case, the Director's blanket concealment of all observation of how and when and what drugs are administered is neither "essential" nor "narrowly tailored" to advance any legitimate interest.

Finally, Defendants question whether the First Amendment applies at all to execution information, arguing that disclosure would not play a "significant positive role in the functioning of executions." Mot. at 18. But *Woodford* settled that access to executions plays a significant positive role. *See* 299 F.3d at 877. And the two cases on which Defendants rely for this point offer no aid: *Jones v. Commissioner*, 811 F.3d 1288 (11th Cir. 2016), did not involve a First Amendment claim; and *Zink v. Lombardi*, 783 F.3d 1089, 1112 (8th Cir. 2015), expressly acknowledged that its First Amendment analysis was directly contrary to *Woodford*—which controls the outcome in this circuit. *See* Mot. at 14, 18. Defendants' view that to examine the reality of the Wood execution is to "chase butterflies," Mot. 11, underscores *Woodford*'s apt observation that "[p]rison officials simply do not have the same incentives to describe fully the shortcomings of lethal injection executions." *Woodford*, 299 F.3d at 884. Defendants' concealment of information about the administration of drugs in Wood's execution hid from the public and this Court that the Director used 13 more doses than the Procedures permitted, and ensured that Wood's counsel could not alert the Court to

the deviation in a timely manner. Equally telling, Defendants' concealment of the sources and other information about the midazolam and hydromorphone meant that Wood could not develop the factual record that might have allowed him to show this Court that the drugs ADC obtained would not work as the Director planned and promised they would. Keeping these facts from public scrutiny cannot be reconciled with *Woodford*, which confirms that "[a]n informed public debate is critical in determining whether execution by lethal injection comports with 'the evolving standards of decency which mark the progress of a maturing society.'" 299 F.3d 868, 876 (quoting *Trop v. Dulles* 356 U.S. 86, 1010 (1958)).

## IV. Claim Five States a Claim for Relief under the First Amendment's Protection of the Condemned Prisoners' Right of Access to Courts.

The SAC also alleges that the Director has unconstitutionally impaired Condemned Plaintiffs' right of access to the courts. "Penal institutions have a duty to afford prisoners 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (quoting *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). A state violates that right when its policies "hinder[] efforts" to "meaningful[ly]" challenge an "actionable harm," *Casey*, 518 U.S. at 351.

Plaintiffs here have already alleged several concrete, "actionable harms"—namely, that midazolam will not prevent the suffering caused by KCl, and that the paralytic conceals that suffering and compounds it by causing its own harm. SAC ¶ 137-38. Plaintiffs have also shown that the Director's policies "hinder[] [their] efforts to pursue a legal claim." *Id.* ¶¶ 137-38, 174-76. Specifically, after *Glossip*, to bring an Eighth Amendment method-of-execution challenge, Plaintiffs must show that the method is "sure or very likely" to "cause serious illness and needless suffering," and that there is an alternative that is "feasible, readily implemented, and in fact significantly reduce[] a substantial risk of severe pain." 135 S. Ct. at 2737. The Director's policies, however, "hinder" Plaintiff's ability (a) to fully evaluate the needless suffering inflicted; (b) to fully evaluate feasible alternatives; and (c) to litigate the constitutionality of how the Director actually carries out an execution, because he departs without notice from the written procedures. *See infra* § VI.

11

Defendants respond that the right of access does not extend to the right to "discover *information*." Mot. at 14 (emphasis added). That is too broad—it would defeat any discovery or assistance. All *Casey* foreclosed was a requirement that prisons equip prisoners "to discover *grievances*." 518 U.S. at 354. The Court held that prisons need not provide all of the legal resources to file "everything from shareholder derivative actions to slip-and-fall claims." *Id.* at 355. But *Casey* expressly reaffirmed that prisoners must be given the "tools [they] require[]," which includes information, to bring "actions under 42 U.S.C § 1983 to vindicate basic constitutional rights." *Id.* at 354; *see Hebbe*, 627 F.3d at 343. That is what Plaintiffs seek—without knowing how the Director actually plans to execute them, with what drugs, and in what amounts and of what quality, and without knowing how and from where Defendants obtained those drugs, Plaintiffs lack several of the "tools" required to litigate their constitutional deprivations. This claim is sufficiently pleaded.

