1   **WO**

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7                **FOR THE DISTRICT OF ARIZONA**

8

9   First Amendment Coalition of Arizona, Inc.;          No. CV-14-01447-PHX-NVW
    Charles Michael Hedlund; Graham S. Henry;
10  David Gulbrandson; Robert Poyson; Todd               **ORDER**
    Smith; Eldon Schurz; and Roger Scott,
11
                    Plaintiffs,
12
    v.
13
    Charles L. Ryan, Director of ADC; James
14  O'Neil, Warden, ASPC – Eyman; Greg
    Fizer, Warden, ASPC – Florence; and Does
15  1-10, Unknown ADC Personnel, in their
    official capacities as Agents of ADC,
16
17                  Defendants.

18

19

20          This action challenges Arizona's way of executing death row inmates.  Before the

21  court is Defendants' motion to dismiss Plaintiffs' second amended complaint, argued on

22  April 7, 2016.  (Doc. 98.)  The motion will be granted in part and denied in part.

23          Plaintiffs are seven Arizona death row inmates and the First Amendment Coalition

24  of Arizona, Inc., a non-profit corporation made of news organizations dedicated to free

25  speech, accountable government, and public participation in civic affairs.  (Doc. 97, ¶

26  10.)  The second amended complaint raises eight claims under 42 U.S.C. § 1983.  (Doc.

27  97.)  Plaintiffs challenge Arizona's execution process and its "lack of transparency,"

28  including the use of a paralytic agent in the three-drug lethal injection protocol, on First

Amendment, Eighth Amendment, due process, and equal protection grounds.  (*Id.* at 3.) The defendants are the Director of the Arizona Department of Corrections and two wardens.  They will be referred to as "the Department" or "the State," the entities answerable for their actions.  They move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

## I.    LEGAL STANDARD

A motion to dismiss is a challenge to the legal sufficiency of the plaintiff's pleadings.  Dismissal under Rule 12(b)(6) can be based on "the lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint need include "only enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

On such a motion, all allegations of material fact are assumed to be true and construed in the light most favorable to the non-moving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  However, that does not apply to legal conclusions or conclusory factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*   The details of the complaint must permit the court to infer more than a mere possibility of conduct for which the law gives a remedy.  *Id.*   If the plaintiff's pleadings fall short of this standard, dismissal is warranted.

## II.    BACKGROUND

Arizona law requires execution by lethal injection for capital crimes committed

after 2000, A.R.S. § 13-757(A), which "shall be administered under such procedures and supervision as prescribed by law."  Ariz. Const. art. XXII § 22.  In fact, nothing in the Arizona Revised Statutes or the Arizona Code of Regulations states any other substantive standards or procedural requirements for executions.  The Department states its protocols in a Departmental Order which, though generally written in mandatory language, allows the Department to deviate anytime in any way it thinks necessary.

### A.    Arizona's Current Execution Procedures

The execution procedures of the Arizona Department of Corrections are set forth in Department Order 710, which became effective on October 23, 2015.  (Doc. 98, Ex. A.)  Department Order 710 allows four lethal injection protocols: two one-drug protocols using pentobarbital or sodium pentothal (Protocols A and B) and two three-drug protocols, one using midazolam as a sedative (Protocol C) and one using sodium pentothal (Protocol D).  Protocols C and D both use a paralytic as the second drug, to be administered before the final drug, potassium chloride. At issue in this litigation is Protocol C, which consists of (1) 500 mg of midazolam, (2) 100 mg of vecuronium bromide, rocuronium bromide, or pancuronium bromide, and (3) 240 mEq of potassium chloride.

In three-drug lethal injection protocols such as Protocol C, the first drug is intended to produce a state of unconsciousness such that the prisoner is insensate to pain that would be caused by the later drugs.  *See Glossip v. Gross*, 135 S. Ct. 2726, 2741 (2015).   The second drug "is a paralytic agent that inhibits all muscular-skeletal movements and, by paralyzing the diaphragm, stops respiration."  *Baze v. Rees*, 553 U.S. 35, 44 (2008).  The third drug "interferes with the electrical signals that stimulate the contractions of the heart, inducing cardiac arrest."  *Id.*  "It is uncontested that, failing a proper dose of [the first drug] that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride."  *Id.* at 53.

Midazolam is a sedative in the benzodiazepine family of drugs. (Doc. 97, ¶ 135.) Arizona, along with other states, included midazolam in its lethal injection protocol when the barbiturates sodium thiopental and pentobarbital became unavailable. (*Id.*, ¶¶ 32–38.)

## B. Recent Changes to and Deviations from Arizona's Execution Procedures

Although Department Order 710 establishes execution procedures, the first paragraph retains discretion to deviate from the procedures whenever deemed necessary. The clause states:

> These procedures shall be followed as written unless deviation or adjustment is required, as determined by the Director of the Arizona Department of Corrections (Department). This Department Order outlines internal procedures and does not create any legally enforceable rights or obligations.

(Doc. 98, Ex. A at 002.)  This clause was not included in the version of Department Order 710 effective November 5, 2004, *Dickens v. Brewer*, 07-CV-01770-NVW, Doc. 108-1 at 26, but similar provisions have been included since at least 2008, *id.* at 2.

In recent history, the Department has deviated from its published execution procedures in ways ranging from minor to fundamental.  It has successfully defended litigation in district court based on the Protocol as written but then deviated before the execution.  It has changed its Protocol at oral argument in the court of appeals, showing the litigation in district court was hypothetical, to get a favorable ruling from which to negotiate with the court of appeals about what it really will do.  It has deviated in the course of an execution without explanation.