## V. Claim Six States a Claim for Relief Based on Defendants' Unchecked Discretion and Pattern of Deviation from Their Procedures.

The Director's discretion to deviate from the Procedures at any time and in any way—including as to the drugs used and notice given—violates the Eighth and Fourteenth Amendments. Those amendments prohibit execution-by-experiment. *Beardslee v. Woodford*, 395 F.3d 1064, 1070 (9th Cir. 2005) ("[T]he Eighth Amendment prohibits punishments that . . . do not accord with 'the dignity of man . . . .'" (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976))); *see Hall v. Florida*, 132 S. Ct. 1986, 2001 (2014) ("The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects."); SAC ¶ 28 & n.8. The Constitution also prohibits arbitrary deviations from written execution procedures without due process or legitimate reason. *See Wolff*, 418 U.S. at 557 ("[T]he State having created [a] right [to a process] . . . the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated."); *Arthur v. Thomas*, 674 F.3d 1257, 1263 (11th Cir. 2012)

("Significant deviations from a protocol that protects inmates from cruel and unusual punishment can violate the Eight Amendment."). ADC's boundless discretion, *see* SAC ¶¶ 128-31, renders illusory the Procedures and any protection they might purport to offer.

The Director describes ADC's past deviations as "isolated mishaps," and characterizes concerns about future deviations as "speculative." Mot. at 11. There is no speculation here. Defendants wrote the Procedures to imbue the Director with boundless discretion. The Procedures begin with the disclaimer that they "shall be followed as written *unless deviation or adjustment is required . . . .* [and do] *not create any legally enforceable rights or obligations*." SAC ¶ 130 (emphasis added). Defendants have assured Plaintiffs' counsel that the Director retains the right to inject prisoners with new chemicals, combinations, and/or dosages without any prior notice or disclosure, to turn off the audio or the video, or close the curtain, at any time during the execution. SAC ¶ 128.

Defendants' past exercises of discretion show that the risk of future deviations is not speculative. *E.g.*, *NAACP, W. Region v. City of Richmond*, 743 F.2d 1346, 1351 (9th Cir. 1984) (holding that a challenge to city's "uncircumscribed discretion" in adhering to ordinance about parade permits was justiciable, even though no constitutional violation would occur until defendants used discretion unconstitutionally, in part because of the city's past pattern of misusing its discretion). Wood's execution involved (a) pre-execution promises to this Court, the Ninth Circuit, and the Supreme Court that proved false, including that "every detail about [Wood's] execution is provided to him and to the general public, including exactly what and how much lethal drugs will be used," Reply Br. of Ariz. in Supp. of App. for Stay at 2, *Ryan v. Wood*, No. 14A82 (U.S. July 22, 2014),[7] (b) mid-execution changes to the drug protocol without notice to the prisoner or the press, (c) mid-execution misrepresentations to this Court about how the execution was proceeding, and (d) a medical experiment involving never-before-used amounts of drugs with no scientific basis for believing that such dosages would be effective or humane. *See* SAC ¶¶ 3-4, 92-114.

---

[7] The "unanimous U.S. Supreme Court affirm[ance]" that Defendants cite at the end of their Motion was procured in part based on this false statement. Mot. at 18.

Wood's execution also was not an "isolated mishap." Rather, it came after a series of deviations and broken promises in prior executions, which included injecting chemicals into a corpse (Landrigan), injecting painful KCl before a consciousness check (King), and changing drugs mere hours before an execution (Beaty, Moorman, and Towery). SAC ¶ 131. Even before Wood's execution, the Ninth Circuit warned that Defendants' constant deviations were approaching the constitutional limit and "cannot continue," admonishing that "[u]nless permanent changes are made in the manner in which Arizona amends its protocols, Arizona's ongoing conduct may require [the court] to monitor every execution on an ad hoc basis, because the State cannot be trusted to fulfill its otherwise lawful duty to execute inmates sentenced to death." *Towery v. Brewer*, 672 F.3d 650, 653 (9th Cir. 2012).