In 2007, the State sought a warrant of execution for Jeffrey Landrigan. (Doc. 97, ¶¶ 50–51.)  While the application for the warrant was pending, several inmates filed a complaint challenging the lethal injection procedures then in effect.  *Dickens v. Brewer*, 07-CV-01770-NVW.  During that litigation, the Department amended its protocol twice after conducting discovery.  (Doc. 97, ¶ 52.)  The Department agreed to amend its protocol to address the concerns plaintiffs raised.  The court ultimately granted summary

judgment for the Department, finding that when considering the Department's averments and promises in its briefing and oral argument, the protocol was substantially similar to that upheld in *Baze*.  (*Id.*)

The State again sought a warrant of execution for Landrigan.  (*Id.*, ¶ 53.)  The Department's protocol still prescribed a three-drug combination with sodium thiopental as the first chemical.  (*Id.*)  By this time, however, the vendors relucted and a nationwide shortage of sodium thiopental developed.   The Department refused to disclose the provenance of the drug it intended to use except to confirm that it was not manufactured by Hospira, the only FDA-approved domestic manufacturer.  (*Id.*, ¶¶ 54–55.)  The district court granted a temporary stay of execution to allow Landrigan to challenge the use of non-FDA-approved sodium thiopental, *Landrigan v. Brewer*, 10-CV-2246-ROS, Doc. 21, and the Ninth Circuit affirmed.  (Doc. 97, ¶ 56.)  The Supreme Court then vacated the stay, and Landrigan was executed.  (*Id.*)   After Landrigan was declared dead, the Department continued to inject additional doses of backup chemicals into his body until the physician-executioner warned that further injections could rupture his vena cava.  (*Id.*)

Following Landrigan's execution, the Ninth Circuit heard oral argument in *Dickens*.  631 F.3d 1139 (9th Cir. 2011).  The record included testimony that a medical team member responsible for carrying out executions "knowingly 'improvised' the doses of lethal injection drugs, adhered to no set protocol, and kept no records of procedures." *Id.* at 1147.   During oral argument, however, the Department contended that any deficiencies in its protocol had been cured and that it was purely speculative to believe that they would not follow their procedures in the future.   (Doc. 97, ¶ 59.)

Eric King's execution took place in March 2011.  (*Id.*, ¶ 61.)  After the three-drug combination was administered, however, King was injected with an additional dose of both potassium chloride and sodium thiopental.  (*Id.*)  No consciousness check was performed before the additional dosages were administered.  (*Id.*, ¶ 131.)

Donald Beaty's execution was set for May 25, 2011.  (*Id.*, ¶ 62.)  Eighteen hours

before it was to begin, the Department notified Beaty that it would substitute sodium thiopental with pentobarbital.  (*Id*.)  The Arizona Supreme Court permitted the execution to proceed, based on the State's avowal that the only change was the drug substitution.  (*Id*.)  Justice Hurwitz dissented, observing that Beaty's application was occasioned "by the State's last-minute decision to substitute one barbiturate for another, and we have been compelled to address this issue literally overnight."  (*Id*.)

The State executed Richard Bible in June 2011 and scheduled Thomas West's execution for July 19, 2011.  (*Id.*, ¶¶ 63–64.)  Three days before West's execution, several inmates filed a lawsuit charging that the Department would not follow its written protocol.  *West v. Brewer*, 11-CV-1409-NVW.  Specifically, the plaintiffs alleged that the Department failed to conduct required trainings, failed to obtain drugs from a safe and reputable source, and failed to administer drugs through peripheral instead of femoral lines.  (Doc. 97, ¶ 64.)  The court denied the request to enjoin West's execution.  The Ninth Circuit affirmed, relying specifically on counsel's representations that the protocol adopted during the *Dickens* litigation would be followed.  (*Id.*, ¶ 65.)  West was executed, but the litigation filed on his behalf (among others) proceeded.  After discovery and trial, the court denied relief.   (*Id.*, ¶ 66.)

One month later, the Department adopted a new lethal injection protocol, which spurred another lawsuit by inmates scheduled for execution.  *Towery v. Brewer*, 12-CV-00245-NVW.   Questions were raised regarding the qualifications of execution team members, placement of IV lines, and inmates' access to counsel on the morning of their execution.  (Doc. 97, ¶ 68.)  The Court denied relief and the inmates appealed.  (*Id.*, ¶ 69.)  The Ninth Circuit scheduled oral argument for 4:00 p.m. on February 27, 2012.  (*Id.*)  Five hours before oral argument, the Department notified the plaintiffs that it intended to change the method of execution to one dose of pentobarbital because the pancuronium bromide it intended to use had expired six weeks before.  (*Id.*, ¶ 70.)

During oral argument, the Department shifted course and made several representations on how the protocol would be changed to ensure team members were

qualified and that IV lines were properly placed.  (*Id.*, ¶ 71.)  The Department also agreed to allow inmates access to counsel on the morning of their executions.  (*Id.*)  The Ninth Circuit affirmed the denial of relief based on the representations of counsel during oral argument.  (*Id.*, ¶ 72.)

Robert Towery was executed on March 8, 2012.  (*Id.*, ¶ 74.)  A private autopsy revealed that he was punctured at least eleven times in an attempt to locate a vein. (*Id.*, ¶ 77.)  Towery also communicated by code to his attorneys while he was speaking his last words.  (*Id.*, ¶ 75.)  He indicated that the execution team made numerous attempts to set the IV lines and that he had been prevented from speaking with counsel.  (*Id.*)

On April 25, 2012, Thomas Kemp was executed.  (*Id.*, ¶ 78.)  Despite the prominence of good veins, he was punctured at least three times, including once in the femoral area and at least twice over the left upper extremity.  (*Id.*)

A few days after Kemp's execution, Samuel Lopez filed a motion for preliminary injunction to stay his May 1, 2012 execution.  (*Id.*, ¶ 79.)  The district court denied relief. (*Id.*)  The Ninth Circuit affirmed but warned the Department that its constant deviation from its established procedures could not continue.  (*Id.*)

On March 26, 2014, the Department adopted a new protocol, which included the combination of 50 mg of midazolam and 50 mg of hydromorphone. (*Id.*, ¶ 90.)  The next prisoner to be executed under this protocol was Joseph Wood.  (*Id.*)  Wood and other inmates scheduled for execution filed this action.  The district court denied a motion to stay Wood's execution, but the Ninth Circuit conditionally stayed the execution until the Department disclosed the name and provenance of the drugs to be used and the qualifications of the medical personnel.  (*Id.*, ¶ 94.)  The Supreme Court reversed and vacated the conditional stay.  (*Id.*, ¶ 97.)