The Director has done nothing to respond constructively to these warnings. Rather, he has refused to alter the Procedures to limit his ability to again deviate from them, and confirms in the Motion that he thinks those deviations—including the Wood execution—are insignificant. No clearer showing that future deviations are likely could be made.

## VI.   Claim Seven States a Claim for Relief under the Fourteenth Amendment's Guarantee of Procedural Due Process.

Defendants' absolute discretion also violates the Fourteenth Amendment's protection of procedural due process, to which even a condemned prisoner is entitled before a state risks erroneously depriving him of his liberty interest in a humane death. *Mathews*, 424 U.S. at 334-35; *cf. Hall*, 132 S. Ct. at 2001 ("Persons facing [death] must have a fair opportunity to show that the Constitution prohibits their execution.").

Defendants argue that Plaintiffs' allegations are "speculation," Mot. at 15, in part because "inmates have been able to challenge the State about the drug protocol in the two past executions," *id.* at 15-16 (citing SAC ¶¶ 62 (Beaty), 70-72 (Moorman and Towery)). But Beaty was told just 18 hours before his execution that Defendants intended to use pentobarbital instead of sodium thiopental, triggering rushed objections and a dissent regarding the utter impossibility of evaluating Beaty's claim on such a "last-minute" basis.

*See* SAC ¶ 62; Order, *State v. Beaty*, No. CR-85-0211-AP/PC, at 2-3 (Ariz. May 25, 2011) (Hurwitz, J., dissenting).

For Moorman and Towery, Defendants notified them of a change from a three-drug to a one-drug protocol merely five hours before their Ninth Circuit oral argument. SAC ¶ 70. That change prompted several Ninth Circuit judges to later remark in discussing the *Towery* litigation that "the State of Arizona has subjected prisoners whose lives it takes— and has subjected this court—to a mockery of the constitutional requirement of due process." *Lopez v. Brewer*, 680 F.3d 1084, 1094 (9th Cir. 2012) (Reinhardt, J., dissental); *see id.* at 1079 (Berzon, J, concurring in part and dissenting in part); *id.* at 1093-94 (Pregerson, J., dissental). And in Wood's execution, he was never "able to challenge" the constitutionality of using 750 mg of midazolam and 750 mg of hydromorphone, because the Director switched to that protocol in secret, during his execution. SAC ¶¶ 102-06.

Such last-minute changes "effectively den[y] [Plaintiffs] of [their] procedural due process right to have [their] Eighth Amendment challenge heard at a meaningful time [and] in a meaningful manner." *Lopez*, 680 F.3d at 1079 (Berzon, J., concurring and dissenting in part). Unless and until this Court binds Defendants to provide meaningful notice of how they intend to carry out an execution, Plaintiffs will be deprived of their due process rights.

## VII.   Claim Eight States a Claim for Relief Under the Equal Protection Clause Based on Defendants' Pattern of Arbitrarily Adhering to Their Written Procedures.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Under it, once a State announces procedures concerning a fundamental interest, it "may not, by later arbitrary and disparate treatment" selectively adhere to them. *Bush v. Gore*, 531 U.S. 98, 104 (2000) (state may not arbitrarily depart from established vote-counting procedures); *Perry v. Brown*, 671 F.3d 1052, 1082-85 (9th Cir. 2012) (state cannot arbitrarily withdraw procedures concerning liberty interests once it has provided them); *Myers v. Ylst*, 897 F.2d 417, 421 (9th Cir. 1990) ("[W]e agree that once a state has established a rule it must be applied evenhandedly.").

Defendants' contention that the equal protection claim fails for want of an Eighth Amendment violation lacks merit. *Towery* declined "to adopt this broad proposition," 672 F.3d at 659, as have other courts, *In re Ohio Exec. Protocol Litig.*, 840 F. Supp. 2d 1049, 1055 (S.D. Ohio 2012). More importantly, Plaintiffs have alleged an Eighth Amendment violation. *See Arthur*, 674 F.3d at 126; SAC ¶¶ 147-55, 177-80, 187; *see supra* §§ I, VI.