Wood's execution commenced on July 23, 2014, at 1:52 p.m. (Doc. 26 at 1.) Twelve minutes into his execution, after first appearing sedated, Wood "rose upwards against his restraints and gulped for air."  (Doc. 97, ¶ 101.)  At the 18- and 24-minute marks, the Department administered second and third doses of the midazolam-hydromorphone combination, without performing a consciousness check as provided

under the written protocol.  (*Id.*, ¶¶ 102–03.)  By approximately 100 minutes after the execution began, the Department had injected Wood 12 times with each drug.  (*Id.*, ¶ 105.)  Finally, after nearly two hours and a total of 15 injections, Wood was pronounced dead.  (*Id.*, ¶ 100.)

On September 18, 2014, the inmates filed their first amended complaint, which the First Amendment Coalition joined as an additional plaintiff.  (Doc. 53.)  The parties stipulated to stay the action until the Department published their revised execution procedures.  (Docs. 67, 68.)  The new procedures were published on October 23, 2015.  (Doc. 73.)  On motion of the Department, the court lifted the stay on December 20, 2015, as to Protocol C, the only one for which the Department has the drugs.  (Doc. 85.)  On January 12, 2016, the Court lifted the stay in its entirety.  (Doc 89.)  The Department agreed not to seek warrants of execution until the completion of this litigation as to the form of execution the State seeks to use, and it was so ordered.  (*Id*.)  Plaintiffs filed their second amended complaint on January 29, 2016.  (Doc. 97.)  This motion to dismiss followed.

## III.    DISCUSSION

The Supreme Court has emphasized that "because it is settled that capital punishment is constitutional, '[i]t necessarily follows that there must be a [constitutional] means of carrying it out.'"  *Glossip*, 135 S. Ct. at 2732–33 (quoting *Baze*, 553 U.S. at 47).  The court views the claims and the motion to dismiss with this principle in mind.  The pharmaceutical manufacturers' withdrawal of the best drugs from use in executions does not end capital punishment.

### A.    Eighth Amendment: Midazolam and Paralytic (Claim 1)

In Claim 1, the inmates allege that Protocol C, with its use of midazolam followed by a paralytic, violates their Eighth Amendment rights.   They allege that "midazolam . . . cannot reliably ensure that Petitioner [sic] will remain in a state in which he will be unable to experience pain caused by the potassium chloride."  (Doc. 97, ¶ 151.)  They

allege that midazolam "has no pain-relieving effects, and it is not used as a sole agent to maintain unconsciousness in painful procedures." (*Id.*, ¶ 135.)  They further allege that midazolam has a ceiling effect, "a point at which additional doses of midazolam cease to affect the central nervous system (the brain and spinal cord)," and that midazolam, "at any dose, will not reliably keep a person insensate during the administration of painful stimuli." (*Id.*)  In contrast to midazolam, "[s]odium thiopental and pentobarbital belong to a class of drugs called barbiturates.  The mechanism of action for barbiturates is different than that for benzodiazepines.  Unlike benzodiazepines, barbiturates can keep a person insensate to painful stimuli and, in high doses, will cause death." (*Id.*, ¶ 136.)

The inmates allege, therefore, that use of the paralytic, which causes pain on its own "through slow suffocation" (*id.*, ¶ 5) and masks pain resulting from the potassium chloride, violates their "rights under the Eighth and Fourteenth Amendments to be free from severe pain, experimentation, and the gratuitous invasion of the body." (*Id.*, ¶ 151.)

The relevant law is set forth in *Baze* and *Glossip*.  To succeed on an Eighth Amendment method-of-execution claim, a prisoner must make two showings.  First, he must establish that the method presents a risk that is "*sure or very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers." *Baze*, 553 U.S. at 50 (quotations omitted).  "[T]here must be a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." *Id.* (quotations omitted).

Second, the prisoner "must identify an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 52).  The prisoner must do more than "show[] a slightly or marginally safer alternative." *Id.* (quoting *Baze*, 553 U.S. at 51).

The inmates argue that midazolam fails to maintain unconsciousness and it is "sure or very likely" that the paralytic will "cause serious illness and needless suffering."

- 9 -

If, on the other hand, midazolam does achieve sedation and prevent the experience of pain, then use of the paralytic is, in their view, "gratuitous, violative of bodily integrity, and 'unusual.'" (Doc. 102 at 3.)

As a feasible alternative, the inmates cite removal of the paralytic from the protocol, which will "eliminat[e] the substantial likelihood of awareness of suffocation-through-paralysis." (*Id.* at 4.) They also suggest that alternatives to midazolam, such as pentobarbital, are readily available. (*Id.*, n.4.)

The Department contends that the decisions in *Glossip* and *Baze* foreclose relief on this ground. In *Glossip*, the Supreme Court considered a lethal injection protocol identical to Protocol C. The Court found that the district court, which held a three-day evidentiary hearing on the petitioners' motion for a preliminary injunction, "did not commit clear error when it found that midazolam is highly likely to render a person unable to feel pain during an execution." 135 S. Ct. at 2739.

In *Baze*, the Court addressed a three-drug protocol involving the use of sodium thiopental as the first drug, followed by the paralytic and potassium chloride. The Court rejected the petitioners' argument that the second drug, pancuronium bromide, "serves no therapeutic purpose while suppressing muscle movements that could reveal an inadequate administration of the first drug." 553 U.S. at 57. The Court found that that use of the paralytic "does not offend the Eighth Amendment," explaining that the paralytic serves two purposes: (1) it "prevents involuntary physical movements during unconsciousness that may accompany the injection of potassium chloride," thereby serving the state's "interest in preserving the dignity of the procedure, especially where convulsions or seizures could be misperceived as signs of consciousness or distress," and (2) "stops respiration, hastening death." *Id.* at 57–58.

The inmates counter that the holdings in *Glossip* and *Baze* are not dispositive. They note that *Glossip* did not consider a challenge to the paralytic, while *Baze* considered the paralytic in the context of a different sedative—sodium thiopental, a barbiturate, which the petitioners conceded would "eliminate any meaningful risk" of

pain from injection of the subsequent drugs. *Baze*, 553 U.S. at 49. Noting the posture in which the case reached the Supreme Court, the inmates also contend that *Glossip* "did not enshrine one court's findings after an emergency injunction hearing as scientific fact beyond challenge, let alone endorse midazolam's constitutionality in all cases." (Doc. 102 at 3–4.)