Defendants also argue that Plaintiffs do not identify a similarly situated class. Mot. at 16. But Condemned Plaintiffs allege each is a "class of one" similarly situated to each other. SAC ¶¶ 11-17, 186. To state a "class of one" claim, a plaintiff need allege only that he will be "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Gerhart v. Lake Cty. Mont.*, 637 F.3d 1013, 1022 (9th Cir. 2011). Strict scrutiny applies, moreover, where differential treatment "impinge[s] on personal rights protected by the Constitution," *Cleburne*, 473 U.S. at 439; *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1310 (9th Cir. 1982), and the challenged procedures "will be sustained only if they are suitably tailored to serve a compelling state interest." *Cleburne*, 473 U.S. at 439.

Here, Condemned Plaintiffs allege that the Director (i) has "unfettered discretion to depart from the [Procedures] in any manner, at any time, and without any advance notice," SAC ¶ 2; *id.* ¶¶ 128-31; (ii) exhibits a pattern and practice of intentionally and arbitrarily deviating from the Procedures, *id.* ¶ 2; *id.* ¶¶ 4, 45, 56-62, 64-72, 74-81, 86, 90-91, 96-114; and (iii) is likely to again arbitrarily deviate from the Procedures, *id.* ¶ 188. Further, the Director has no legitimate penological justification, much less a compelling interest, in retaining *unlimited* discretion to apply the Procedures arbitrarily (*e.g.*, to administer any amount, of any drug, without notice). SAC ¶¶ 191-92. Thus, Plaintiffs state an equal protection claim. *Arthur*, 674 F.3d at 1263 (prisoner stated plausible equal protection claim where he alleged state failed to perform required consciousness check in recent execution and "protocol is not certain and could be unexpectedly changed for his execution"); *Cooey v. Kasich*, 801 F. Supp. 2d 623, 652-54 (S.D. Ohio 2011) (prisoner likely to succeed on equal protection claim where he presented evidence of state's pattern of deviations from

execution protocol, because such deviations "introduce uncertainty and eliminate safe guards" and "do not logically further the goal of humane executions"); *Ohio Exec. Protocol*, 840 F. Supp. 2d at 1049 (same), *aff'd* 671 F.3d 601, 602 (6th Cir. 2012) ("We agree with the district court that the State should do what it agreed to do: in other words it should adhere to the execution protocol it adopted.").

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion in its entirety, or, in the alternative, grant Plaintiffs leave to amend their complaint to cure any defects.[8]

Dated:  March 7, 2016                    SIDLEY AUSTIN LLP

                                         s/ Mark E. Haddad
                                         *Counsel for Plaintiffs* First Amendment
                                         Coalition of Arizona, Inc.; Charles Michael
                                         Hedlund; Graham S. Henry; David
                                         Gulbrandson; Robert Poyson; Todd Smith;
                                         Eldon Schurz; and Roger Scott

---

[8] Plaintiffs also reserve the right to amend to bring non-duplicative claims for relief under the Arizona Constitution. *See, e.g.*, Ariz. Const. art. II, § 6 ("Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."); *id.* § 11 ("Justice in all cases shall be administered openly, and without unnecessary delay."); *Coleman v. City of Mesa*, 230 Ariz. 352, 361 n.5 (2012) ("Arizona's Constitution . . . is in some respects more protective of free speech rights than the First Amendment.").

1

**<u>CERTIFICATE OF SERVICE</u>**

2

     I   hereby   certify   that on March 7, 2016, the foregoing  document was personally

3

served   at  the  Office  of  the  Arizona  Attorney  General,  to  the  attention  of  David  D.

4

Weinzweig,  Senior  Litigation  Counsel,  and  was  electronically  filed  using  the  CM/ECF

5

System.

6

7

By:  s/  Chelsea Pitman

8

Assistant Paralegal
Capital Habeas Unit

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28