The inmates' arguments are well taken. Neither *Baze* nor *Glossip* is dispositive of their Eighth Amendment claims. The inmates challenge Protocol C, alleging that midazolam is not reliable as a sedative, which means the paralytic will mask the inmate's pain. In *Baze*, by contrast, there was no dispute that the first drug, sodium thiopental, would render the inmate insensate to pain caused by the paralytic and the potassium chloride. 553 U.S. at 49.

*Glossip* does not foreclose relief. *Glossip* held only that the district court did not clearly err in denying a preliminary injunction based on the evidence before it. Here, the inmates indicate they will present substantial new evidence challenging midazolam's efficacy as a sedative. (Doc. 102 at 4.) *Glossip* underscores that this is a fact-based inquiry, and the inmates are entitled to present evidence in support of the allegations. *See Glossip*, 135 S. Ct. at 2740 (explaining that "an inmate challenging a protocol bears the burden to show, *based on evidence presented to the court*, that there is a substantial risk of severe pain") (emphasis added).

The inmates have stated an Eighth Amendment claim that is plausible on its face. Assuming the alleged material facts as true and construing them in the light most favorable to the inmates, Claim 1 adequately alleges that Protocol C, by calling for a paralytic after an ineffective sedative, is very likely to cause serious illness and needless suffering. *Baze*, 553 U.S. at 50. The inmates have also adequately alleged that removing the paralytic from the three-drug protocol is a feasible, readily implemented alternative that would significantly reduce a substantial risk of severe pain. *Id.* at 52. They also allege that alternatives to midazolam, such as pentobarbital, are readily available. (Doc. 102 at 4 n.4.)

### B.      Failure to Follow the Department's Protocols

The inmates challenge the Department's recurring and substantial deviations from its execution protocols as both cruel and unusual punishment and denial of procedural due process.

#### 1.      Eighth Amendment (Claim 6)

The inmates allege that the Department's "excessive discretion" and "proven failure to adhere to any stable and reliable method of execution" violate the Eighth Amendment.  (Doc. 97, ¶ 179.)  They argue that "Defendants' past experimentation and improvisation with unprecedented methods and dosages of drugs amount to cruel and unusual punishment."  (*Id.* at 52.)

In support of this claim, the inmates cite the discretionary clause in Arizona's current execution protocol allowing for "deviation or adjustment" where "required, as determined by the Director."  (Doc. 97, ¶ 130 (quoting Doc. 98, Ex. A at 002).)  The inmates also cite the Department's deviations from the protocol and "broken promises" in previous executions, most prominently Wood's.  (*Id.*, ¶¶ 72, 131.)

In *Arthur v. Thomas*, 674 F.3d 1257, 1263 (11th Cir. 2012), the Eleventh Circuit held that "[s]ignificant deviations from a protocol that protects inmates from cruel and unusual punishment can violate the Eighth Amendment."  *See also Cooey v. Kasich*, 801 F. Supp. 2d 623, 653–54 (S.D. Ohio 2011) (explaining that core deviations in protocol burden inmate's fundamental right to be free from cruel and unusual punishment).  This is because "[s]ubjecting individuals to a risk of future harm—not simply actually inflicting pain—can qualify as cruel and unusual punishment."  *Arthur*, 674 F.3d at 1263 (quoting *Baze*, 553 U.S. at 49).   In *Arthur*, the prisoner alleged that in a previous execution the execution team failed to perform the required consciousness check after injection of the first drug.  674 F.3d at 1263.  The court deemed it "plausible" that a similar failure could occur in the prisoner's own pending execution, in part "because the protocol is not certain and could be unexpectedly changed for his execution."  *Id.*

This cause of action is narrower than perhaps the inmates hope.  It cannot be cruel and unusual punishment for the Department to fail to plan ahead for every minor contingency.   If the inmates are challenging the Department's ability to exercise discretion even for minor, routine contingencies, that challenge fails.  But the inmates' principal challenge is to the Department's failure to commit to, and its deviation from, central aspects of the execution process once adopted.  Those unlimited major deviations and claims of right to deviate threaten serious pain.

The inmates allege here that the required consciousness check was not performed during Wood's execution and that there have been numerous other deviations from the written protocol during recent executions, including the multiple dosages administered to Wood.  (Doc. 97, ¶¶ 103, 131.)  In the inmates' view, such deviations affect "critical aspects" of the execution process.  (*Id.*, ¶ 129.)  They claim the Department will continue to deviate from its protocol because the discretionary clause permits it.  (*Id.*, ¶¶ 129–30.)

This claim is plausible in light of the broad language of the discretionary clause and the Department's pattern and practice of making major changes at any time, even after litigation is concluded in the district court.  Sometimes the Department just fails to comply with its announced protocols without changing them.  The Department's history of last minute deviations from critical aspects of its announced execution process is the gist of this Eighth Amendment claim.  The fact that the Department has discretion over execution procedures may not, by itself, create a risk of serious pain.   The inmates' allegations are tied to the unique facts in Arizona.  These allegations, presumed true at this stage, support the inmates' fear that the Department's prior conduct was not just an "isolated mishap," *Baze*, 553 U.S. at 35, but rather creates a substantial risk of serious harm in their own upcoming executions.

## 2. Procedural Due Process (Claim 7)

The inmates also claim that the Director's unfettered discretion and pattern of deviating from the execution protocol violate their procedural due process rights under the Fourteenth Amendment.  (Doc. 97, ¶¶ 182–83; Doc. 102 at 14–15.)  This claim

overlaps with their Eighth Amendment claim, but it ultimately aims to vindicate the inmates' ability to protect their Eighth Amendment rights.

A case can be made for a procedural due process right to know ahead of time the critical aspects of the intended execution.  The Eighth Amendment protects inmates from execution methods that pose a substantial risk of serious pain if another available method would significantly reduce the risk.  For this protection to have effect, inmates must be able to challenge critical aspects of their own execution.  The "right to be heard before being condemned to suffer grievous loss of any kind . . . is a principle basic to our society."  *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring).  The only meaningful time that an inmate can challenge the method of his own execution is before he is executed.  "There is no redo."  *Lopez v. Brewer*, 680 F.3d 1084, 1092 (Berzon, J., concurring in part and dissenting in part from denial of rehearing en banc).

There is, however, no right, substantive or procedural, to have every question about executions answered ahead of time.  For example, in *Jones v. Commissioner, Georgia Department of Corrections*, 811 F.3d 1288, 1293 (11th Cir.), *cert. denied sub nom. Jones v. Bryson*, 136 S. Ct. 998 (2016), the plaintiff sought the identity of the manufacturer of the drugs Georgia intended to use to execute him, contrary to Georgia's secrecy statute prohibiting such disclosure.  Plaintiff contended this prohibition violated his due process rights.  Noting that no other circuit had recognized such a right to manufacturer identity, the Eleventh Circuit denied relief.  *Id.*

Similarly, in *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir.), *cert. denied*, 135 S. Ct. 41 (2014), the State of Texas disclosed the type, amount, and expiration date of the drug to be used, and the fact that independent laboratory testing confirmed the potency and purity of the drug; it also confirmed that the execution would be carried out in conformity with its prior thirty-three executions.  *Id.*  The court found that the inmate's speculation "that there are unknowns regarding the drug to be used which may add an unacceptable risk of pain and suffering" was insufficient to warrant general discovery

into the process.  *Id.*

At issue here is not a general due process right to information about critical aspects of the execution; the State has already volunteered that information.  The question is whether an inmate's due process rights are violated when a state provides information about an execution protocol but then carries out the execution in a manner that fundamentally differs from that protocol.  This practice has different fairness and due process dimensions than the oft-rejected claim to general discovery based on speculative concerns.

A pre-execution challenge to an execution method is meaningful only if the inmate knows what he is challenging.  An inmate cannot be expected to raise challenges to the electric chair, for example, if he is told he will face a firing squad.  Basic fairness should not allow a state to evade Eighth Amendment scrutiny by misdirecting an inmate into challenging an execution protocol that will not, in fact, be used.  A death row inmate has a due process interest in notice of critical changes to his method of execution in time to raise applicable Eighth Amendment challenges.

The strength of the inmate's due process interest depends on the magnitude of the change at issue and the imminence of the execution.  Fundamental changes to an execution process are more likely to have far-reaching or unintended consequences and, thus, more likely to trigger new Eighth Amendment concerns.  Similarly, last-minute changes afford less opportunity for critical investigation and therefore present a greater risk of introducing preventable harm.

Against the inmate's interest in predictability must be weighed the State's interest in flexibility.  *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (weighing individual's interest in additional procedures against government's contrary interest).  The strength of the State's interest depends on the circumstances.  The State has a strong interest in being able to change inherently variable aspects of the execution process, such as the placement of an IV line, immediately before or during an execution.  Ordinary medical contingencies may demand it.  The State may also have a strong interest in being able to

change major aspects of the process, such as the type of drugs used, in advance of an execution.  Market forces or medical advances may warrant it.

In some cases, the State's change to an inmate's execution method may be so significant, so near the date of execution, and so unsupported by state interests, that it denies the inmate the process he is due in order to raise an Eighth Amendment challenge.

The inmates claim this is such a case.  They allege that the Department has made significant changes in the execution process at the last minute, with no meaningful opportunity to be heard, resulting in a constitutionally intolerable risk of pain.  They anticipate a similar fate because the discretionary clause in the State's current protocol allows for similar deviations.  This discretion is not limited to any particular aspects of, or stages in, the execution process.

The inmates' claim is plausible in light of the breadth of the discretionary clause and the recent instability of important aspects of Arizona's execution procedures.  Indeed, the Ninth Circuit foreshadowed this claim, putting the State on notice that "[u]nless permanent changes are made in the manner in which Arizona amends its protocols, Arizona's ongoing conduct may require [the court] to monitor every execution on an ad hoc basis, because the State cannot be trusted to fulfill its otherwise lawful duty to execute inmates sentenced to death."  *Towery v. Brewer*, 672 F.3d 650, 653 (9th Cir. 2012).  Judge Reinhardt, in his dissent from the denial of rehearing en banc in *Lopez v. Brewer*, noted, "Over and over again, judges of this court have told the state that its cavalier defiance of due process must end."  680 F.3d at 1095 (Reinhardt, J., dissenting).

Thus, against the backdrop of the Department's failure to follow its own written protocol, *Jones*, *Trottie*, and other cases offer no guidance. Contrary to the Department's contention, the allegations here are more than "mere speculation."  (Doc. 98 at 15.)  As observed during the *Lopez* and *Towery* litigation, the Department has failed in material ways to follow its written protocol in many of the executions in the last nine years. This history, coupled with the unlimited discretion retained by the Director, gives rise to a plausible claim that the Department's ad hoc application of its execution protocol violates

1    the inmates' right to procedural due process under the Fourteenth Amendment.

2    Defendants' motion to dismiss Claim 7 is denied.

3          **C.      First Amendment (Claims 1, 3, 4, and 5)**

4          Plaintiffs' First Amendment arguments take several forms.   In Claim 1, the

5    inmates and the Coalition allege that the Department's use of a paralytic violates their

6    First Amendment rights "by preventing them from observing midazolam's efficacy at

7    maintaining unconsciousness and the pain and suffering caused by the administration of

8    the paralytic itself and the third drug, potassium chloride, and, if warranted, to challenge

9    the constitutionality of that pain."  (Doc. 97, ¶ 153.)  They also allege that use of the

10   paralytic prevents the press and public from "observing the reality" of the prisoner's

11   experience of the injections of midazolam and potassium chloride, and serves as a

12   "content-based restriction on important expression."  (*Id.*, ¶ 154.)

13         In Claim 3, the Coalition alleges that the Department unconstitutionally prevents

14   them from aurally and visually observing the full execution proceeding, including the

15   provenance and amounts of drugs used, the timing and method of their administration,

16   their effect upon the prisoner, the details about the drugs, the rationale for the selection of

17   the drugs and dosages, the chain of custody of the drugs, and the qualifications of the

18   people administering them.  (*Id.*, ¶¶ 162–63.)  In Claim 4, the inmates allege that lack of

19   access to this information violates their right to be informed of the method of execution.

20   (*Id.*, ¶¶ 165–67.)

21         In Claim 5, the inmates allege that the Department's failure to adhere to the

22   written protocol and failure to provide information concerning the drugs violates their

23   right to access to the courts and to petition the government for redress of grievances.  (*Id.*,

24   ¶¶ 169–176.)

25              **1.      *California First Amendment Coalition***

26         "Neither the First Amendment nor the Fourteenth Amendment mandates a right of

27   access to government information or sources of information within the government's

28   control."  *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) (plurality opinion).   The

1   Supreme Court "has never intimated a First Amendment guarantee of a right of access to

2   all sources of information within government control." *Id.* at 9; *see McBurney v. Young*,

3   133 S. Ct. 1709, 1718 (2013) ("This Court has repeatedly made clear that there is no

4   constitutional right to obtain all the information provided by FOIA laws.").

5          There is, however, a First Amendment right of public access to governmental

6   proceedings. *See California First Amendment Coalition v. Woodford*, 299 F.3d 868, 873

7   (9th Cir. 2002) ("It is well-settled that the First Amendment guarantees the public—and

8   the press—a qualified right of access to governmental proceedings."); *Press–Enterprise*

9   *Co. v. Superior Court*, 478 U.S. 1, 8–14 (1986).   Whether the public has a First

10  Amendment right of access to particular governmental proceedings is informed by two

11  considerations: (1) "whether the place and process have historically been open to the

12  press and general public" and (2) "whether public access plays a significant positive role

13  in the functioning of the particular process in question." *Press-Enterprise*, 478 U.S. at 8–

14  9.

15         In *California First Amendment Coalition v. Woodford*, the Ninth Circuit

16  considered a regulation that prohibited witnesses from viewing the execution until after

17  the inmate had entered the chamber, the IV had been inserted, and the execution team

18  members had left the chamber.  299 F.3d at 871.  The court found the regulation was an

19  "exaggerated, unreasonable response to prison officials' legitimate concerns about the

20  safety of prison staff and thereby unconstitutionally restricts the public's First

21  Amendment right to view executions from the moment the condemned is escorted into

22  the execution chamber." *Id.* at 870–71.  The court explained that the regulation "prevents

23  the public from having any first-hand knowledge of the events that take place behind the

24  curtain." *Id.* at 883.  For example, witnesses could "not observe the condemned inmate's

25  demeanor as he enters the execution chamber, has intravenous lines inserted into his body

26  and realizes that the saline solution has begun to flow" or "the manner of the guards as

27  they restrain the prisoner." *Id.*  "Because witnesses cannot see first-hand the manner in

28  which the intravenous lines are injected, they will not be privy to any complications that

may arise during this initial, invasive procedure." *Id.*

The Ninth Circuit applied *Press-Enterprise* to executions and held the press and the public have a First Amendment right to view execution proceedings from the moment the condemned enters the execution chamber to the time he is pronounced dead. *Id.* at 885–86. The court first found that "historical tradition strongly supports the public's First Amendment right to view the condemned as the guards escort him into the chamber, strap him to the gurney and insert the intravenous lines." *Id.* at 876.

With respect to the functional role of public access to executions, the court reasoned:

> To determine whether lethal injection executions are fairly and humanely administered, or whether they ever can be, citizens must have reliable information about the "initial procedures," which are invasive, possibly painful and may give rise to serious complications. This information is best gathered first-hand or from the media, which serves as the public's surrogate. . . . Accordingly, the same functional concerns that drove the Court to recognize the public's right of access to criminal trial proceedings compel us to hold that the public has a First Amendment right to view the condemned as he enters the execution chamber, is forcibly restrained and fitted with the apparatus of death.

*Id.* at 876–77 (citations omitted); *see Associated Press v. Otter*, 682 F.3d 821, 822–26 (9th Cir. 2012) (holding that media corporations were likely to prevail on the merits of their claim that Idaho violated the First Amendment by denying their right to witness all stages of executions, including the prisoner's entry into the execution chamber and insertion of IV lines).

### 2. Right to Know the Efficacy of Midazolam (Claim 1)

The plaintiff inmates and the Coalition argue that their First Amendment rights are violated because the paralytic acts as a "chemical screen" that hides the effects of the lethal injection drugs. (Doc. 102 at 6.) In support of this claim, they rely exclusively on *California First Amendment Coalition*. As described below, however, that case established only a public right to view the execution, including the injection of the drugs.

### 3.    Right to Know Other Details of the Execution (Claims 3 and 4)

The plaintiff inmates and the Coalition allege the Department violates their First Amendment right of access to governmental proceedings by concealment of facts such as the source, quality, and amounts of drugs used in executions, and the timing, method, and effect of the administration of the drugs.   These allegations are insufficient to state a plausible First Amendment claim.

Department Order 710 satisfies *California First Amendment Coalition* by allowing the public "to view the condemned as he enters the execution chamber, is forcibly restrained and fitted with the apparatus of death."  299 F.3d at 876.  Witnesses are able to observe the prisoner entering the execution chamber.  (*See* Doc. 97, ¶ 126.)  The protocol provides, "At the designated time, the overhead microphone will be turned on and the inmate will be brought into the execution room . . . .  [C]losed-circuit monitors will allow witnesses in the designated witness room to observe this process."  (Doc. 98, Ex. A at 030.)  "[C]losed-circuit monitors will allow witnesses in the designated witness room to observe the IV Team's vein assessment and placement of IV catheters in the inmate."  (*Id.* at 031.)  Accordingly, witnesses can see the prisoner's demeanor, the manner of the guards, and the way in which the IVs are inserted.  *California First Amendment Coalition*, 299 F.3d at 883.

Plaintiffs allege that the execution chamber curtain is closed during this process, and opened only after the IVs are inserted, at which point the monitors and microphone are turned off.  (Doc. 97, ¶ 140.)  Even if true, these facts do not render the procedures deficient under *California First Amendment Coalition*, because witnesses are able to view the entire execution, either through closed circuit monitors or when the execution chamber curtain is opened.

*California First Amendment Coalition* did not address a right of access to information about lethal injection drugs, the development of lethal injection protocols, the qualification of the execution team, the effects of the paralytic, or any of the other information Plaintiffs seek.  No precedent extends *California First Amendment Coalition*

to information preceding the inmate's entrance into the execution chamber.  Indeed, no other Circuit has followed *California First Amendment Coalition* even as far as it does go.

This court previously denied a preliminary injunction based on Plaintiff Wood's claim of a First Amendment right of access to information about the lethal injection drugs and execution team personnel.  (Doc. 21.)  The Ninth Circuit reversed, enjoining Wood's execution, but the United States Supreme Court vacated the injunction without dissent. *Wood v. Ryan*, 759 F.3d 1076, 1088 (9th Cir.), *vacated,* 135 S. Ct. 21 (2014).

Other circuits and lower courts have rejected the First Amendment claim made here.  In *Wellons v. Comm'r, Georgia Dept. of Corrections*, 754 F.3d 1260 (11th Cir. 2014), the Eleventh Circuit considered an inmate's claim that the state's failure to provide information about his execution violated his First Amendment right of access to governmental proceedings.  The court denied the claim, explaining:

> Neither the Fifth, Fourteenth, or First Amendments afford Wellons the broad right "to know where, how, and by whom the lethal injection drugs will be manufactured," as well as "the qualifications of the person or persons who will manufacture the drugs, and who will place the catheters." . . . Wellons has not established a substantial likelihood of success on the merits of his claim that the dearth of information regarding the nature of the pentobarbital that will be used in his execution and the expertise of those who will carry it out violates the First Amendment or his right to due process.

*Id.* at 1267 (quotation omitted)

In *Zink v. Lombardi*, 783 F.3d 1089, 1112 (8th Cir. 2015), the Eighth Circuit rejected the prisoners' claim of a First Amendment right to information concerning the source of compounded pentobarbital.  The court first noted that it had never "ruled that an execution constitutes the kind of criminal proceeding to which the public enjoys a qualified right of access under the First Amendment."  *Id.*  The court then explained that even if *Press-Enterprise* did apply to executions, as the Ninth Circuit held in *California First Amendment Coalition*, the prisoners still failed to state a First Amendment claim:

- 21 -

> In sum, the prisoners fail to state a claim of a qualified right of public access to information regarding the source of the compounded pentobarbital to be used in their executions because they do not plausibly allege a history of openness to the general public. The complaint likewise provides no basis to conclude that public access to detailed information about execution protocols plays a significant positive role in the functioning of the process in question, given that the practical effect of public disclosure would likely be frustration of the State's ability to carry out lawful sentences.

*Id.* at 1113.

The *California First Amendment Coalition* measure of First Amendment right is "whether the public has a First Amendment right to *view* executions." 299 F.3d at 873 (emphasis added). "The public and press historically have been allowed to watch the condemned inmate enter the execution place, be attached to the execution device and then die." *Id.* at 876. There is no allegation here that the press and general public have historically had greater visual or aural access to executions than that provided by Department Order 710, or access to information concerning the provenance of the drugs or the qualifications of the execution team members. *See Zink*, 783 F.3d at 1112 (citing *Wood*, 759 F.3d at 1093–95 (Bybee, J., dissenting)); *Oklahoma Observer v. Patton*, 73 F.Supp.3d 1318, 1328 (W.D. Okla. 2014).

The public's First Amendment right to view court proceedings does not reach back to sitting in on the police's, the prosecutor's, or the judge's preparation for the proceeding. Nor does it reach behind an execution to learn everything about the execution to come. If an inmate has rights to such information, they come out of the Eighth Amendment, perhaps as aided by procedural due process in an appropriate case, not the First Amendment. The press has no such right, not without the Court making new law that extends beyond historical practice and legal authority.

### 4. Failure to Follow Protocols and Inmate's Right of Access to the Courts (Claim 5)

The inmates allege that the Department, by concealing information about the execution drugs, violates their right of access to the courts and their ability to challenge

- 22 -

the constitutionality of their executions.  Courts have consistently rejected these claims of right of access to the courts.  *See Wellons*, 754 F.3d at 1264, 1267; *Phillips v. DeWine*, 92 F. Supp. 3d 702, 715 (S.D. Ohio 2015) (dismissing right to petition and right of access claims); *Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668, at *9 (D. Ariz. Oct. 7, 2013) (rejecting argument that "Defendants' concealment of the drug information violates their right to due process and meaningful access to the courts by preventing them from discovering whether they have a colorable claim that their executions will be carried out in violation of the Eighth Amendment").  "The right of access to the courts does not include a right to discover causes of action or to litigate effectively once in court." *Schad*, 2013 WL 5551668, at *9 (citing *Lewis v. Casey*, 518 U.S. 343, 354 (1996)).

Plaintiffs' First Amendment claims lack a cognizable legal theory and do not allege facts sufficient under a cognizable legal theory.  *Balistreri*, 901 F.2d at 699.  The Department's motion to dismiss these claims is granted.

### D.   Substantive Due Process:  Paralytic as Arbitrary and Not Medically Appropriate (Claim 2)

The inmates allege that the Department's use of a paralytic invades their liberty interest in bodily integrity under the Due Process Clause of the Fourteenth Amendment. (Doc. 97, ¶¶ 157–60.)  They assert that the "paralytic is at best entirely superfluous, and at worst, masks immense pain"; that a three-drug protocol using the paralytic "will be invasive, offensive, disfiguring, and/or torturous"; and that "Defendants have no rational basis" for using such a protocol.  (*Id.*, ¶¶ 159, 160.)  They argue that because the paralytic "serves no legitimate purpose," its use is "arbitrary" and "shocks the conscience."  (Doc. 102 at 8.)

First, as already noted, the Supreme Court in *Baze* found that the paralytic, which was used in the three-drug execution protocol of at least 30 states, 553 U.S. at 44, serves two legitimate purposes, maintaining the dignity of the procedure and hastening death. *Id.* at 57–58.  Administration of a paralytic as the second drug after an effective agent of

1   unconsciousness in a three-drug lethal injection protocol is not so arbitrary that it shocks

2   the conscience.  *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("[O]nly the

3   most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'")

4   (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)).

5          Next, in support of this substantive due process claim, the inmates rely on

6   *Washington v. Harper*, 494 U.S. 210 (1990), and *Johnson v. Meltzer*, 134 F.3d 1393,

7   1397 (9th Cir. 1998).  *Harper* held that there is "a significant liberty interest in avoiding

8   the unwanted administration of antipsychotic drugs under the Due Process Clause of the

9   Fourteenth Amendment."  494 U.S. at 221–22.  *Johnson* explained that *Harper* and

10  *Riggins v. Nevada*, 504 U.S. 127 (1992), another "'substantive due process' case[]

11  involving the nonconsensual administration of medication," stand for the proposition that

12  "due process requires that if a doctor gives a drug to an inmate without his consent, the

13  drug must be medically appropriate."  134 F.3d at 1397.

14         These cases are inapposite.  In *Chavez v. Florida SP Warden*, 742 F.3d 1267, 1269

15  n.2 (11th Cir. 2014), the Eleventh Circuit rejected the prisoner's argument that the

16  forcible administration of the paralytic vecuronium bromide violated his due process

17  rights because it served no medical purpose in the execution process.  Affirming the

18  district court, the court of appeals explained that "the liberty interest in avoiding

19  involuntary medical treatment . . . does not apply in the context of capital punishment

20  'because by its nature, the execution process is not a medical procedure, and by design, it

21  is not medically appropriate for the condemned,' and '[u]sing drugs for the purpose of

22  carrying out the death penalty does not constitute medical treatment.'"  *Id.* (quoting

23  *Chavez v. Palmer*, No. 3:14-cv-110-J-39JBT, 2014 WL 521067, at *22 (M.D. Fla. Feb.

24  10, 2014)); *see Howell v. State*, 133 So.3d 511, 523 (Fla. 2014) (rejecting due process

25  challenge to forced administration of paralytic).

26         The inmates cite no authority extending *Harper* and *Riggins* beyond the context of

27  forced medical treatment.  "A condemned inmate does not have a liberty interest in

28  avoiding the use of execution drugs."  *Chavez v. Palmer*, 2014 WL 521067, at *22.

Claim 2 is not supported by a cognizable legal theory, *Balistreri*, 901 F.2d at 699, and will be dismissed.

### E.      Class of One Equal Protection Violation (Claim 8)

In Claim 8, the inmates allege that the Department's "pattern of deviating from their Procedures and exercising their discretion in inhumane ways increases the risk of being subjected to an unusual or lingering death, in violation of the Fourteenth Amendment's Equal Protection Clause."   (Doc. 97 at 53.)    They allege that this "disparate treatment burdens a fundamental right."  (*Id.*, ¶ 189.)  The inmates also allege that each of them is a "class of one."  (*Id.*, ¶ 186.)

As the threshold matter, there is no "fundamental right" to burden here except the Eighth Amendment right to be free of cruel and unusual punishment.   The Eighth Amendment is adequate to measure and remedy their true rights.

The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).  "[T]he plaintiff in a 'class of one' case does not allege that the defendants discriminate against a *group* with whom she shares characteristics, but rather that the defendants simply harbor animus against her *in particular* and therefore treated her arbitrarily."  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008).   In *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 601 (2008), the Court narrowed the scope of "class of one" claims, recognizing that not all state actions resulting in disparate treatment raise equal protection concerns.

The inmates misapprehend the class-of-one doctrine under the Equal Protection Clause.   In *Towery* and *Lopez*, the Ninth Circuit specifically rejected equal protection claims in Arizona execution cases.   In *Towery*, the court found that the class-of-one doctrine does not apply to forms of state action which by their nature involve

discretionary decision-making.  672 F.3d at 660.  The court explained that "the existence of discretion, standing alone, cannot be an Equal Protection violation.  At the very least, there must be some respect in which the discretion is being exercised so that the complaining individual is being treated less favorably than others generally are."  *Id.* at 661.  "Treating one similarly situated prisoner differently from another with regard to punishment does not inherently impact the right to be free of cruel and unusual punishment."  *Id.* at 660; *see Lopez*, 680 F.3d at 1076.  The court noted that an equal protection violation could be demonstrated only if the plaintiffs "were able to show an actual pattern of treating prisoners differently in ways that did affect the *risk* of pain to which they would be subjected, and therefore the *risk* of being subjected to cruel and unusual punishment."  *Towery*, 672 F.3d at 660.

The inmates here do not allege a "pattern of generally exercising the discretion in a particular manner while treating one individual differently *and* detrimentally."  *Id.* at 660–61.  Instead, they allege the Department has engaged in a pattern, not of treating one inmate differently from others generally, but of treating all inmates differently from all others, or close to it.  Under the inmates' theory, no one is treated appropriately.  This is not a cognizable violation of the Equal Protection Clause.

The inmates have not stated a plausible equal protection claim.  Claim 8 is dismissed.


**IT IS THEREFORE ORDERED** that Defendants' motion to dismiss (Doc. 98) is granted with prejudice as to the following claims in Plaintiffs' Second Amended Complaint:

Claim 1 (in part): First Amendment right to know efficacy of midazolam.

Claim 2: Substantive due process claim against use of paralytic.

Claims 3 and 4: First Amendment claims to information about the execution.

Claim 5: First Amendment right of access to courts.

Claim 8: Class of one equal protection violation.

**IT IS FURTHER ORDERED** that Defendants' motion to dismiss (Doc. 98) is denied as to the following claims in Plaintiffs' Second Amended Complaint:

Claim 1 (in part): Eighth Amendment claim as to midazolam and paralytic.

Claim 6: Eighth Amendment claim for failure to follow protocol.

Claim 7: Procedural due process claim for failure to follow protocol.

**IT IS FURTHER ORDERED** that Plaintiff First Amendment Coalition of Arizona, Inc., is dismissed from this action with prejudice, as any amendment would be futile.

**IT IS FURTHER ORDERED** that Plaintiffs' unopposed request for judicial notice of the 1992 General Election Arizona Publicity Pamphlet (Doc. 100) is granted.

**IT IS FURTHER ORDERED:**

(1)  that Defendants shall file an answer to Plaintiffs' Second Amended Complaint no later than Friday, May 27, 2016.

(2)  that initial disclosures shall be served no later than Wednesday, June 8, 2016.

(3)  that the parties shall file a joint proposed Discovery Plan pursuant to Federal Rule of Civil Procedure 26(f) no later than Friday, June 24, 2016.

(4)  that a Scheduling Conference pursuant to Federal Rule of Civil Procedure 16 is set for Wednesday, June 29, 2016, at 1:30 p.m. in Courtroom 504, Sandra Day O'Connor U.S. Courthouse, 401 West Washington Street, Phoenix, Arizona 85003.

Dated this 18th day of May, 2016.

Neil V. Wake
United States District Judge